FILED

2019 Jul-22  PM 02:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **Robert Barton and Mindy Barton,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Case No. 2:17-cv-00618-TMP** |
| | * | |
| **Nationwide Mutual Fire Insurance** | * | |
| **Company, and Stacy Alliston** | * | |
| **Design and Building, Inc., et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## <u>DEFENDANT NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, INC'S MOTION FOR SUMMARY JUDGMENT</u>

### TABLE OF CONTENTS

INTRODUCTION………………………………………………….………………………..2

UNDISPUTED FACTS………………………………………………………………………...2

SUMMARY JUDGMENT STANDARD……………………………………………………...8

ARGUMENT…………………………………………………………………………………10

A.       Defective Work Not Covered…………………………………….……….…....11

B.        No Accident……………………………………………………………….…...11

C.       No Subcontractor Exception……………………………………………….……14

D.       Manifestation………………………………………………………………..……16

E.       Mold Exclusion…………………………………………………………..………17

F.       Intentional Conduct……………………………………………………………18

CONCLUSION………………………………………………………………………….20

COMES NOW, DEFENDANT, Nationwide Mutual Fire Insurance Co. ("Nationwide"),

and moves this Honorable Court to grant summary judgment because there is no issue of genuine

fact and Nationwide is entitled to judgment as a matter of law.

## I.    INTRODUCTION

This is a simple case.  The Bartons sued the builder of their home, Stacy Alliston Design & Building, Inc. ("SADB") for defective construction.  Because there was no coverage for the Bartons' claim against SADB, Nationwide withdrew its defense.  During the course of the underlying litigation, the Bartons moved for summary judgment.  SADB did not oppose the motion, and the Bartons took a default judgment in the amount of $900,000.00 against SADB, which by that time was no longer doing business.  The Bartons filed this action in an effort to collect the judgment from Nationwide.

Nationwide opposes the Bartons' efforts because there is no coverage for their claim.  A punch list created around the time the Bartons closed on the house describes the deficient work. Because defective construction is not an "occurrence" under Alabama law, the deficiencies are not covered under the Nationwide policy.

An expert from Crown Construction Consulting, LLC inspected the home on August 20, 2010 - a year and a half after the Nationwide policy was cancelled for non-payment.  His report details the existing problems the Bartons were experiencing at that time.  The only potentially resulting damage reported is from mold, which is specifically excluded from the policy.

Because defective work is not an "occurrence" under Alabama law, and the only possible resulting damages did not occur during the Nationwide policy, and are specifically excluded if they did, Nationwide is asking this Court to grant this Motion for Summary Judgment.

## II.    UNDISPUTED FACTS

1.    The Bartons entered into a contract with Stacy Alliston Design & Building, Inc. ("SADB") for the construction of a custom home to be built by SADB and located at 3949

Butler Springs Way, Hoover, Alabama 35226.  (Barton's underlying state court complaint, attached as Def.'s Exhibit 1, ¶12).

2.  The Bartons closed on the property on October 27, 2006.  (Def.'s Exhibit 2, Robert Barton Deposition, pg. 39)

3.  After moving in, the Bartons identified numerous deficiencies with the home and listed them on a punch list attached as Def.'s Exhibit 3; which were the only complaints made in writing to SADB.  (Def.'s Ex. 2, Robert Barton Deposition pg. 53:4-10; Def.'s Exhibit 4, Mindy Barton Deposition, pgs. 22:24-23:2).

4.  On August 20, 2010, the Bartons' home was inspected by David Bennett of Crown Construction Consulting.  (His report is attached as Def.'s Exhibit 5)  As a result of the home inspection, Mr. Bennett identified 34 deficient areas of construction.

5.  The punch list and the Crown report encapsulate all of the construction problems the Bartons were aware of as of January 4, 2012.  (Def.'s Ex.2, Robert Barton Deposition, pgs. 75:21-76:6).

6.  As a result of SADB's failure to correct the deficient items, the Bartons filed suit on January 19, 2011 in the Circuit Court of Jefferson County alleging the following Counts: Count I:  Negligence/Wantonness Construction; Count II Negligence/Wantonness Repair; and Count III:  Negligence/Wantonness Hiring/Revision/Training, amongst other allegations.  A copy of the complaint is attached as Def.'s Ex. 1, ¶s 21-42).

7.  On July 18, 2014, the Bartons filed for summary judgment against SADB.  A copy of the motion is attached as Def.'s Exhibit 6.

8.  SADB did not respond to the summary judgment and judgment was entered against it on November 12, 2014 in the amount of nine hundred thousand dollars ($900,000.00).

3

A copy of the order is attached as Def.'s Exhibit 7).

9.     SADB was insured under Nationwide Policy Number 77PR735296-3001.  The policy became effective on December 18, 2005 and was cancelled due to non-payment of premium on March 15, 2009.  A copy of the policy is attached as Def.'s Exhibit. 8.

10.     The Nationwide Policy contains the following relevant policy provisions:

**COMMERICAL GENERAL LIABILITY COVERAGE PART**

A.     Paragraph 1.b. under **COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY in SECTION I – COVERAGES** is replaced by the following:

b.   This insurance applies to "bodily injury" and "property damage" only if:

(1)  The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2)  The "bodily injury" or "property damage" first "manifests" during the policy period.

C.     The following definition is added to **SECTION V – DEFINITIONS**:

"Manifests" means that the damage or injury is either:

a.   Discovered by the insured or some other person; or

b.   Reasonably should be discovered by the insured or some other person.

D.     The following exclusion is added to paragraph 2., **Exclusions** of **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages)**:

This insurance does not apply to "Bodily injury" and "property damage" which "manifests" prior to the inception of this policy or after termination of this policy.

**2. Exclusions**
This insurance does not apply to:

**a.     Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.

**k.**     "Property damage" to "your product" arising out of it or any part of it.

Endorsement: Exclusion – Damage to Work Performed by Subcontractors On Your Behalf

Exclusion l of **Section 1 – Coverage A – Bodily Injury and Property Damage Liability** is replaced by the following:

2.     **Exclusions**
       This insurance does not apply to:
       l.     **Damage to Your Work**
              "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

[Endorsement, CG 22 94 10 01]

**This endorsement modifies insurance provided under the following:**

**COMMERCIAL   GENERAL   LIABILITY   COVERAGE PART**

A.     The following exclusion is added to Paragraph **2., Exclusions** of **Section 1 – Coverage A – Bodily Injury and Property Damage Liability**.

       **2.     Exclusions**

              This insurance does not apply to:

              **Fungi or Bacteria**

              a.     "Bodily injury' or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, absorption of, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its

contents, regardless of whether any other cause, event, maternal or product contributed concurrently or in any sequence to such injury or damage.

b.     Any loss, cost or expenses arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or "bacterial", by any insured or by anyone other person or entity.

\* \* \*

C.     The following definition is added to the **Definitions** Section:

"Fungi" means any type or form of fungus, including mold or mildew, and any spores, mycotoxins scents or produced or released by fungi.

[Fungi or Bacterial Exclusion Endorsement]
     **Definitions.**

3.   "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. "Property damage" means:

a.   Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.   Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

21.  "Your product":

    a.  Means

       (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

          (a) You;

          (b) Others trading under your name; or

          (c) A person or organization whose business or assets you have acquired; and

       (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b.  Includes:

       (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

       (2) The providing of or failure to provide warnings or instructions.

22.    "Your work":

    a.  Means:

       (1) Work or operations performed by you or on yor behalf; and

       (2) Materials, parts or equipment furnished in connection with such work or operations.

    b.  Includes:

       (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

       (2) The providing of or failure to provide warnings or instructions.

### III.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *King v. Archer*, 2018 WL 4257934, at *2 (N.D. Ala. Sept. 6, 2018).   *See* Fed.R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things:  whether any genuine issues of material fact exist, and whether the moving party is entitled to judgment as a matter of law. *King,* at *2  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.,* at *2, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The Court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the non-moving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In other words, the Bartons must show by substantial evidence that their claim is covered by the SADB's policy with Nationwide.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.* teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, at 252. "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' " *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

In a declaratory judgment action, Alabama law places on the insured the burden of establishing that a claim falls within the coverage of the policy, while the insurer bears the burden to prove that any policy exclusion applies. *Owners Ins. Co. v. Shep Jones Const., Inc.,*

2012 WL 1642169, at *3 (N.D.Ala. May 3, 2012) (citing *Chandler v. Ala. Mun. Ins. Co.,* 585 So.2d 1365, 1367 (Ala.1991)).   The burden is also on the party seeking coverage to prove that coverage existed within the terms of the policy.   *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Snider*, 996 F. Supp. 2d 1173, 1180 (M.D. Ala. 2014), *aff'd.* 607 F. App'x 879 (11th Cir. 2015), (quoting *Ala. Hosp. Ass'n Trust v. MASA,* 538 So.2d 1209, 1216 (Ala.1989)).   The Bartons cannot show by substantial evidence of an "occurrence" during the policy period of a covered claim. Therefore, Nationwide's Motion for Summary Judgment should be granted.

Because Nationwide does *not* bear the ultimate burden of proving policy coverage at trial, it can succeed here either by (1) showing an absence of evidence in the defendants' case on this issue, or (2) providing affirmative evidence demonstrating that the defendants will be unable to prove their case at trial.   *Employers Mut. Cas. Co. v. Smith Const. & Dev., LLC*, 949 F. Supp. 2d 1159, 1168 (N.D. Ala. 2013) *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). In this case, Nationwide can show that there was no occurrence, and the resulting mold damages are excluded.

## IV.   <u>ARGUMENT</u>

### A.   Defective Work Not Covered

In Alabama, claims for faulty workmanship such as those the Bartons made against SADB are not an "occurrence."   *Town & Country Property, LLC v. Amerisure Insurance Company*, 111 So. 3d 699, 706 (Ala. 2011).   In that opinion, the Alabama Supreme Court succinctly explained the law in Alabama:

…[W]e may conclude that faulty workmanship itself is not an occurrence but that faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to "continuous or repeated exposure" to some other "general harmful condition" (e.g., the rain in *Moss*) and, as a result of that exposure, personal property or other parts of the structure are damaged. *Town & Country* at, 706.

The Alabama Supreme Court solidified its position that defective work is not an "occurrence" under a CGL with its opinion in *Owner's Insurance Company v. Jim Car Homebuilders, LLC*, 157 So.3rd 148 (Ala. 2014). In *Jim Carr Homebuilder*, at 155-156, the Alabama Supreme Court explained:

…we think it prudent to restate that principle in more precise terms—faulty workmanship itself is not "property damage" "caused by" or "arising out of" an "occurrence." See also *Shane Traylor Cabinetmaker, L.L.C. v. American Res. Ins. Co.*, 126 So.3d 163, 172 (Ala.2013) (Murdock, J., concurring specially) ("I would state the rule as follows: 'faulty workmanship itself' is not 'property damage' 'caused by' or 'arising out of' an 'occurrence.' That is, the fact that the cost of repairing or replacing faulty workmanship itself is not the intended object of the insurance policy does not necessarily mean that, in an appropriate case, additional damage to a contractor's work resulting from faulty workmanship might not properly be considered 'property damage' 'caused by' or 'arising out of' an 'occurrence.' "). In sum, the cost of repairing or replacing faulty workmanship is not the intended object of a CGL policy issued to a builder or contractor. Accordingly, we conclude that the definition of the term "occurrence" does not itself exclude from coverage the property damage alleged in this case.

In other words, SADB's defective work is not covered under the Nationwide policy. Rather, only resulting damages to something other than SADB's work would trigger coverage. In this case, the entire punch list describes nothing but defective work and is devoid of any resulting damages. Likewise, the Crown report is equally without resulting damages - with the exception of mold, which is specifically excluded under the policy. Therefore, Nationwide is entitled to summary judgment.

## B.    No Accident

An "occurrence" that would create any obligation for Nationwide requires an accident. The Alabama Supreme Court dealt with this issue in *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1011 (Ala. 2005). In *Hartford*, the Court explained that "The term "accident" is not defined in the policy, but it is a commonly used word in the legal profession." In *St. Paul Fire & Marine Insurance. Co. v. Christiansen Marine, Inc*., 893 So.2d 1124, 1136 (Ala.2004), the Court applied the following definition of "accident" found in Black's

Law Dictionary 15 (7th ed. 1999): "An unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could be reasonably anticipated."  In *United States Fidelity & Guaranty Co. v. Bonitz Insulation Co. of Alabama*, 424 So.2d 569, 572 (Ala.1982), the Alabama Supreme Court, citing E*mployers Insurance Co. of Alabama v. Rives*, 264 Ala. 310, 87 So.2d 653 (1955), stated: "The term 'accident' has ... been variously defined as something unforeseen, unexpected, or unusual."   In their Motion for Summary Judgment, the Bartons alleged that SADB knowingly failed to follow building codes and (Def.'s Ex. 6, pg. 8) that proximately caused the defective construction. (Def.'s Ex. 6, pg. 9)[1]

In this case, the report created by Crown Construction on August 20, 2010[2] lists 34 specific defects at the Bartons' residence.  (Def's Ex. 5)  Nearly every single one is a defect itself, and not the *resulting damage* from defective construction.  In addition, all of the items on the punch list are also limited to defective work.  See Def.'s Ex. 3.  As the Alabama Supreme Court noted in  *Town & Country Prop., L.L.C.,* at 707 (Ala. 2011), "a CGL policy is intended " 'to protect an insured from bearing financial responsibility for unexpected and accidental damage to people or property' " while a performance bond is intended " 'to insure the contractor against claims for the cost of repair or replacement of faulty work.' " *Essex Ins. Co. v. Holder,* 372 Ark. 535, 539, 261 S.W.3d 456, 459 (2007) (quoting *Nabholz Constr. Corp. v. St. Paul Fire & Marine Ins. Co.,* 354 F.Supp.2d 917, 923 (E.D.Ark.2005)).  In other words, a performance bond protects against poor construction, while an insurance policy protects against an accident, such as a board

---

[1] The Bartons argued in their Motion for Summary Judgment that "In this case it is undisputed that the damages to Plaintiffs' home were primarily caused by Defendant Alliston Design's failure to adhere to building codes and supervise its subcontractors, resulting in deficient work." Def.'s Ex.6, pg. 8.

[2] The Crown report identified problems that existed August 20, 2010, a year and a half *after* the Nationwide policy was cancelled on March 15, 2009. (See Barton's Interrogatory Response # 4, attached as Def.'s Exhibit. 9). Regardless, Mr. Bennett inspected the house and "documented damage."  Therefore, the report represents the condition of the house as it existed on August 20, 2010.

falling and hitting something.  Therefore, the damages to the Bartons' residence would not be covered under SADB's Nationwide policy because defective work is not an "occurrence."

As a more recent case noted, "Where the alleged damage is the faulty workmanship itself, there is no occurrence.", 2016 WL 527075, at *7 (S.D. Ala. Feb. 9, 2016) *Employers Mut. Cas. Co. v. Kenny Hayes Custom Homes, LLC.,* citing *Town & Country Prop., L.L.C. v. Amerisure Ins. Co.,* 111 So.3d 699, 706 (Ala. 2011) (citing *United States Fid. & Guar. Co. v. Warwick Dev. Co.,* 446 So.2d 1021 (Ala. 1984).  See also  *Auto-Owners Ins. Co. v. Wier-Wright Enterprises, Inc,* 2017 WL 1019535, at *14 (N.D. Ala. Mar. 16, 2017) ("Under Alabama law, when a contractor performs faulty work, generally his conduct is not considered an accident").  *See Owners Ins. Co. v. Jim Carr Homebuilder, LLC*, 157 So.3d 148, 155 (Ala. 2014).  *When the contractor's faulty work creates a condition that in turn damages property, however*, the conduct is considered an accident under Alabama law.  *Id.* (emphasis original).  As the Court succinctly stated "faulty workmanship itself is not "property damage" "caused by" or "arising out of" "an occurrence"."  *Jim Carr Home Builders*, at 155.  The punch list and Crown report are simply a litany of defects, and do not document resulting damages that are covered under the policy. Therefore, Nationwide is entitled to summary judgment.

The Alabama Supreme Court previously has considered, under similar circumstances and virtually identical policy language, whether claims arising out of the allegedly defective construction of a home constitute a covered "occurrence."  *Nationwide Mut. Ins. Co. v. Gibson,* 2009 WL 10687856, at *10 (N.D. Ala. Sept. 1, 2009).  The District Court in *Nationwide* noted that "In *United States Fidelity v. Guar. Co. v. Warwick Development Co., Inc.*, 446 So.2d 1021 (Ala. 1984), the Alabama Supreme Court held that the "faulty workmanship" and use of "noncomplying materials" in the construction of a home was not an "accident," and thus did not

constitute an "occurrence," as defined almost identically to the one in this Policy. *Nationwide at *10*, citing *Warwick*, 446 So.2d at 1022–23. "Accordingly, the Court found that the insurer had properly denied the insured home contractor a defense and indemnification against the home purchasers' claims for damage to their home based upon numerous "defects throughout the structure." *Id.,* at *10. Likewise, this Nationwide policy, with identical language and identical issues does not provide coverage for the defective work on the Bartons' home because there was no occurrence. Therefore, Nationwide is entitled to summary judgment.

## C.    No Subcontractor Exception

The rule that resulting damages can be covered even though the defective work itself is not an "occurrence" is based on the "subcontractor exception" to the "your work" exclusion. See *Town & Country Prop., L.L.C. v. Amerisure Ins. Co.*, 111 So. 3d 699, 705 (Ala. 2011) ("In practical effect, the your-work exclusion and the subcontractor exception operate to exclude coverage for property damage caused by work performed by the insured contractor on his own behalf but to restore coverage for property damage caused by work performed by a subcontractor on behalf of the insured contractor.").

In this case, the "subcontractor exception" to SADB's policy with Nationwide was removed by endorsement. A copy of the individual endorsement is attached as Def.'s Exhibit 10. The removal of the "subcontractor exception" has the practical effect of making the entire home SADB's "work". Therefore, even resulting damages to the Barton's house from defective work would not be an "occurrence" under the policy at issue. See *J.B.D. Const., Inc. v. Mid-Continent Cas. Co.,* 571 F. App'x 918, 925 (11th Cir. 2014), where the Eleventh Circuit held that "By eliminating the subcontractor's exception, the MCC Policy no longer covered any claims for damage to J.B.D.'s 'work'".

In *J.B.D.,* the insured general contractor used multiple subcontractors to build a fitness center. *J.B.D.,* at 919.  After completion, the owner noticed damage caused by water leaks in the fitness center's roof, windows, and doors. *Id.,* at 919-920.  Therefore, the Court noted, under the standard policy the resulting damages would be covered because of the "subcontractor exception" to the "your work" exclusion.  ("As originally written, therefore, the MCC Policy covered claims for damage to J.B.D.'s "work" arising from the faulty construction of J.B.D.'s subcontractors.")  *Id*., at 925.  "However, this exception was eliminated by Endorsement CG 22 94 101 01." *Id.* "By eliminating the subcontractor's exception, the MCC Policy no longer covered any claims for damage to J.B.D.'s "work" arising from work performed by J.B.D.'s subcontractors." *Id.*

The Eleventh Circuit affirmed the District Court's finding of no coverage and stated:

Because J.B.D. undertook the construction of the entire fitness center, we agree with the district court's finding that J.B.D.'s "work," for the purpose of applying the "your work" exclusion, included "construction of the health center building with related and appurtenant improvements to an existing structure."  Therefore, the "your work" exclusion, absent the subcontractor's exception, bars coverage for damages to the completed fitness center or its components (J.B.D.'s "work") arising from J.B.D. or its subcontractor's defective construction. *See e.g., Amerisure Mut. Ins. Co. v. Auchter Co.*, 673 F.3d 1294, 1310 (11th Cir. 2012) (explaining that the "your work" exclusion, absent a subcontractor's exception, would eliminate a contractor's coverage for damage to a completed project where a subcontractor's faulty workmanship on one part of the project caused damage to another part of the project). *Id.*

In this case, the "subcontractor's exception" was removed from the "your work" exclusion by endorsement.  See Def.'s Ex. 10.  The change in the policy made the entire Barton's home part of SADB's "work" and excluded any damage to the "work" from coverage.  Thus, even resulting damages would not be covered under the policy.  Therefore, Nationwide is entitled to summary judgment.

**D.     Manifestation**

The Bartons must not only prove that their claim was an "occurrence", but that it was discovered during the Nationwide policy period.   Def.'s Ex. 8, Alabama has followed the "manifestation trigger" rule for over 30 years to determine when an occurrence is deemed to have happened.   As the Alabama Supreme Court explained in *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co*., 851 So. 2d 466, 481 (Ala. 2002), "This Court has stated that 'as a general rule the time of an "occurrence" of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time the complaining party was actually damaged.'  Citing *Warwick Development Co.,* at 1024.

In *Cincinnati Ins. Co. v. Amerisure Ins. Co.*. 2012 WL 4033724, at *9 (S.D. Ala. Sept. 12, 2012), the federal district court explained how Alabama law decides the time of an occurrence for determining insurance coverage issues:

Alabama law is clear that, in determining the timing of an "occurrence" for insurance coverage purposes, the relevant inquiry is when the property damage took place, not when the underlying work was performed.   *See U.S. Fidelity & Guar. Co. v. Warwick Development Co.,* 446 So.2d 1021, 1024 (Ala.1984) ("A majority of courts have held that in order to have liability under the terms of such a policy the 'occurrence' must arise during the       policy period, for it is the insurance that is in force at the time of the       property damage that is applicable rather than insurance that was in force when the work was performed.") (citations omitted). Simply put, "as a   general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy *is not the time the wrongful act was committed but the time the complaining party was actually damaged.*" (emphasis original), *Warwick,* 446 So.2d at 1024 (citations omitted).   This rule (which is sometimes labeled in the literature as a manifestation theory for triggering coverage) is firmly entrenched in Alabama jurisprudence. *See Alabama Plating Co. v. U.S. Fidelity and Guar. Co.,* 690 So.2d 331, 334 n. 1 (Ala.1996) ("Under the rule of ... *Warwick* ..., the time of the 'occurrences' under the liability insurance policies at issue is the time the property was actually injured").

Alabama law is clear that, in determining the timing of an "occurrence" for insurance coverage purposes, the relevant inquiry is when the property damage took place, not when the underlying work was performed. *See Warwick,* at 1024, ("A majority of courts have held that in

order to have liability under the terms of such a policy the 'occurrence' must arise during the policy period, for it is the insurance that is in force at the time of the property damage that is applicable rather than insurance that was in force when the work was performed.")  Simply put, "as a general rule the time of an 'occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time the complaining party was actually damaged." *Warwick,* 446 So.2d at 1024.  Because the Bartons cannot prove that any resulting damages occurred during the Nationwide policy period, there is not coverage for their claim and Nationwide is entitled to summary judgment[3].

## E.    Mold Exclusion

The Nationwide policy specifically excludes damages related to mold.  Def.'s Exhibit 11. In *Nationwide Mut. Ins. Co. v. Thomas,* 103 So.3d 795, 805 (Ala.2012) the Court granted summary judgement for the insurance company based on an identical exclusion.   Although exclusions are interpreted narrowly, the Alabama Supreme Court explained: "However, where there is no ambiguity in the terms of an insurance policy, the court must enforce the policy language "as written" and "cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties."  *USF Ins. Co. v. Metcalf Realty,* 2013 WL 4679833, at *5, (N.D. Ala. Aug. 30, 2013).   Likewise, in this case, the *only* potential resulting damages (mold) to the Bartons' house are specifically excluded by the Nationwide

---

[3] The Bartons named Richard LaFramboise as a causation expert, and stated that "His opinions are based on his inspection of the home, forty years of experience in the construction industry, over fifteen (15) years experience as a home inspector and he has conducted over 3000 home inspections."  Mr. LaFramboise's inspected the Bartons' residence in the latter part of 2012, more than three full years *after* the Nationwide policy was cancelled.  His report does not establish *when* any of the defects existed.  Therefore, the punch list, and to a much lesser extent, the Crown report, give a more accurate picture of the condition of the house while SADB's policy was in effect.

policy[4].  (Def.'s Ex. 5, Crown report, pg. 2, photo# 3; pg. 18, photo #33; Def.'s Ex. 2, Robert Barton Deposition, pg. 60:9-22; Def.'s Ex. 4, Mindy Barton Deposition, pg. 60:3-6).

In *Nationwide Mut. Fire Ins. Co. v. Hopper*, 2007 WL 9712063, at *9 (N.D. Ala. Mar. 20, 2007), the District Court stated, "Additionally, insurers generally have the right to limit their liability by writing policies with narrow coverage." Citing *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Center*, 595 So. 2d 1375, 1377 (Ala. 1992).  The Court went on to explain that "[I]insurance companies are entitled to have their policy contracts enforced as written ..." *Hopper,* at *9, citing (*Gregory v. Western World Ins. Co.*, 481 So. 2d 878, 881 (Ala. 1985)) with the provisions of an insurance policy being given their ordinary, common meaning (*Allstate Ins. Co. v. Sellers–Bok*, 942 F. Supp. 1428 (M.D. Ala. 1996)).  See also *Singh v. State Farm Fire & Cas. Co.*, 2017 WL 3425521, at *1 (N.D. Ala. Aug. 9, 2017), where the District Court granted summary judgment for the carrier based on the "mold exclusion."

In sum, the Crown report cites two instances of resulting damage – mold. (see Def.'s Ex. 5, pg. 2 and pg. 18).  Not only is it excluded by the "your work" exclusion, to remove any doubt it is specifically excluded under the policy's mold exclusion.  Therefore, Nationwide is entitled to summary judgment.

## F.     Intentional Conduct

Significantly, the summary judgment in favor of the Bartons is based on negligent *and* intentional conduct by SADB[5].  In their Motion for Summary Judgment, the Bartons argued that SADB knowingly built the home to the applicable code standards.  Specifically, the Bartons argued:

---

[4] Nationwide does not concede that the Bartons have proof that the mold damage occurred during the Nationwide policy period.  However, even if it did, it would be excluded by the unambiguous language of the policy with the "your work" exclusion and the "mold" exclusion.

[5] In their motion for summary judgment against SADB, the Bartons allege negligent and wanton construction, repair and supervision. (Def.'s Ex. 6, ¶7).

Furthermore, Defendant Alliston Design's knowing failure to construct Plaintiffs' home to applicable code standards constitutes wantonness under Alabama law. Wantonness is defined as the "conscious doing of some act or the omission of some duty while knowing that such act or omission of such duty will result in injury." *Thermal Components v. Golden*, 716 So. 2d 1166, 1169 (Ala. 1998).  Alliston Design <u>knew it was not following applicable building codes</u>, and therefore **<u>knew that damages were likely to result</u>**.  Based on the uncontroverted evidence that Defendant breached its duties of care owed to Plaintiffs, Plaintiffs' Motion for Summary Judgment as to the negligent and wanton construction and supervision claims are due to be granted.  (emphasis added) Def.'s Ex. 6, pg. 8.

The Bartons went on to argue that "In this case it is undisputed that the damages to Plaintiffs' home were primarily caused by Defendant Alliston Design's failure to adhere to building codes and supervise its subcontractors, resulting in deficient work." (Def.'s Ex. 6, pg. 9).  In other words, the damages were caused by intentional conduct which is not an "accident" and is excluded under the policy (Def.'s Ex. 8, § 2.a).  "Alabama has established that intentional torts will always be barred from coverage under policy provisions limiting coverage to injuries not "intended or expected" by the insured.  See *Tapscott v. Allstate Ins. Co*., 526 So.2d 570, 573–75 (Ala.1988); *Ladner & Co., Inc. v. Southern Guaranty Ins. Co*., 347 So.2d 100, 103–04 (Ala.1977).

In *Thorn v. Am. States Ins. Co.,* 266 F. Supp. 2d 1346, 1350 (M.D. Ala. 2002),*aff'd,* 66 F. App'x 846 (11th Cir. 2003), the District Court stated:  "The Alabama Supreme Court has held that an objective standard must be used in determining whether the allegations of a complaint fall under an insurance policy's exclusion of coverage for bodily injury or property damage which is the result of willful and malicious acts of the insured."  Citing *State Farm Fire & Cas. Co. v. Davis,* 612 So.2d 458, 465 (Ala.1993).  The Court went on to explain that, "Thus, the acts of the insured, rather than his or her subjective intent to cause injury (or lack of such intent), determine whether a policy exclusion for intentional conduct applies.  *Thorn,* at 1350, citing *McCauley v. Estes,* 726 So.2d 719, 722 (Ala.Civ.App.1998).  Therefore, the Court granted summary judgment for the carrier finding that the intentional conduct was excluded under the policy.  *Id*., at 1350.

Likewise, the Bartons obtained a judgment against SADB based on allegations of intentional conduct.   No dispute exists as to whether the conduct was intentional because the Bartons themselves plead in their motion that the conduct was intentional, telling the Court, "Alliston Design knew it was not following applicable building codes, and therefore knew that damages were likely to result."   Def.'s Ex. 6 pg. 8.   This is exactly the type of intentional conduct excluded under the policy.   In addition, it further proves that there was no "occurrence" because there was no "accident."   Therefore, no coverage exists for their claims, making summary judgment proper.

### IV.   <u>CONCLUSION</u>

In conclusion, this is a simple case.   First, defective work is not an "occurrence" under Alabama law.   The punch list and the Crown report demonstrate that all of the damages complained of are defective work and not resulting damages.

Second, the "subcontractor exception" to the "your work" exclusion in the policy was removed by endorsement, making the entire Barton's home SADB's "work".   Therefore, to the extent there are any resulting damages, they would not be covered under the Nationwide policy because they are damage to SADB's "work" which is excluded.

Third, even if the mold damage is not excluded by the "your work" exclusion, a specific exclusion for fungi and mold dictates that it would not be covered.

Fourth, the Bartons' Motion for Summary Judgment makes it clear that they were complaining of wanton conduct because SADB ignored relevant building codes knowing that damages were likely.   Such conduct is not an "accident" and it is specifically excluded under the policy.

Finally, the Bartons cannot show that any of the damages occurred during the Nationwide policy period.   Therefore, no coverage exists for the Barton's judgment against SADB and Nationwide is entitled to summary judgment.

Respectfully submitted,

s/Kile T. Turner
Kile T. Turner (ASB-8182-U83K)
Attorney for Nationwide Mutual Fire Insurance Company
Norman, Wood, Kendrick & Turner
1130 22nd Street South; Suite 3000
Birmingham, Alabama  35205
Phone: (205) 328-6643
Fax:  (205) 251-5479
Email:  kturner@nwkt.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of July, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

H. Arthur Edge, III, Esq.
Arthur Edge, III, P.C.
2320 Highland Avenue South
Suite 175
Birmingham, AL  35205

s/ Kile T. Turner
Of Counsel

EXHIBIT 1

ELECTRONICALLY FILED
1/19/2011 11:02 AM
CV-2011-900187.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | |
|---|---|
| ROBERT BARTON; and <br> MINDY BARTON; <br><br>     Plaintiffs, <br><br> v. <br><br> STACY ALLISTON DESIGN AND <br> BUILDING, INC.; <br> and Fictitious Defendants A - D, <br> whether singular or plural, being that person, <br> firm, corporation or other entity who <br> or which negligently or wantonly <br> manufactured defective building <br> materials or components incorporated <br> into the construction of Plaintiffs' <br> home made the basis of this <br> lawsuit who or which is liable to Plaintiffs <br> by virtue of the provisions of the Alabama <br> Extended Manufacturers' Liability <br> Doctrine ("AEMLD"); Fictitious <br> Defendants E - H, whether singular or <br> plural, being that person, firm, <br> corporation, or other entity who or which <br> negligently or wantonly installed building <br> materials or components incorporated <br> into the construction of Plaintiffs' <br> home made the basis of this lawsuit; <br> Fictitious Defendants I - L, whether <br> singular or plural, being that person, <br> firm, corporation or other entity who <br> or which supervised the individuals <br> or entities who or which improperly <br> installed building materials or <br> components incorporated into the <br> construction of Plaintiffs' home <br> made the basis of this lawsuit; Fictitious <br> Defendants M - P, whether singular or <br> plural, being that person, firm, <br> corporation or other entity who or which <br> negligently or wantonly made repairs to | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br><br>    CIVIL ACTION NUMBER: <br><br><br><br><br><br>    JURY TRIAL DEMANDED |

1

Plaintiffs' home made the basis of                    )
this lawsuit; Fictitious Defendants Q -T,              )
whether singular or plural, being that                 )
person, firm, corporation or other entity              )
who or which negligently or wantonly                   )
designed, evaluated or prepared the site               )
of Plaintiffs' home made the basis                     )
of this lawsuit for construction; and                  )
Fictitious Defendants U - Z, whether                   )
singular or plural, being that person,                 )
firm, corporation or other entity who                  )
or which negligently or wantonly                       )
participated in the construction of,                   )
and construction services relating to,                 )
Plaintiffs' home made the basis of this lawsuit.       )
Plaintiffs currently do not have information           )
confirming the identities of the                       )
fictitious Defendants referenced herein                )
who are otherwise unknown to Plaintiffs at             )
this time and Plaintiffs will substitute by            )
amendment the correct names of the                     )
fictitious Defendants if and when their                )
identities are ascertained,                            )
                                                       )
        **Defendants.**                                )

---

# COMPLAINT

---

## I. PARTIES

1.      Plaintiff Robert Barton is a resident citizen of Jefferson County, Alabama aged nineteen (19) years or older.

2.      Plaintiff Mindy Barton is a resident citizen of Jefferson County, Alabama aged nineteen (19) years or older.

3.      Plaintiffs Robert Barton and Mindy Barton are the first owners of a home situated in Jefferson County, Alabama located at 3949 Butler Springs Way, Hoover, Alabama 35226.  Plaintiffs

closed on the purchase of their home in February, 2009.

      4.    Defendant Stacy Alliston Design and Building, Inc. is a domestic corporation licensed to do and doing business in Jefferson County, Alabama at all times material hereto.  Defendant Stacy Allison Design and Building, Inc. constructed Plaintiffs' home.

      5.    Fictitious Defendants A - D, whether singular or plural, is that person, firm, corporation or other entity who or which negligently or wantonly manufactured defective building materials or components incorporated into the construction of Plaintiffs' home made the basis of this lawsuit who or which is liable to Plaintiffs by virtue of the provisions of the Alabama Extended Manufacturers' Liability Doctrine ("AEMLD").  Plaintiffs currently do not have information sufficient to identify the fictitious Defendant(s) referenced in this paragraph but will substitute the correct identity of this Defendant(s) by amendment when ascertained.

      6.    Fictitious Defendants E - H, whether singular or plural, is that person, firm, corporation or other entity who or which negligently or wantonly installed building materials or components incorporated into the construction of Plaintiffs' home made the basis of this lawsuit.  Plaintiffs currently do not have information sufficient to identify the fictitious Defendant(s) referenced in this paragraph but will substitute the correct identity of this Defendant(s) by amendment when ascertained.

      7.    Fictitious Defendants I - L, whether singular or plural, is that person, firm, corporation or other entity who or which supervised the individuals or entities who or which improperly installed building materials or components incorporated into the construction of Plaintiffs' home made the basis of this lawsuit.  Plaintiffs currently do not have information sufficient to identify the fictitious Defendant(s) referenced in this paragraph but will substitute the

3

correct identity of this Defendant(s) by amendment when ascertained.

8.     Fictitious Defendants M - P, whether singular or plural, is that person, firm, corporation or other entity who or which negligently or wantonly made repairs to Plaintiffs' home made the basis of this lawsuit.  Plaintiffs currently do not have information sufficient to identify the fictitious Defendant(s) referenced in this paragraph but will substitute the correct identity of this Defendant(s) by amendment when ascertained.

9.     Fictitious Defendants Q - T, whether singular or plural, is that person, firm, corporation or other entity who or which negligently or wantonly designed, evaluated or prepared the site of Plaintiffs' home made the basis of this lawsuit.  Plaintiffs currently do not have information sufficient to identify the fictitious Defendant(s) referenced in this paragraph but will substitute the correct identity of this Defendant(s) by amendment when ascertained.

10.    Fictitious Defendants U - Z, whether singular or plural, is that person, firm, corporation or other entity who or which negligently or wantonly participated in the construction of Plaintiffs' home or otherwise provided construction services relating to Plaintiffs' home made the basis of this lawsuit.  Plaintiffs currently do not have information sufficient to identify the fictitious Defendant(s) referenced in this paragraph but will substitute the correct identity of this Defendant(s) by amendment when ascertained.

## II. JURISDICTION

11.    This Court has jurisdiction over this action as the minimum amount in controversy is present.  Venue is proper in this Court pursuant to Ala. Code § 6-3-5 (1975) and Alabama Rule of Civil Procedure 82(c).

DOCUMENT 1

### III. STATEMENT OF FACTS

12.    Plaintiffs entered into a contract with Defendants in for the construction of a custom home  to be constructed by Defendants and located at 3949 Butler Springs Way, Hoover, Alabama 35226.

13.    During construction, Plaintiffs had problems working with Defendant Stacy Alliston, as work was not being performed on time, Defendant would not show up to the job site, and Plaintiffs had to incur additional expenses when the home was not completed on time.

14.    After Plaintiffs moved into their home, they began noticing issues with the home.

15.    Plaintiffs contacted Defendant Stacy Alliston Design and Building, Inc. to correct the defects and problems with their home.

16.    Defendant Stacy Alliston Design and Building, Inc. corrected an issue with a window in Plaintiffs' home, and continually reassured Plaintiffs that all other issues with the home would be corrected.

17.    Plaintiffs continued to experience problems with their home and attempted to work with Defendant Stacy Alliston Design and Building, Inc. but to do the issues with the home have not been corrected.

18.    Plaintiffs became concerned over the defects and problems with their home and hired a third party inspector to inspect the home.

19.    The inspector identified numerous construction defects and violations of the applicable building code and residential construction industry standards which have resulted in damage to Plaintiffs' home.  Those defects, deficiencies and damages include, but are not limited to, the following: roof framing is improper, roofing installed incorrectly, moisture barrier was not

installed properly, doors were not aligned properly, Palladian window at entrance way has leaked and caused damage to the surrounding drywall, windows do not seal properly, improper installion of brick veneer as weep holes were not evident in the brick veneer and through wall flashing was not installed, brick rowlocks do not have minimum slope, dissimilar materials not sealed properly, front retaining wall does not have proper drainage,

20.     As a proximate result of Defendants' actions, Plaintiffs have suffered the following damages:

a.     The difference between the market value of the home had it been constructed correctly and the present market value of the home as it exists in its damaged condition;

b.     Consequential damages for the cost of repairs to the structure of the home; and

c.     Physical injury, mental anguish and emotional distress.

## IV. CAUSES OF ACTIONS

### COUNT ONE - NEGLIGENCE/WANTONNESS: CONSTRUCTION

21.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

22.     Defendants had a duty to prepare Plaintiffs' lot and construct Plaintiffs' home in accordance with all applicable building codes and standards of the construction industry so as to minimize the damages associated with the known inherent risks of residential construction.

23.     Defendants breached their duty.

24.     Defendants' breach of their duty was both reckless and wanton.

6

25.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

26.     Defendants had a duty to utilize and properly install adequate materials for all components of Plaintiffs' home.

27.     Defendants breached their duty to utilize and properly install adequate materials for all components of Plaintiffs' home.

28.     Defendants' breach of their duty to utilize and properly install adequate materials for all components of Plaintiffs' home was both reckless and wanton.

29.     As a direct and proximate result of Defendants' failure to utilize and properly install adequate materials for all components of Plaintiffs' home, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

30.     New and distinct damages caused by Defendants' negligence continue to occur and new damage will continue to occur for the foreseeable future.

## COUNT TWO - NEGLIGENCE/WANTONNESS: REPAIR

31.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

32.     Defendants had a duty to repair all deficiencies with Plaintiffs' home to conform to good and workmanlike building practices and all applicable building codes.

33.     Defendants breached their duty to repair all deficiencies with Plaintiffs' home to conform to good and workmanlike building practices and all applicable building codes.

34.     Defendants' breach of their duty to repair all deficiencies with Plaintiffs' home to conform to good and workmanlike building practices and all applicable building codes was both

7

reckless and wanton.

35.     As a direct and proximate result of Defendants' breach of their duty to repair all deficiencies with Plaintiffs' home to conform to good and workmanlike building practices and all applicable building codes, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

36.     New and distinct damages caused by Defendants' negligence continue to occur and new damage will continue to occur for the foreseeable future.

<strong>COUNT THREE - NEGLIGENCE/WANTONNESS:</strong>

<strong>HIRING/SUPERVISION/TRAINING</strong>

37.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

38.     Defendants had a duty to properly supervise all aspects of the construction for Plaintiffs' home including the original construction, as well as any repairs or work performed subsequent to closing.

39.     Defendants breached their duty to properly supervise, inspect, hire, train, instruct, or educate their employees or subcontractors in the proper construction and repair of Plaintiffs' home.

40.     Defendants' breach of their duty to properly supervise, inspect, hire, train, instruct, or educate their employees or subcontractors in the proper construction and repair of Plaintiffs' home was both reckless and wanton.

41.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

42.     New and distinct damages caused by Defendants' negligence continue to occur to this

8

date and new damage will continue to occur for the foreseeable future.

## COUNT FOUR - NEGLIGENCE/WANTONNESS

43.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

44.     Defendants had a duty.

45.     Defendants breached their duty.

46.     Defendants' breach of their duty was both reckless and wanton.

47.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

48.     New and distinct damages caused by Defendants' negligence continue to occur to this date and new damage will continue to occur for the foreseeable future.

## COUNT FIVE - FRAUDULENT MISREPRESENTATION AND/OR INNOCENT MISREPRESENTATION

49.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

50.     Defendants made material representations that included statements to Plaintiffs that the home was built correctly,  that the home would be built in accordance with the plans, the home would be finished on time, and that all issues identified with the home would be corrected

51.     The above described representations were false.

52.     Defendants intended for the above described representations to induce Plaintiffs to act in reliance thereon by agreeing to purchase their home and by allowing Defendants to perform repairs on the home.

53.     Defendants' misrepresentations were made either willfully to deceive, recklessly

9

without knowledge, or by mistake and innocently.

54.    Plaintiffs acted in reliance on Defendants' misrepresentations by purchasing their home and accepting repairs, which they would not have done had they known the truth.

55.    Plaintiffs' reliance was reasonable and justified based on the knowledge available to Plaintiffs and the circumstances at the time.

56.    As a proximate result of the above described misrepresentations made by Defendants, Plaintiffs have suffered direct and consequential damages as set forth in the above Statement of Facts.

## COUNT SIX - SUPPRESSION

57.    Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

58.    Defendants willfully, wantonly, fraudulently or recklessly suppressed material facts from Plaintiffs including, but not limited to, that their home was not built in compliance with the applicable building code and in a good and workmanlike manner in accordance with applicable residential construction industry standards.

59.    Defendants suppressed and concealed this information from Plaintiffs.

60.    Defendants had a duty to disclose to Plaintiffs the material facts set forth above under the circumstances.

61.    Defendants had superior knowledge of the facts and had a means of knowledge and expertise not shared by Plaintiffs and, therefore, Defendants had a duty to disclose to Plaintiffs the material facts set forth above.

62.    Defendants suppressed and concealed material facts from Plaintiffs in order to induce Plaintiffs to purchase the home and to induce Plaintiffs to allow Defendants to perform the repairs

10

to Plaintiffs' home.  Without knowledge of the foregoing material facts, Plaintiffs acted to their injury by purchasing the home and occupying it.

63.     As a proximate result of the above described suppression, Plaintiffs have suffered direct and consequential damages as set forth in the above Statement of Facts.

64.     The actions of Defendants constitute suppression of material facts pursuant to Ala. Code § 6-5-102 (1975).

## COUNT SEVEN - BREACH OF WARRANTIES

65.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

66.     By contract and operation of law, Defendants impliedly and expressly warranted Plaintiffs' home.

67.     Defendants breached the warranties to Plaintiffs by failing to construct, erect and complete Plaintiffs' home in a good and workmanlike manner with good and substantial materials, in accordance with the plans and specifications, applicable building code and applicable industry standards. Defendants also breached warranties by failing to perform complete repairs in accordance with all applicable codes, applicable industry standards and in a good and workmanlike manner.

68.     As a direct and proximate result of Defendants' breach, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

## COUNT EIGHT  - THIRD PARTY BENEFICIARY

69.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

70.     Fictitious Defendants "A" through "Z", entered into express subcontracts with

11

Defendant Stacy Alliston Design and Building, Inc., whereby Fictitious Defendants "A" through "Z" would perform work on the Plaintiffs' home. Plaintiffs were the intended beneficiaries of the subcontracts between Defendant Stacy Alliston Design and Building, Inc. and Fictitious Defendants "A" through "Z".

71.    Defendant knew that Plaintiffs would benefit from their contracts and that Plaintiffs could be harmed by any breach of the contracts by Defendants.

72.    Fictitious Defendants "A" through "Z" breached their subcontracts with Defendant Stacy Alliston Design and Building, Inc. by failing to carefully and properly perform their work in a good and workmanlike manner and therefore, Plaintiffs are entitled to damages as  third party beneficiaries because Plaintiffs suffered damages as a result of the breach.

73.    As a direct and proximate result of the actions of Defendant Stacy Alliston Design and Building, Inc. and Fictitious Defendants "A" through "Z", which combined and concurred to form the basis of this suit, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

## COUNT NINE - NUISANCE

74.    Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

75.    Defendants' acts and omissions in the construction of Plaintiffs' home have created a private nuisance by causing hurt, inconvenience or damage to Plaintiffs in that building materials used in the construction of Plaintiffs' home are harmful to humans and property to which they are exposed.

76.    As a direct and proximate result of Defendants' acts and omissions in the construction

of Plaintiffs' home, Plaintiffs have suffered direct and consequential damages as set forth in the above Statement of Facts.

77.    The actions of Defendants constitute a nuisance pursuant to Ala. Code § 6-5-120 (1975).

## COUNT TEN - BREACH OF CONTRACT

78.    Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

79.    Plaintiffs and Defendants agreed to perform certain obligations under the terms of a contract into which they entered.

80.    Plaintiffs agreed to pay Defendants a set sum for the construction of a home located at 3949 Butler Springs Way, Hoover, Alabama 35226.

81.    Defendants agreed to provide Plaintiffs with the home located at 3949 Butler Springs Way, Hoover, Alabama 35226 which was constructed in a good and workmanlike manner in accordance with all residential construction industry standards and applicable building codes.

82.    Plaintiffs have fulfilled their obligations to Defendants under the agreements.

83.    Defendants breached the agreements between itself and Plaintiffs by failing to construct the home in a good and workmanlike manner in accordance with all residential construction industry standards and applicable building codes.

84.    As a direct and proximate result of the breach of contract by Defendants, Plaintiffs have suffered damages as set forth in the above Statement of Facts.

## COUNT ELEVEN - DECEPTIVE TRADE PRACTICES

85.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

86.     Defendants' actions constitute violations of the Deceptive Trade Practices Act as defined in Ala. Code § 8-19-5 (1975).

87.     Plaintiffs provided Defendants with the required notice of their violations of Alabama's Deceptive Trade Practices Act and Defendant failed or refused to provide the requested relief.

88.     Plaintiffs demand judgment against Defendants in an amount equal to the funds improperly received by Defendants as the result of their deceptive acts plus interest, attorneys' fees, and costs of Court.

89.     The acts or omissions of named and fictitious Defendants combined and concurred to cause Plaintiffs' damages.

## COUNT TWELVE - DECEIT

90.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

91.     Plaintiffs specifically inquired to Defendants regarding problems with the Palladian window in the entrance way and the repair of the problems associated with the leaking window, and rectifying the issues that were identified in their punch lists and subsequent issues with the home.

92.     Defendants, through statements and actions of their agents, made numerous material representations, including but not limited to that they would correct all problems associated with the window and that all problems identified in the punch lists and the subsequent issues would be

14

corrected.

93.     The above described representations made by Defendants and their agents to Plaintiffs were known to be untrue and were willingly and knowingly or recklessly without regard to the truth made to conceal the severity of the deficiencies of the home from Plaintiffs after repeated inquiries by the Plaintiffs regarding the particular facts.

94.     Plaintiffs were deceived in that they did, without knowledge of the falsity of the representations, directly or indirectly, justifiably and reasonably acted upon the misrepresentations to their detriment.

95.     As a direct and proximate result of the above described deceit, Plaintiffs have suffered direct and consequential damages as set forth in the above Statement of Facts.

96.     The actions of Defendants constitute deceit pursuant to Alabama Code § 6-5-103 (1975).

## COUNT THIRTEEN - TOLLING OF THE STATUTE OF LIMITATION

97.     Plaintiffs reallege, as if fully set forth, each and every allegation contained in the preceding paragraphs, and further allege that:

98.     Until less than two (2) years ago, Plaintiffs were unaware of Defendants' patterns and practices of wrongdoing, and the schemes alleged above, and were lulled into a false sense of security about their home.  Defendants actively concealed their practices, schemes and wrongdoing, took steps to make it appear as if there was no wrongdoing, and engaged in other activities by reason of which the tolling of all applicable statutes of limitation is appropriate and required. *Rumford v. Valley Pest Control*, 629 So.2d623 (Ala. 1993).

WHEREFORE, Plaintiffs pray for judgment, joint and several, be entered against

15

DOCUMENT 2

Defendants, including fictitious Defendants, in an amount to be determined by the trier of fact, and

for further exemplary damages to the extent permitted by law.  Plaintiffs also demand the costs of

this action, attorneys' fees, expenses, and interest on the judgment as allowed by law.

Dated:   January 19, 2011.

**PLAINTIFFS DEMAND TRIAL BY A STRUCK JURY**

DOCUMENT 2

s/W. Brian Collins
W. Brian Collins (COL115)
Attorney for Plaintiffs


s/David L. Horsley
David L. Horsley (HOR052)
Attorney for Plaintiffs


**OF COUNSEL:**
COLLINS & HORSLEY, P.C.
2021 Morris Avenue, Suite 200
Birmingham, Alabama 35203
(205) 324-1834
(205) 324-1946 (fax)
E-mail:brian@collinshorsley.com
        david@collinshorsley.com


s/H. Arthur Edge, III
H. Arthur Edge, III (EDG003)
Attorney for Plaintiffs


**OF COUNSEL:**
H. ARTHUR EDGE, P.C.
2021 Morris Avenue, Suite 200
Birmingham, Alabama 35203
(205) 453-0323
(205) 453-0326 (fax)
E-mail:art@edgelawyers.com


17

DOCUMENT 2

**SERVE DEFENDANT AT:**

**STACY ALLISTON DESIGN AND BUILDING, INC.**
**1175 BERWITK ROAD**
**BIRMINGHAM, ALABAMA 35242**

18

EXHIBIT 2

A50B525
## ROBERT BARTON      JANUARY 4, 2012

```
1                    IN THE CIRCUIT COURT

2              OF JEFFERSON COUNTY, ALABAMA

3

4   ROBERT BARTON and

5   MINDY BARTON,

6        Plaintiffs,

7   v.                    CASE NUMBER: CV-11-900187

8   STACY ALLISTON DESIGN

9   and BUILDING, et al.,

10        Defendants.

11

12                    DEPOSITION OF:

13                    ROBERT BARTON

14                  2021 Morris Avenue

15                 Birmingham, Alabama

16                  January 4, 2012

17                    10:00 a.m.

18               ATKINSON-BAKER, INC.

19                  COURT REPORTERS

20       500 North Brand Boulevard, Third Floor

21             Glendale, California 91203

22                  (818) 551-7300

23

24   REPORTED BY:  KAREN KELLEY, CCR NO. 317

25             FILE NO.:  A50B525
```

Page 1

A50B525
ROBERT BARTON      JANUARY 4, 2012

| | |
|---|---|
| 1    S T I P U L A T I O N S | 1    EXAMINATION INDEX |
| 2    IT IS STIPULATED AND AGREED, by and between | 2  EXAMINATION               PAGE |
| 3  the parties through their respective counsel, that | 3    BY MR. POTTS              5 |
| 4  the deposition of: | 4 |
| 5        ROBERT BARTON | 5 |
| 6  may be taken before Karen Kelley, Notary Public, | 6 |
| 7  State at Large, at 2021 Morris Avenue, Birmingham, | 7        EXHIBIT INDEX |
| 8  Alabama on January 4, 2012 commencing at | 8  DEFENDANT'S EXHIBIT          MARKED |
| 9  approximately 10:00 a.m. | 9   1   Sales Contract        23 |
| 10    IT IS FURTHER STIPULATED AND AGREED that | 10  2   Addendum Sales Contract      23 |
| 11 the signature to and reading of the deposition by | 11  3   Limited Warranty Agreement     23 |
| 12 the witness is waived, the deposition to have | 12  4   Construction Specifications   24 |
| 13 same force and effect as if full compliance had | 13  5   Homeowner Extras         26 |
| 14 been had with all laws and rules of Court relating | 14  6   Affidavit of Acceptance     27 |
| 15 to the taking of depositions. | 15  7   Daniel Homes, LLC Document      28 |
| 16    IT IS FURTHER STIPULATED AND AGREED that it | 16  8   Acknowledgments of Purchasers   28 |
| 17 shall not be necessary for any objections to be | 17  9   Building Quality Standards    29 |
| 18 made by counsel to any questions, except as to | 18  10  Receipt of Building Quality Standards  29 |
| 19 form or leading questions, and that counsel for | 19  11  Punch List          42 |
| 20 the parties may make objections and assign grounds | 20  12  McCaleb Website Testimonials    41 |
| 21 at the time of the trial, or at the time said | 21  13  Crown Construction Consulting   57 |
| 22 deposition is offered in evidence, or prior | 22       Inspection Report |
| 23 thereto. | 23 |
| 24 | 24 |
| 25        * * * * * | 25 |
| 25 | |
| Page 2 | Page 4 |

| | |
|---|---|
| 1    A P P E A R A N C E S | 1    I, Karen Kelley, a court reporter of |
| 2  FOR THE PLAINTIFF: | 2  Birmingham, Alabama, and a Notary Public for the |
| 3    H. ARTHUR EDGE | 3  State of Alabama at large, acting as commissioner, |
| 4    Collins & Horsley, P.C. | 4  certify that on January 4, 2012 pursuant to |
| 5    2021 Morris Avenue, Suite 200 | 5  Rules of Civil Procedure and the foregoing |
| 6    Birmingham, Alabama  35203 | 6  stipulation of counsel, there came before me at |
| 7    (205)324-1834 | 7  2021 Morris Avenue, Birmingham, Alabama, ROBERT |
| 8 | 8  BARTON, party in the above cause, for oral |
| 9 | 9  examination, whereupon the following proceedings |
| 10 FOR THE DEFENDANT: | 10 were had: |
| 11  JAMES (Jay) ALAN POTTS, II | 11 |
| 12  Gaines, Gault, Hendrix & Bishop, PC | 12        ROBERT BARTON |
| 13  3500 Blue Lake Drive, Suite 425 | 13  Being first duly sworn, was examined and testified |
| 14  Birmingham, Alabama  35243 | 14  as follows: |
| 15  (205)980-5888 | 15 |
| 16 | 16        EXAMINATION |
| 17 | 17  BY MR. POTTS: |
| 18 | 18    **Q.   Could you state your full name, please?** |
| 19 | 19    A.   Robert Besalski Barton. |
| 20 | 20    **Q.   And what is your current resident** |
| 21 | 21  **address?** |
| 22 ALSO PRESENT: | 22    A.   3949 Butler Springs Way, Hoover, Alabama |
| 23 Stacy Alliston | 23  35226. |
| 24 Mindy Barton | 24    **Q.   What is your date of birth?** |
| 25 | 25    A.   May 7th 1969. |
| Page 3 | Page 5 |

2 (Pages 2 to 5)

A50B525
ROBERT BARTON        JANUARY 4, 2012

1    Q.  Mr. Barton, have you ever given a
2  deposition before?
3    A.  No, sir.
4    Q.  All right.  Have you ever been involved
5  in any other lawsuits before?
6    A.  No, sir.
7    Q.  My name is Jay Potts.  I represent Stacy
8  Alliston Design and Building in this lawsuit that
9  you filed against him.  I am going to be asking you
10 questions today that you are going to answer under
11 oath just as if we are in front of a judge or
12 jury.  You understand that?
13   A.  Yes, sir.
14   Q.  If you would, please answer out loud
15 with yeses and nos rather than head nods or
16 "uh-uhs" because she's taking down everything we
17 say and we want the record to read cleanly.
18   A.  Yes.
19   Q.  If I ask a question and you don't
20 understand it, let me know and I will rephrase it
21 or I will ask it again.  If I ask you a question
22 and you answer it, I am going to assume that you at
23 least felt like you understood the question.  Is
24 that fair?
25   A.  Yes.
                                          Page 6

1  address?
2    A.  1383 Eden Ridge Circle, Hoover, Alabama.
3    Q.  And that was with your wife, Mindy, and
4  your three kids, right?
5    A.  Yes.
6    Q.  How long did you live at that address?
7    A.  We lived at that address from May of
8  1998 -- is it okay if I refer to my wife on that
9  and make sure this is correct?
10      MS. BARTON:  We lived there eight years.
11   Q.  Now, when you moved into it, was it a
12 new home?
13   A.  No, it was not.
14   Q.  Where did you live prior to that
15 address?
16   A.  2108 Foxford Street in Pensacola,
17 Florida.
18   Q.  And all of the same folks lived at that
19 address?
20   A.  No, some were not born yet.  Hunter
21 lived there for a short period of time, for a few
22 months.
23   Q.  How long did you live at that address?
24   A.  Two-and-a-half years.
25   Q.  Do you recall where you lived before
                                          Page 8

1    Q.  And this is not a marathon.  If at any
2  time you need a break, let me know and we will take
3  a break.  All I ask is if there is a question on
4  the table, we get the answer to the question before
5  the break is taken.  Okay?
6    A.  All right.
7    Q.  Now, you have lived at 3949 Butler
8  Springs Way since October of 2006?
9    A.  Correct.  Yes.
10   Q.  And you live there with your wife Mindy?
11   A.  Yes.
12   Q.  And y'all have some children, correct?
13   A.  Yes.
14   Q.  What are their names?
15   A.  Hunter, Jackson and Mary Brooke.
16   Q.  How old is Hunter?
17   A.  Hunter is 14.
18   Q.  How old is Jackson?
19   A.  11.
20   Q.  And how old is Mary Brooke?
21   A.  She's 8.
22   Q.  Does anyone else live at 3949 Butler
23 Springs Way?
24   A.  No.
25   Q.  Where did you live prior to that
                                          Page 7

1  that?  And you don't have to give me an exact
2  address.
3    A.  We lived in Birmingham, Alabama.
4    Q.  Okay.  Were you born and raised in
5  Birmingham?
6    A.  I was, yes.
7    Q.  Where did you go to high school?
8    A.  Vestavia Hills High School.
9    Q.  What year did you graduate?
10   A.  1987.
11   Q.  And what education did you have after
12 Vestavia?
13   A.  Auburn University.
14   Q.  And did you graduate from Auburn?
15   A.  I did.
16   Q.  What year?
17   A.  1991.
18   Q.  What was your major?
19   A.  Economics.
20   Q.  I also graduated from Auburn with an
21 economics degree.  And after you graduated from
22 Auburn, did you have any education after that?
23   A.  No, there was no master's degree.
24   Q.  Did you go back to Birmingham?
25   A.  I did.
                                          Page 9

3 (Pages 6 to 9)

A50B525

ROBERT BARTON        JANUARY 4, 2012

**Page 10**

1  Q.  What was your first job out of college?
2  A.  My first job was the company called IC
3  Systems.
4  Q.  What did you do for them?
5  A.  That was accounting, debt collections,
6  stuff like that.  I was an account manager for
7  them.
8  Q.  How long did you work there?
9  A.  About a year and a half.
10  Q.  What did you do after that?
11  A.  I went to a company called Deroyal
12  Surgical.
13  Q.  Deroyal?
14  A.  D-E-R-O-Y-A-L Surgical.
15  Q.  What did you do for them?
16  A.  I was a medical account manager,
17  hospital account manager.
18  Q.  Where are they located?
19  A.  Powell, Tennessee.
20  Q.  Did you work out of Birmingham?
21  A.  I did.
22  Q.  How long did you work for them?
23  A.  I worked for them for, I think, four and
24  a half, almost five years.
25  Q.  Do you recall where you went after that?

**Page 11**

1  A.  I went to a company called Schneider,
2  S-C-H-N-E-I-D-E-R.
3  Q.  The trucking company?
4  A.  No, it's a peripheral vascular
5  interventional.  And that company ended up becoming
6  Boston Scientific.  They were bought out by Boston
7  Scientific.
8  Q.  How long were you with them?
9  A.  I was with them about a year and a half.
10  Q.  Since you started working at Deroyal
11  Surgical, have you been in some capacity of the
12  medical or pharmaceutical sales at the present
13  time?
14  A.  I have.
15  Q.  Okay.
16  A.  My current company I've been with for 14
17  years now.
18  Q.  What's the name of that company?
19  A.  Abbott Vascular.
20  Q.  Can you spell that?
21  A.  A-B-B-O-T-T Vascular.
22  Q.  What product do you sell for them?
23  A.  Interventional cardiology, stents,
24  angioplasty systems.
25  Q.  Where are they based out of?

**Page 12**

1  A.  Abbott Corporate is out of Abbott Park,
2  Illinois, but our division is out of Santa Clara,
3  California.  Abbott Vascular is actually out of
4  Santa Clara, California.
5  Q.  And where did your territory include?
6  A.  I basically am the account manager for
7  seven major interventional hospitals in Alabama.
8  So I go to Huntsville, down to Tuscaloosa, and then
9  I have Birmingham.
10  Q.  At any time in your working career, and
11  this is going back to when you had your first job
12  as a teenager, have you ever done anything in the
13  construction industry?
14  A.  Yes.
15  Q.  When would that be?
16  A.  When I was in high school I worked for
17  Natter Properties, Pat Natter and Mike Natter, as
18  basically a clean-up crew kind of guy, kind of a
19  do-it-all clean-up person.  And then I worked for a
20  contractor.  I can't remember his name, but he was
21  building houses in Meadowbrook and I kind of was
22  his clean-up, do-it-all kind of guy.  I did
23  everything from waterproofing to insulation work
24  and stuff like that.  And I have done some
25  landscape work as well too.  I worked landscape for

**Page 13**

1  Ala Lawn and I worked landscape for American
2  Landscape.  These were all summer jobs when I was
3  in college and high school.
4  Q.  The contractor who was building houses
5  in Meadowbrook, what time period did you work for
6  him, what years?
7  A.  I think I was 16.  I think that would be
8  1985.  He was a contractor.  He was working
9  specifically on one house in Meadowbrook.  His wife
10  worked with my dad at my dad's dental office and I
11  was just working there during the summertime.
12  Q.  And you helped him do clean-up but other
13  things as well?
14  A.  Yeah, I'd clean up and I waterproofed a
15  basement for him.  Mostly just clean-up guy.  You
16  know, when the subs came through, I picked up the
17  mess they left behind, for the most part.
18  Q.  What time period did you work for Pat
19  and Mike Natter?
20  A.  I worked for them I think two separate
21  summers.  I believe one was when I was probably 17
22  and one I was probably about 18.  And my mom worked
23  for the real estate company and just same thing,
24  clean-up guy, just went to houses sweeping out from
25  the Sheetrock and stuff like that.

4 (Pages 10 to 13)

A50B525
ROBERT BARTON        JANUARY 4, 2012

1    Q.   So they build houses as well?
2    A.   They built houses.  And mostly, I
3 remember at that point in time, we worked a lot in
4 Riverchase and stuff like that.
5    Q.   You said your mom worked for a real
6 estate company?
7    A.   Yes, sir.
8    Q.   Which company?
9    A.   It was Natter Properties.
10    Q.   Is that with Ds or Ts?
11    A.   Ts, I believe.
12    Q.   N-A-T-T-E-R?
13    A.   That's correct.
14    Q.   While we are on that subject, do you
15 have, other than your wife and your children, do
16 you have any relatives over the age of 19 or older
17 living in Jefferson County?
18    A.   Just my mother.
19    Q.   What's her name?
20    A.   Carolyn Barton.
21    Q.   And this is not to pry into your family
22 life, it's just if we have a trial, it will be a
23 jury trial and I want to make sure that a first
24 cousin doesn't get on the jury.
25    A.   No, there is nobody in Jefferson County
Page 14

1    Q.   Are you a member of a church that is in
2 Jefferson County?
3    A.   Yes.
4    Q.   Which one?
5    A.   Shades Mountain Baptist Church.
6    Q.   And how long have y'all been going
7 there?
8    A.   Three years.
9    Q.   Were you a member of a different church
10 before that?
11    A.   Yes.
12    Q.   Which one?
13    A.   Lakeside Baptist Church.
14    Q.   How long did you go there?
15    A.   About eight years.
16    Q.   Are you a member of any clubs or civic
17 organizations that regularly meet in Jefferson
18 County?
19    A.   No, not that I can think of.
20    Q.   Are you a member of Auburn Alumni
21 Association or anything like that?
22    A.   I'm not.
23    Q.   Okay.  Do you recall the time period,
24 roughly the time period that you and your wife
25 decided to build a house?
Page 16

1 except for my mother.  That's correct.
2    Q.   And I presume she's retired?
3    A.   She still works.
4    Q.   What does she do?
5    A.   She's a real estate agent at Liberty
6 Park.
7    Q.   Did she act as your agent in the
8 transaction for this house?
9    A.   Yes.
10    Q.   And so is she a captive agent out at
11 Liberty Park?
12    A.   Define captive for me.
13    Q.   Well, I mean, her office is at Liberty
14 Park but she does act as an agent in other
15 neighborhoods?
16    A.   No, she had to get special permission to
17 help us with our closing at that point in time.  So
18 she works specifically in Liberty Park.
19       MS. BARTON:  She works for Liberty Park
20 Properties.
21    Q.   Okay.  Have you ever been arrested for
22 anything?
23    A.   No.
24    Q.   Have you ever declared bankruptcy?
25    A.   No.
Page 15

1    A.   I would say roughly -- you know, we have
2 always discussed -- I think after our third child
3 was born.  She was born in 2003; I think that we
4 started coming to the realization that our other
5 house was probably going to be too small.  And we
6 kind of started thinking about what the next step
7 would be.  And I remember we used to drive around
8 looking at houses and thinking about where we
9 wanted to live and stuff like that.  So it's
10 probably a year or so.  Maybe -- really things
11 progressed quickly as far as looking at houses and
12 stuff like that.  I would say in the neighborhood
13 of the end of 2003 time frame, 2003 probably about
14 right.
15    Q.   Have you ever built a house before the
16 one in this lawsuit?
17    A.   No, sir.
18    Q.   Had you ever done any remodeling to any
19 house that you had been in before?
20    A.   Yes.
21    Q.   When would that be?
22    A.   When I added an office space to the
23 house we lived in at Eden Ridge, we added on a
24 room.  We had an unfinished garage area that we
25 added on a room to that.  So I would say that was
Page 17

5 (Pages 14 to 17)

ATKINSON-BAKER, INC.                      1-800-288-3376

A50B525
ROBERT BARTON        JANUARY 4, 2012

**Page 18**

1  in the neighborhood of 2001 maybe, maybe 2000. I
2  can find that information out but I don't have it
3  directly in front of me right now.
4      **Q.    Who did you get to do that work?**
5      A.    John Bradley.
6      **Q.    And is he still working?**
7      A.    No, he's retired.
8      **Q.    And that was just to add an office**
9  **space?**
10     A.    Essentially. Just minimal things,
11  yeah. It was a pretty simple project.
12     **Q.    Other than that, have you ever done any**
13  **remodeling projects at any home that you have lived**
14  **in?**
15     A.    Just paint. That's about it really.
16     **Q.    So about end of 2003, you and your wife**
17  **start contemplating about building a new house?**
18     A.    That's correct.
19     **Q.    All right. You enter a contract with my**
20  **client to build a home in January of 2006. Does**
21  **that sound correct?**
22     A.    Yes.
23     **Q.    What lead you to enter into a contract**
24  **with my client?**
25     A.    We liked Ross Bridge. We liked the

**Page 19**

1  concept of Ross Bridge. We liked the lot which
2  Stacy owned, was responsible for that lot, because
3  the builder came with the lot. And we liked the
4  conversations that we had had with him as far as
5  what we felt like he was capable of doing. And it
6  just seemed like the right thing.
7      **Q.    Okay. Prior to entering the contract**
8  **with my client, had you gotten any recommendations**
9  **from anyone else concerning his work?**
10     A.    No.
11     **Q.    Did you look at any houses he had built**
12  **before y'all entered a contract?**
13     A.    I believe so.
14     **Q.    Would that be in the Ross Bridge area?**
15     A.    No. And I am not sure if he had
16  finished that house.
17         MS. BARTON: It was in Legacy.
18     A.    It was Legacy. We had gone to Greystone
19  and looked in the Legacy at some houses he had
20  built just from outside. And I believe when we
21  entered our contract with him, I am not sure if any
22  houses were complete at that point in time in Ross
23  Bridge that he was working on.
24     **Q.    Did you look at any of those houses?**
25     A.    Did I look in any of those houses?

**Page 20**

1      **Q.    Did you look at any of those houses?**
2      A.    In Ross Bridge?
3      **Q.    Yes.**
4      A.    Like I said, I am not sure if that --
5  there was one he had built as a spec home and I am
6  not sure if it was finished at that time or not. I
7  am not sure. Can I ask my wife? I am not sure. I
8  don't remember if it was finished or not.
9      **Q.    That's fine.**
10     A.    He had some under construction. But I
11  am not sure if -- I don't remember walking through
12  it at all. But Ross Bridge was real new. We were
13  very early on. So there wasn't much complete out
14  there at that point in time.
15     **Q.    And just so it's easier on the court**
16  **reporter, anything that she can clear up later we**
17  **will get in her deposition.**
18     A.    All right. Sure.
19     **Q.    So you looked at some houses in**
20  **Greystone.**
21     A.    Yes.
22     **Q.    And you had some conversations with my**
23  **client before signing the contract?**
24     A.    Yes.
25     **Q.    And you liked what you heard in the**

**Page 21**

1  **conversations?**
2      A.    Yes.
3      **Q.    What kind of things were you hearing**
4  **that made you want to enter the deal?**
5      A.    Stacy seemed like a good guy. He seemed
6  like he was competent. He seemed like he had a
7  good plan for us. And I felt confident that he
8  felt like he could do a good job for us and build
9  the house we wanted. My wife and I really designed
10  our house ourselves. We had gone through dozens
11  and dozens of house-building magazines and books
12  and we kind of understood of the front elevation we
13  wanted, the type of style house we wanted, which is
14  a little bit different than, you know, some people
15  build. It was more of a traditional house. And I
16  felt like Stacy kind of comprehended our idea and
17  put it to paper well. And I don't remember if he
18  had met with his building architect or his house
19  plan, but it seemed like that was going well as
20  well. The person that we used to draw up our house
21  plans seemed like it went real well.
22     **Q.    Would that person have been Grant**
23  **McCaleb?**
24     A.    No, David Smelcer.
25     **Q.    Can you spell that last name?**

6 (Pages 18 to 21)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525

**ROBERT BARTON        JANUARY 4, 2012**

1        MR. EDGE:  S-M-E-L-C-E-R.
2     Q.    And David Smelcer drew up the plan for
3  the home?
4     A.    Yes.  Before we signed the contract.
5     Q.    Right.  Now is that somebody that my
6  client retained or you retained?
7     A.    Your client retained.  And that was who
8  he really suggested we use and said that's who he
9  used and he really wanted to use.  And we felt like
10  he did a good job, especially putting our ideas
11  onto paper.
12     Q.    How many conversations do you think you
13  had with Stacy Alliston before you entered the
14  contract on January 26, 2006?
15     A.    It would be really hard to say, but I
16  would say a lot.  We talked a good deal because
17  this was a new process for us.  We had never built
18  a house.
19     Q.    Sure.  More than five times?
20     A.    Yes.
21     Q.    More than ten?
22     A.    Yes.
23     Q.    I am going to show you a document that I
24  am marking as Defendant's Exhibit 1 and ask you to
25  look through that real quick and just confirm that
                                              Page 22

1  that is the January 26th 2006 sales contract.
2        (Defendant's Exhibit Number 1 was marked
3        for identification.)
4     A.    Yes, I believe it is.  I have no reason
5  not to think that.
6     Q.    Is that your signature on the last page?
7     A.    Yes, it is.
8     Q.    What I want to do now is go through
9  these documents and get them marked, and then we
10  can go back and talk about them.  But I am going to
11  show you what I am marking as Defendant's Exhibit
12  2.  This appears to be an addendum to the sales
13  contract that addresses mold, mildew, and fungi.  I
14  am just going to ask if those are your initials at
15  the bottom of the page.
16        (Defendant's Exhibit Number 2 was marked
17        for identification.)
18     A.    Those are my initials.
19     Q.    I am going to show you now a document
20  that I am marking as Defendant's Exhibit 3.  I am
21  going to ask that you look at this document and
22  confirm that this is the limited warranty agreement
23  that you entered into with my client and then
24  confirm that your signature is on the last page.
25        (Defendant's Exhibit Number 3 was marked
                                              Page 23

1        for identification.)
2     A.    That is my signature.
3     Q.    All right.  We will mark as Defendant's
4  Exhibit 4 what I believe to be construction
5  specifications for your particular house.  And it
6  looks like on each page you've put your initials in
7  the bottom right corner.
8        (Defendant's Exhibit Number 3 was marked
9        for identification.)
10     A.    That looks correct.  And that is my
11  signature as well on both pages.
12     Q.    Do you recall looking over these
13  construction specifications?
14     A.    I do not.
15     Q.    Do you recall that in the process of
16  building the house there were some changes that
17  were made in the plans?
18     A.    Yes.
19     Q.    Okay.
20     A.    When you say plans, can you define plans
21  to me as far as additions to?
22     Q.    Sure.  Well, changes --
23        MR. EDGE:  He said changes, not
24  additions.
25  BY MR. POTTS:
                                              Page 24

1     Q.    Were there changes to the construction
2  specifications that you can recall?
3     A.    Can you define when you say construction
4  specifications?
5     Q.    Sure.  What's set out here in
6  Defendant's Exhibit 4 where it lays out what he's
7  going to put in each room.
8     A.    Right.
9     Q.    Do you recall there being any changes to
10  those specifications in the building process?
11        MR. EDGE:  Let me ask you this because
12  of the way you are asking the question I think
13  it's susceptible to reasonable
14  interpretations.  Are you talking about
15  changes that they came in and said to
16  Mr. Alliston, hey, as the house is going up, I
17  know we wanted six-inch base molding.  We have
18  decided we want to step up to eight; or are
19  you talking about changes that were made sort
20  of involuntary like going from the eight-foot
21  doors to the seven-foot doors?
22        MR. POTTS:  The former of those two.
23     Q.    Were there times that you went to my
24  client and said we want to change what we had
25  originally planned to do to this?
                                              Page 25

7 (Pages 22 to 25)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525
ROBERT BARTON        JANUARY 4, 2012

1      A.    Right.  I know that there were several
2  things that we added on.  We finished off two more
3  rooms.  There was attic space that we finished off
4  a playroom for my daughter and a guest room.  We
5  added that.  Off the top of my head I can't really
6  think of anything specifically that we added to or
7  changed a lot.  Now, my wife may have a different
8  interpretation of that, but off the top of my head
9  I can't think of anything out of our general
10  construction plan.  But we did add some things.  We
11  had to add a retaining wall because the elevation
12  of the property was different than we thought it
13  was going to be.  But it was kind of a joint
14  decision.  The only thing that I can remember
15  specifically that we added on was we finished off
16  two rooms that we found out we were capable of
17  adding more space to the house, but we thought it
18  was going to be attic space originally.  But off of
19  that I can't think of anything else.
20      Q.    Okay.  I am going to mark this next
21  document as Defendant's Exhibit 5.  And at the top
22  of it it says, "Homeowner extras for lot 18."  Have
23  you seen that document before?
24          (Defendant's Exhibit Number 5 was marked
25           for identification.)
                                          Page 26

1      A.    Yes.
2      Q.    And was it your understanding that this
3  price down here reflected additional cost due to
4  the things that were added?
5      A.    Yes.
6      Q.    I am going to mark this document as
7  Defendant's Exhibit 6 and it's titled, "Affidavit
8  of Acceptance."  Have you seen that document before
9  today?
10          (Defendant's Exhibit Number 6 was marked
11           for identification.)
12      A.    Can I ask the question when I would have
13  seen it?
14      Q.    Sure.  Well, let me ask you this.  Are
15  these your initials up here?
16      A.    Yes, these are my initials.  So I have
17  seen it at some point in time.
18      Q.    You don't recall when you saw it?
19      A.    I am not exactly sure what this is.
20          MR. EDGE:  Don't guess at it.
21      Q.    I'll represent to you that this is an
22  affidavit -- you can read it for yourself, of
23  course, but I'll represent to you it's an affidavit
24  saying that you and your wife had walked through
25  the house on the final inspection and that you
                                          Page 27

1  accepted the property and specifically list out
2  certain portions of the property as it was built.
3  Do you recall signing a document like that at any
4  time after you took possession of the property?
5      A.    I don't recall, but that definitely is
6  my signature, my initials.
7      Q.    I am marking as Defendant's Exhibit 7 a
8  document that looks like it's just something that
9  reflects the fact your mother served as your agent
10  in the transaction.
11          (Defendant's Exhibit Number 7 was marked
12           for identification.)
13      A.    Yes.
14      Q.    Okay.  I will mark as Defendant's
15  Exhibit 8 it's a document entitled, Acknowledgments
16  by Purchasers.  And that's really provisions that
17  have to do with, you know, living in the Ross
18  Bridge neighborhood.  Is that your signature on the
19  last page there?
20          (Defendant's Exhibit Number 8 was marked
21           for identification.)
22      A.    Yes, it is.
23      Q.    I am marking now as Defendant's Exhibit
24  9 a document entitled, Building Quality Standards.
25  It's a pretty thick packet of information.  It
                                          Page 28

1  looks like those are your initials on the bottom
2  right corner of the page.  Do you recall receiving
3  that document?
4          (Defendant's Exhibit Number 9 was marked
5           for identification.)
6      A.    I do not recall.
7      Q.    Are those your initials?
8      A.    That's my initial on the front page,
9  that's correct.
10      Q.    And I am marking as Defendant's Exhibit
11  10 a copy entitled, Receipt of Building Quality
12  Standards.  Is that your signature on that page?
13          (Defendant's Exhibit Number 10 was
14           marked for identification.)
15      A.    Yes, it is.
16      Q.    Looking now at the complaint that was
17  filed against my client in this matter, and that's
18  just the document that got this lawsuit started,
19  have you seen this before today, this complaint?
20      A.    I believe I have.  I believe I got a
21  copy of it from my lawyer at some point in time.
22      Q.    I want to talk briefly about some of the
23  allegations made in the complaint.  Paragraph
24  number 13 of the complaint states, During
25  construction plaintiffs had problems working with
                                          Page 29

8 (Pages 26 to 29)

A50B525
ROBERT BARTON          JANUARY 4, 2012

1 defendant, Stacy Alliston and Design.  What problem
2 did you have working with Stacy Alliston and
3 Design?
4     A.    And this elaborates and says, as work
5 was not being performed on time, defendant would
6 not show up on the job site and plaintiffs had to
7 incur additional expenses when home was not
8 completed on time.  We -- actually my wife informed
9 me it was five weeks we had to move into an
10 apartment because our house was five weeks over on
11 the due date on the construction.  So we incurred
12 the cost of living in an apartment with our
13 children for five weeks when our house was overdue.
14     Q.    And I am going to come back to that in a
15 second.  But other than that issue, what other
16 problems did you have with Stacy Alliston Design
17 and Building during the construction process?
18     A.    Well, there is a -- you know, when you
19 say problems, I would say we worked through most of
20 the problems.  So when you say problems there can
21 be, not in the sense that we are holding fault
22 against this, but there are certain things that
23 came up during the construction process like we had
24 to put in an extra additional retaining wall, which
25 cost us more because the slope of the lot was more
                                                    Page 30

1 encompassing than Stacy thought it would be.
2 Certain things were compromised, like they tore
3 down the staircase probably three different times
4 because the way the house plans came out, my wife
5 wanted a coat closet and they were going to have to
6 change the angle of the staircase to make it so the
7 stairs came out here instead of here. And so the
8 compromise was instead of having an eight-foot door
9 we went with a six-foot door.  So the plane of the
10 stairs go where they were and we could still have
11 the coat closet.  So like I said, we worked through
12 most of those things.  There was a compromise on
13 that.  But there were some additional expenses
14 incurred because of those things.
15     Q.    Have you tallied up at any time what
16 those additional expenses were that you incurred as
17 a result of the problems?
18     A.    I have not sat down specifically,
19 because during the construction process I believe
20 that it was a compromise between Stacy and us of
21 saying this is what's happening, you know, this is
22 something that was unexpected and since this was
23 the first house we had ever built we felt like it
24 was -- you know, there were several situations, I
25 believe, where Stacy said he would cover half the
                                                    Page 31

1 cost and we would cover the other half of the cost,
2 which he did.
3     Q.    Were there any problems that you
4 experienced during the construction process that
5 you feel like my client did not work through?
6     A.    During the construction process?
7     Q.    Yes, during the construction process.
8     A.    The only thing that I can specifically
9 think of was that we had plans to do something on
10 the fourth floor.  We had discussed with Stacy, you
11 know, making the fourth floor so that we could make
12 a bonus room up there.  And it was kind of a
13 surprise to us when it was not completed in that
14 fashion that we could use it.  At that point in
15 time it was just a -- once again, it was a learning
16 experience for both of us.  We had never built a
17 house before.  But it was explained to us that
18 things need to lay out a certain way.  But our
19 expectation was to be able to use that part of the
20 house.  And at that point in time it didn't seem to
21 be a big issue, but as we have lived in the house
22 for longer it would have been nice if we had been
23 able to complete that.  But I would say that Stacy
24 was good about -- in the process of developing our
25 house or building our house that when things came
                                                    Page 32

1 up that were -- the biggest thing I can think of is
2 the front retaining wall was unexpected, that we
3 would have to do that, but he said he would share
4 the cost with us on building that.  And we felt
5 like that was a compromise.  I think that the most
6 important thing to me and to my wife was to
7 maintain a good relationship with our builder.  And
8 the simple fact is that Stacy seemed to be
9 reasonable in his request of meeting us halfway on
10 things.  And I think we worked pretty much
11 everything out.  There were some issues with the
12 grade of the backyard, but we were able to work
13 through that with building another retaining wall
14 in the backyard there.  But that was somewhat
15 expected.  But I think I have stated most
16 everything that comes to mind.
17     Q.    This bonus room on the fourth floor,
18 what's its present condition?  Has it been
19 finished?
20     A.    It's basically unusable.  Because our
21 expectation was that we could have it framed and
22 designed in a certain way, that if we decided to
23 finish it off later on down the road that we could
24 use it.  And I am not sure if my wife and I were on
25 vacation or we were gone for a period of time, but
                                                    Page 33

9 (Pages 30 to 33)

A50B525
ROBERT BARTON          JANUARY 4, 2012

1 when we came back it had been framed. And our
2 project manager explained to us that it had been
3 framed in a sense that the support beams would not
4 be able to support another room up there. And our
5 expectation was that we would be able to have an
6 area that we would be able to finish off later on.
7 We had seen a house in Liberty Park that the fourth
8 floor where the dormer windows were, somebody had
9 finished it off later on and made an entertainment
10 room or something like that. And that was our
11 expectation, but ultimately that was not what took
12 place.
13    Q.   So basically, does this fourth floor
14 room that we are talking about, does it just kind
15 of look like attic space?
16    A.   Yes, it looks now.
17       MR. EDGE:  Not only looks like attic
18 space. It is attic space.
19    Q.   So basically you are just seeing exposed
20 boards, there is no Sheetrock or anything like
21 that?
22    A.   That's correct.
23    Q.   And at some point in the construction
24 process you had a conversation with my client about
25 getting that room finished up?

Page 34

1    A.   I don't think he explained that they
2 couldn't. I think it was more of an explanation
3 that they didn't. I think it could have been done
4 that way but it just wasn't done that way. And I
5 don't know if it was just a lapse of -- it got
6 away, they just didn't think about it or they did
7 didn't make the appropriate plans to make it to
8 that point, but it seemed like at that point in
9 time we were dealing with a lot of unexpected
10 stuff, you know, being a first-time home builder.
11 So we were disappointed, yes, but it was --
12       MR. EDGE:  You answered the question.
13    Q.   So was your response that, you know, we
14 are not going to close on the house until you
15 finish it, or were you okay with it at the time?
16    A.   Ask me that again.
17    Q.   When he told you that we didn't do the
18 room this way, was your response, you know, we are
19 not going to close on the house until you do it the
20 way we talked about, or did you say, okay, let's
21 just move forward?
22    A.   Our response was okay, let's move
23 forward.
24    Q.   You state in the complaint that my
25 client would not show up at the job site. How many

Page 36

1 A.   We had talked about finishing it to the
2 point where we could down the road finish it off.
3 We didn't have the money at that point in time to
4 complete that project. So we were talking about
5 just making it so that it would be able to support,
6 you know, a room down the road. I guess something
7 about the joists, the way the floor joists are,
8 they have to be a certain dimension or whatever,
9 and then after the fact when it turned out
10 differently, our project manager said, well, we
11 didn't do that. You know, we would have had to use
12 different joists and different supports. And, you
13 know, once again the construction process was
14 fairly new to my wife and myself. So it didn't
15 seem to be the end of the world at that point in
16 time. We would have had to basically tear up the
17 whole entire top of the house and reframe it at
18 that point in time.
19    Q.   The project manager that had this
20 conversation with you, is that Grant McCaleb?
21    A.   That's correct.
22    Q.   When he gave you that explanation as to
23 why they couldn't finish it the way that y'all had
24 originally talked about, were you satisfied with
25 that?

Page 35

1 times did you have a problem with that?
2    A.   I would say that it came down to --
3 there were a few events that came into play where
4 Stacy wasn't there and Grant taking the reins on
5 getting many things accomplished. And I remember
6 specifically Grant telling us one time he had asked
7 Stacy just to show up. We had had some problems
8 and I can't specifically remember what it was, but
9 there was a period of time that Stacy wasn't there
10 that Grant was pretty much handling everything at
11 that point in time.
12    Q.   So did you want Stacy and Grant to be at
13 the job site?
14    A.   I think at certain points during the
15 construction process as you complete a certain
16 point, we felt like there needed to be some closure
17 before we moved on. There were certain things with
18 our retaining wall. There were certain things with
19 additional rooms being added on. And really, after
20 our house was complete we had some issues with some
21 shutters that was a prolonged issue. We had a
22 fairly long punch list that we wanted to get
23 reconciled. And during that period of time Stacy
24 was somewhat absent.
25    Q.   Was there ever a time that you felt like

Page 37

10 (Pages 34 to 37)

ATKINSON-BAKER, INC.                    1-800-288-3376

A50B525

ROBERT BARTON          JANUARY 4, 2012

1 both Stacy and Grant McCaleb both were absent?
2     A.   No.  During the construction of the
3 house, no.  Afterwards, yes.
4     Q.   And you mentioned already that the
5 additional expense you incurred as a result of the
6 house not being completed on time was that you had
7 to get an apartment for five weeks?
8     A.   That's correct.
9     Q.   Do you know how much you paid in rent
10 for that five weeks?
11     A.   I do not off the top of my head, but I
12 am sure I have that record.  I have a file but I do
13 not have it right now.
14     Q.   Looking now at Defendant's Exhibit 1,
15 which is the sales contract, there is a provision
16 that discusses when construction is going to start
17 and the projected closing date, when y'all can take
18 possession.  It looks like originally construction
19 was to commence within 14 days from the date of the
20 contract and be finished 250 days from the date of
21 commencement.  And then there is a line drawn
22 through 250 and 235 drawn in there.  Do you
23 remember the circumstances as to why that number
24 was changed?
25     A.   I do not.

Page 38

1 fairly quick.
2     Q.   And I believe you testified earlier that
3 the other additions or changes that were made
4 during the construction process were that you
5 decided that you wanted to build more rooms.
6     A.   We had an area in our attic that our
7 children's rooms -- due to the architectural layout
8 we didn't realize how much area that was, and when
9 the framing was complete we thought, well, this
10 would be easy to finish off now instead of going
11 back later on and bringing all of the Sheetrock and
12 stuff through the house, so we went ahead and said,
13 what would it take to go ahead and finish these
14 rooms off.
15     Q.   And finishing those rooms off was not
16 part of the original construction specification?
17     A.   That's correct.
18     Q.   Did you, during the construction
19 process, have any problems with Grant McCaleb's
20 work?
21     A.   No.
22          MR. EDGE:  Object to the form.
23     Q.   Do you feel like Grant did a good job in
24 the construction process?
25          MR. EDGE:  Object to the form.

Page 40

1     Q.   Do you remember whether you wanted the
2 change or whether Stacy wanted the change?
3     A.   I do not.
4     Q.   And so the projected closing date was
5 September 15, 2006 but y'all actually closed on
6 October 27, 2006 or thereabouts?
7     A.   That's correct.
8     Q.   With the addition of the retaining wall,
9 do you feel like that prolonged the construction
10 process?
11          MR. EDGE:  The one in the front or the
12 one in the rear?
13     Q.   The one in the front.
14     A.   No, I don't.
15     Q.   Do you know how long it took them to
16 build that?
17     A.   I don't.  But I remember after Stacy had
18 come to us and said that -- we originally were
19 going to have two driveways.  I remember pretty
20 quickly he wanted to remedy it.  And he had a
21 bulldozer come in and cut the bifurcation in the
22 driveway that would go up top pretty quickly
23 afterwards and we drove up it and we felt like it
24 is satisfactory to our needs, but that was where we
25 incurred an additional retaining wall.  But it was

Page 39

1     A.   Yes, I did.
2     Q.   I am going to show you a document here
3 that I am marking as Defendant's Exhibit 12 and
4 it's something that I pulled off Grant McCaleb's
5 website.  If you would -- and the writing is really
6 small and I apologize.  But if you could read the
7 top portion.  It's from the testimonials from his
8 website.
9          (Defendant's Exhibit Number 12 was
10          marked for identification.)
11     A.   That is correct.  And I stand by
12 everything that says.
13     Q.   One of the things that you state in here
14 is that Grant McCaleb was diligent in meeting every
15 need during the construction project.  Do you stand
16 by that statement?
17     A.   During the construction process, yes.
18 After, when it came to the punch list and the
19 things we had left over, no.
20     Q.   Do you feel like Grant McCaleb did not
21 meet your needs after the construction process was
22 over?
23     A.   That's correct.  After the construction
24 process was over we had a large punch list that
25 just was not the major focus.

Page 41

11 (Pages 38 to 41)

ATKINSON-BAKER, INC.                                          1-800-288-3376

A50B525
ROBERT BARTON          JANUARY 4, 2012

1    Q.   All right.  I will show you a document
2  that I will mark as Defendant's Exhibit --
3    A.   Can I add something to a question that
4  you asked earlier that came to additional
5  expenses?
6    Q.   Sure.
7    A.   To live in the apartment we also had to
8  have all of our belongings moved out of the house
9  and stored for that period of time as well, which
10 was an additional cost.  Our moving company had to
11 move us out of our house and then store all of that
12 as well in the process.
13   Q.   Do you have a number for that amount?
14   A.   I don't with me right now.  I do have a
15 file on that, but I don't have it with me right
16 now.
17   Q.   And I skipped an exhibit so the
18 testimonial on Grant McCaleb's website is 12, but I
19 am going to mark this next exhibit as Defendant's
20 11.  And I am going to ask you if that is a punch
21 list that was created around the time of the
22 closing?
23        (Defendant's Exhibit number 11 was
24        marked for identification.)
25   A.   That does look like the punch list that

Page 42

1  had the final walk-through, before closing around
2  that time?
3        MR. EDGE:  Just to be clear, when you
4  are talking about the punch list you are
5  talking about the one that they compiled that
6  ended up in the form that you have marked as
7  Exhibit 11?
8        MR. POTTS:  Yes.
9    A.   It was -- the things that were wrong
10 with the house were made evident before the final
11 walk-through.  We knew that these things -- and
12 Stacy and Grant knew this punch list existed.  But
13 once again after we were trying to get in our house
14 as soon as possible.  After living with five of us
15 in an apartment we were ready to get in.  So this
16 is a punch list that was signed by both of us to
17 get taken care of after the closing.
18   Q.   In going through that list, which of
19 those problems were never taken care of?
20   A.   I'll have to take a look.
21        MR. EDGE:  It would be shorter to
22 identify the ones that were taken care of.
23 I'm not trying to be funny, but sometimes it's
24 easier to identify the ones that were taken
25 care of versus the ones that were not.

Page 44

1  was created around the time of the closing, yes.
2    Q.   Who created this list; was it you or
3  your wife?  Can you tell by the writing?
4    A.   That does not look like my wife's
5  handwriting.  I believe that was probably
6  transcribed by somebody else.
7    Q.   So you don't think that you or your wife
8  wrote out these items here?
9    A.   She may have a better recollection of
10 what -- I know she actually possessed the punch
11 list, our version, on a legal yellow pad.  I think
12 we still have that.  And I think it was transcribed
13 to that document right there.
14   Q.   Do you still have that piece of paper?
15   A.   You would probably have to ask her.  I
16 think we probably do.
17   Q.   Do you know when -- and I know this is
18 kind of separated into two different -- the last
19 part of the list are things that were to be
20 completed about a month after closing.  Do you know
21 when this list was created?
22   A.   I believe the list is a compilation over
23 time of what we were seeing at different points.
24 But I don't have an exact date.
25   Q.   Would this have been created after you

Page 43

1    A.   I will say in a blanket statement a lot
2  of the paint touch-ups were never completed.  There
3  was some of it done.  But we did have some issues
4  with the painters getting out and touching up a lot
5  of the paint work.  Just passing through, a lot of
6  this is touch-up work.  I know that there was a
7  door that went into our garage that had a -- the
8  door was supposed to be replaced because of the
9  wrong type of door put in there.  There was a chunk
10 taken out of the door downstairs, our basement
11 door, which was never fixed.  That door was never
12 taken care of.  It says caulk in paint lines in
13 exterior doors, I don't believe that was taken care
14 of.  That revolves around the painting.  From
15 number 25 to number -- on this page right here to
16 number 28 I don't believe any of that was ever --
17 it doesn't look like it was ever checked off to
18 being completed.
19   Q.   It may not be checked off on that list,
20 but I am just wondering to your recollection what
21 was completed and what wasn't?
22        MR. EDGE:  Say what you are aware of.
23 Mindy, I think, had the primary dealings with
24 getting the punch list finalized.
25   A.   She would be a better person to talk to.

Page 45

12 (Pages 42 to 45)

ATKINSON-BAKER, INC.                    1-800-288-3376

A50B525
ROBERT BARTON        JANUARY 4, 2012

1 This is transcribed from her -- her and Grant had
2 most of the dealings with the punch list, to be
3 honest with you.  So she would probably be a much
4 better person to ask on all of these things.  It
5 looks like it's abbreviated, some of the things
6 they discussed about.
7    **Q.    Paragraph 14 of your complaint states**
8 **that after you moved in you began noticing issues**
9 **with the home.  So by that statement, were there**
10 **issues that you did not notice with the home until**
11 **after you moved in?**
12    A.    Yes, mostly water issues.
13    **Q.    All right.  Tell me specifically.**
14    A.    We have a window in our foyer that --
15 I'm not sure what you describe the windows as --
16    MS. BARTON:  Triple window.
17    A.    Triple window.  It started to leak and
18 it rained one time and water started coming down
19 the Sheetrock.  And Stacy was made aware of it and
20 Stacy came out and his team worked on it.  And I
21 remember Grant McCaleb saying that -- I believe he
22 said that the flashing was installed backwards or
23 upside down or improperly, and they worked on that
24 window.  And to our understanding it was fixed.
25    **Q.    When did that -- when did you notice the**

Page 46

1 water?  How long after you moved in?
2    A.    I would say it was within the first few
3 months.  I say that because I know Stacy was still
4 actively building in the neighborhood.  They were
5 still out there and I remember them coming out
6 there and their team being out there to work on it.
7    **Q.    When you notified Stacy of this problem,**
8 **did you do it in writing or did you just pick up**
9 **the phone and call him?**
10    A.    Called him.
11    **Q.    At any time, have you notified Stacy in**
12 **writing of any problems with the home other than**
13 **the punch list items?**
14    A.    Other than the punch list items I don't
15 think so.  We had a good line of communication with
16 Stacy early on in the construction process and we
17 just usually call by phone with Grant and Stacy.
18 Never any e-mails or texts or anything like that
19 that I can think of.
20    **Q.    And that includes after the construction**
21 **process, there is no correspondence that you know**
22 **of?**
23    A.    Not that I can think of.
24    **Q.    After Stacy came out there with his team**
25 **and worked on the windows, how long after that**

Page 47

1 point in time did you see -- was it that you saw
2 water again in that area?
3    A.    We saw water in that area -- I am not
4 exactly sure of the time frame that we saw water,
5 but we also had seen some water in the attic around
6 that same time frame.
7    **Q.    So we talking about two different**
8 **windows?**
9    A.    We are talking about two -- what we
10 assumed was two separate situations, but -- and I
11 do not know if the window flashing was the ultimate
12 issue with that window or if it was the leaks that
13 we have in the attic that was behind that as well.
14    **Q.    Okay.**
15    MR. POTTS:  Jay, I handed him those
16 photographs because it has the windows that
17 you are talking about.  I didn't know if it
18 might help him.  You want him to point it
19 out?
20    **Q.    I have a copy here of the inspection**
21 **report as well.  Looking at the front page of it,**
22 **the first water issue you saw, was that due to this**
23 **window that's right here right above the doorway?**
24    A.    Yes.
25    **Q.    And then the next water issue, do you**

Page 48

1 **recall seeing it was something that was around the**
2 **dormer windows in the attic?**
3    A.    Yes.  Specifically, I would say if
4 memory serves correct it was the dormer window on
5 the far left.  It wasn't specifically the dormer
6 window but it was the decking of the roof.
7    MR. EDGE:  And since we are looking at
8 the photograph upside down, you are talking
9 about the far left as you are facing the
10 house?
11    A.    Yes.
12    **Q.    Did you call Stacy after you saw that**
13 **issue?**
14    A.    I don't remember if it was Stacy or if
15 it was Grant.  But I remember being in the attic
16 and I think Grant was in the attic with me when we
17 discussed that one.
18    **Q.    What did y'all talk about?**
19    A.    Well, under those dormer windows you
20 could see outside.  And there were a couple of
21 places in the roofing you could see the outside.
22 And I had seen water come down when it was raining
23 one time down some of the support beams, I think
24 they are two by sixes, that hold the decking in
25 place --

Page 49

13 (Pages 46 to 49)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

DOCUMENT 12T

A50B525
ROBERT BARTON          JANUARY 4, 2012

1      MR. EDGE: Rafters.
2    A.    Rafters. And I had seen water come down
3  those. And my concern was it was coming in these
4  areas that you could see outside and running down
5  the rafters. And I remember specifically Grant
6  saying that, you know, it's common for attics to
7  have areas you can see outside, hence, your windows
8  that get the hot air out, you know, that that was
9  commonplace. And my concern was the water was
10  coming in there because I couldn't put my finger
11  specifically on where it was coming in at that
12  point in time.
13    Q.    **Did Grant or Stacy -- let me ask you**
14  **this. Did you ask them to take any action to fix**
15  **it?**
16    A.    I don't know. I don't specifically
17  remember my wording, but I definitely expressed a
18  concern about the water in the attic.
19    Q.    **Did Grant McCaleb or Stacy take any**
20  **steps to address that problem in the attic?**
21    A.    No.
22    Q.    **But you can't recall if you asked them**
23  **to or not?**
24    A.    I do believe I asked them to, but I
25  don't remember specifically saying -- I know for a

Page 50

1    A.    Yes, I was up there. But I wasn't
2  specifically looking for that.
3    Q.    **All right. So we have talked about two**
4  **different instances where you noticed water. The**
5  **first one was the foyer window and Stacy came out**
6  **there and did some work on that. And the second**
7  **time was up in the attic and you had a conversation**
8  **with Grant but no action was taken. What other**
9  **times did you notice water in those areas after**
10  **that?**
11    A.    I did not remember any specific activity
12  except for a few times when it rained I saw water
13  coming down those joists. And that's when we
14  discussed that I told Grant there was water coming
15  in the attic.
16      MR. EDGE: Joists or the rafters?
17    A.    Rafters.
18      MR. EDGE: Off the record.
19      (Off-the-record discussion.)
20  BY MR. POTTS:
21    Q.    **Did you ever call Grant or Stacy to talk**
22  **with them about the water issues after that time**
23  **when you met Grant in the attic?**
24    A.    Yes.
25    Q.    **How many times?**

Page 52

1  fact we discussed it. I had concerns about the
2  water coming in.
3    Q.    **You say that in the attic window there**
4  **was a space that you could see outside?**
5    A.    On all of the dormer windows, that's
6  correct.
7    Q.    **Before you closed on the house, did you**
8  **walk through the attic?**
9    A.    I am sure I had been up there at one
10  point in time, yes.
11    Q.    **Did that -- was that ever a cause of**
12  **concern to you before the closing?**
13    A.    I don't recall.
14      MR. EDGE: Well, the question assumes
15  that he knew it was there.
16      MR. POTTS: I am asking about the space
17  where he can see outside.
18      MR. EDGE: That's what I am saying. In
19  the course -- I think your question was
20  that -- a cause of concern necessarily
21  presumes that he knew it was there in order to
22  be concerned about it.
23    A.    I don't believe I knew it was there
24  before we closed.
25    Q.    **But you were up there before you closed?**

Page 51

1    A.    I've not sure.
2    Q.    **More than five?**
3    A.    I'm not sure.
4    Q.    **All right. The limited warranty**
5  **agreement calls for -- one of the pre-prerequesites**
6  **for the builder to come and address the issues is**
7  **that the complaints be made in writing. Were any**
8  **complaints ever made in writing to my client?**
9    A.    Except for the punch list, not that I'm
10  aware of.
11    Q.    **Are there other problems with the house**
12  **that either Grant or Stacy came to work on or sent**
13  **a team on their behalf to work on other than the**
14  **water issues that you were not satisfied with what**
15  **they did?**
16    A.    The subcontractors, the list of the
17  painting that was done was never completed
18  properly, that is correct.
19      MR. EDGE: There were other water issues
20  beyond the ones that he's talked about. But
21  you may be getting to those. I wanted to make
22  you aware. I didn't want you to think he's
23  sandbagging you by not answering you
24  completely. Because there were some other
25  issues where they had to come back and replace

Page 53

14 (Pages 50 to 53)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525
ROBERT BARTON      JANUARY 4, 2012

1  roof decking.  And you may be heading toward
2  those.  I just wanted to make sure that you
3  were aware that that was out there.
4      Q.   Well, while we are going in that
5  direction, we've talked about water issues in the
6  foyer window, we talked about water issues in the
7  attic.  What other water issues were there with the
8  house?
9      A.   Those are the big issues right there.
10  Ultimately -- I don't know if you are asking me
11  ultimately what -- down the road where we are at,
12  but ultimately when Stacy had shut down more or
13  less his building operation, Grant had moved on --
14  had been relieved of his responsibilities and Stacy
15  had shut down his operation, we had discussed a few
16  things and Stacy just told us that he couldn't
17  afford to come in and change anything else out.
18  Ultimately we've had to replace the roof, which was
19  rotting, and we've had to have a bunch of work done
20  to the house.  Painting, cutting into Sheetrock
21  checking what kind of water damage we've had in the
22  house.  But most of it stems from the dormer
23  windows and the toe board nail holes in our roof.
24      Q.   How long after the closing was it when
25  you had that conversation with Grant McCaleb in the

Page 54

1  attic?
2      A.   Within a couple months I believe.
3      Q.   Which came first, the foyer window
4  problem or the attic problem?
5      A.   I would say they are probably in the
6  same time frame.
7      Q.   Do you recall how many times
8  subcontractors or Stacy Alliston came out to your
9  home after you moved in?
10      A.   I don't remember specific amount of
11  times.  I do remember episodes of them coming out
12  and working on a few things as the punch list
13  reflects that they did some things.  We had a
14  couple of problems with the subcontractors come out
15  to fix something and mess something else up in the
16  process.  But I do remember them coming out on
17  several different occasions, but I can't tell you
18  specifically how many times.
19      MR. POTTS:  We have been going about an
20  hour; do you want to take a break?
21      MR. EDGE:  Sure.
22
23          (Break held.)
24
25  BY MR. POTTS:

Page 55

1      Q.   Mr. Barton, is it fair to say that after
2  the one year warranty expired, which would have
3  been October of '07, that you were continuing to
4  have problems with the home?
5      A.   They were the same problems beforehand,
6  yes.
7      Q.   That's the paint issues and the water
8  issues from the foyer window and the attic?
9      A.   Yes.
10      Q.   Anything else you can think of?
11      A.   Yeah, we had -- from this builder's or
12  this inspector's home those are currently issues as
13  well.  And we had some other things occur.  We had
14  an episode where one of our next door neighbors or
15  the person building a house next to us did a survey
16  on our lot and our --
17      MR. EDGE:  Say behind you, next to you.
18      A.   The house next door to ours, the house
19  to the right of ours, we had an episode where part
20  of our retaining wall was built and part of our
21  yard was about five feet -- our retaining wall had
22  been built about five feet over into our
23  neighborhood's property.  So we had an episode
24  where we had to go through and work with that
25  builder and the project manager of our neighborhood

Page 56

1  to essentially get that builder to give us that
2  land, which could have been quite a fiasco because
3  basically our retaining wall and part of our yard
4  was on his property.  It had been sodded and
5  landscaped and the retaining wall was on there as
6  well.  And which we did get that resolved
7  through -- Stacy worked with us on that and the
8  builder next door basically gave us that property.
9  As far as other things that go with the house, as
10  far as problems, I think most of them are stated on
11  the punch list and on this report here.  I cannot
12  think of anything else that's not accounted for.
13      Q.   While we are on that subject, let me
14  mark the Crown Construction Consulting inspection
15  report as Defendant's 13.  Did y'all call the
16  person who created this report?  Did y'all call him
17  to come out and look at the house?
18          (Defendant's Exhibit Number 13 was
19          marked for identification.)
20      A.   Yes.  I am not sure if we did or what
21  happened, to give you a little history.  A lot of
22  houses in our neighborhood were affected by Chinese
23  dry wall.  And my wife wanted to make sure we
24  didn't have that because we had some friends that
25  had a major issue with that.  We had an inspector

Page 57

15 (Pages 54 to 57)

A50B525
ROBERT BARTON        JANUARY 4, 2012

1  come out and check our house for Chinese dry wall.
2  And when he was in our house he had gone into our
3  attic.  And under the dormer windows when we had
4  our house built they had put in outlets underneath
5  each dormer window.  And when he got there he said,
6  did y'all put those outlets in there?  And we said
7  like after the fact?  And he said, yeah.  And we
8  said, no, our builder did.  And he said there is a
9  lot of water in those outlets and that's a huge
10  fire hazard.  And he said you have a ton of water
11  coming through your roof here.  And his concern was
12  great and he said, I would recommend that you
13  calling or getting in touch with Crown
14  Construction, the inspector that we used, and he
15  came out and gave our house a full inspection.
16      Q.    So the person who initially came out to
17  your house was not the person with Crown?
18      A.    That's correct.  They were checking for
19  Chinese dry wall.
20      Q.    Do you remember his name?
21      A.    My wife may remember it.
22          MS. BARTON:  I will try to come up with
23  it.
24      Q.    And then you contacted the Crown
25  Construction person and he came out there and did a

Page 58

1  full report?
2      A.    Yes.
3      Q.    Did the Crown Construction person refer
4  you to your lawyer?
5      A.    I'm not sure.  I don't remember.
6      Q.    I believe his name is David Bennet.  Did
7  you meet him when he came out there to do the
8  inspection?
9      A.    I did not.  I believe my wife did.
10      Q.    Let me back up one second before we get
11  into this report and let me ask you this.  Were
12  there any times after the one-year warranty period
13  was up, which would have been in October of '07,
14  were there times that you called Stacy Alliston
15  after that period to address things?
16      A.    I am not sure of that time frame.  I am
17  not really sure if past the year we talked at all,
18  to be honest with you.
19      Q.    All right.  If you would go to the
20  second page of the report.  There are pictures
21  taken of the rafters and the ridge beam.  This is
22  up in the attic, correct?
23      A.    Yes.
24      Q.    Did you ever notice these problems
25  before with the rafters and ridge beam before David

Page 59

1      Bennet came out there to inspect it?
2      A.    On the rafters and ridge beams, I am not
3  an expert so I wouldn't notice something like tat.
4      Q.    I mean, do you have an opinion as to
5  whether the condition of those rafters and ridge
6  beams changed from the date that you closed, or did
7  they always look like that?  Do you know?
8      A.    I don't really have an opinion.
9      Q.    And the third picture at the bottom,
10  there are two pictures at the bottom that talks
11  about water damage with evidence of fungal growth,
12  is that near the dormer window?
13      A.    It is essentially near and between all
14  of those dormers.  It is essentially three spots on
15  that front page.  The area that we had replaced on
16  the house would be this whole front elevation of
17  the roof right there.  All of the decking and that
18  part of the roof has been replaced, not the dormer
19  windows but all of that has been taken out and
20  replaced.  And that's where the major culprit for
21  the water and the fungal growth and all of those
22  problems came from.
23      Q.    And on the third page, photographs four
24  and five, are we still in the attic?
25      A.    That's correct.  Yes.

Page 60

1      Q.    And on page four of the report, now we
2  are looking at pictures of the dormer windows?
3      A.    Yes.
4      Q.    I see some dark areas on the wood.
5      A.    Yes.
6      Q.    Is that from water?
7      A.    Yes.
8      Q.    And is that the outlet under the window
9  that Bennet said was a fire hazard?
10      A.    Yes.
11      Q.    On page five we are looking at pictures
12  of the gas supply line to the HVAC.  Did you
13  consider that -- those things a problem?
14      A.    No.
15      Q.    Before he went out there and inspected
16  them?
17      A.    I didn't.
18      Q.    Are those things in the same condition
19  today as they are in this photograph?
20      A.    To my knowledge they are.  I did not
21  find that and I was not looking for that.
22      Q.    Page six there is a picture of the HVAC
23  condensate line.  Did you know that was a problem
24  before this inspection?
25      A.    We did have a copper line that's a

Page 61

16 (Pages 58 to 61)

A50B525
ROBERT BARTON          JANUARY 4, 2012

1  drainage line that goes all the way down into our
2  basement. And we had to have that whole line
3  replaced. It was copper. The person that came out
4  said it really shouldn't have been copper. It had
5  corroded and started leaking in our downstairs. So
6  they had to run a line essentially the length of
7  the entire house using a flexible hose tubing of
8  some sort.
9         MR. EDGE: Did it have anything to do
10        with that one?
11    A.   I am not sure if that's the same line or
12 not to be honest with you. We did have some
13 condensation lines --
14        MR. EDGE: His question was have you had
15        anything done to that line in that
16        photograph?
17    A.   Have I done anything to it? No, I have
18 not fixed that.
19    Q.   **But as far as the copper line that you**
20 **were talking about earlier, you had somebody come**
21 **out and replace it?**
22    A.   Yes.
23    Q.   **Who was it?**
24    A.   It was Jason Bell Snider with Air Force
25 Heating and Air.

Page 62

1    Q.   **When did that happen?**
2    A.   I would say probably about two years
3  ago, three years ago. Somewhere in that time
4  frame.
5    Q.   **It was after the one-year limited**
6  **warranty period?**
7    A.   Yes.
8    Q.   **Okay. On to page seven. There is a**
9  **picture of -- the top picture is a picture of a**
10 **door and door frame. And under the photograph it**
11 **states that several doors were observed to be**
12 **misaligned?**
13    A.   Uh-huh.
14    Q.   **Had you ever noticed that before this**
15 **inspection?**
16    A.   I had.
17    Q.   **How many doors are misaligned in your**
18 **house?**
19    A.   I am not really sure. I know of
20 probably three that I can think of that were
21 misaligned.
22    Q.   **Did you ever inform Stacy Alliston or**
23 **any employee of Stacy Alliston Design of this**
24 **problem?**
25    A.   Just one of the three.

Page 63

1    Q.   **Was there ever any action taken to**
2  **correct that?**
3    A.   No.
4    Q.   **Do you know why not?**
5    A.   I just don't think they ever got around
6  to doing it.
7    Q.   **Did you notify them within the one-year**
8  **limited warranty period?**
9    A.   Yes.
10    Q.   **Did you notify Grant or Stacy if you can**
11 **recall?**
12    A.   I believe Grant. When it came to the
13 punch work I think Grant handled most of that.
14    Q.   **So the misalignment of the door, was**
15 **that in the punch list that we looked at earlier?**
16    A.   It was the overall -- that one door had
17 several problems. So I am not sure if that's in
18 the punch list or not. I'll have to find it and
19 see. I don't specifically see it on this list. My
20 wife might be able to pick up on it.
21        MS. BARTON: What door?
22    A.   The one going into the garage.
23        MR. EDGE: Why don't we let her find it.
24    Q.   **But you do recall having a conversation**
25 **with Grant about the misalignment of the door?**

Page 64

1    A.   Yes, that one specifically.
2    Q.   **Did Grant say he was going to do**
3  **something about it?**
4    A.   Yes.
5    Q.   **What did he tell you specifically he was**
6  **going to do?**
7    A.   He was going to put a new door on.
8  Because they had also improperly kept a lock on
9  that door with a lock that goes into the -- the
10 hinges were on the wrong side of the door.
11        MS. BARTON: I talked with him about the
12        door if you want to revisit that with me
13        later.
14    Q.   **And then we are still on page seven**
15 **there. There are three photographs at the bottom**
16 **of faucet handles and bath fixtures. And it states**
17 **that they weren't installed properly and had come**
18 **loose. Did you notice that as a problem?**
19    A.   The one specifically in my son's room,
20 yes. The other ones, not necessarily, but the one
21 has been a problem.
22    Q.   **Which one is in your son's room?**
23    A.   I believe the middle picture. I'm not
24 sure. I can't see on this it is so dark.
25    Q.   **Let me show you on this color photo.**

Page 65

17 (Pages 62 to 65)

A50B525
ROBERT BARTON        JANUARY 4, 2012

1     A.   Actually his isn't even on this photo.
2  The biggest one is his.  And that one is the powder
3  room.  That's --
4        MS. BARTON:  The left is not the powder
5        room.  That's my sink on the right.  The
6        middle one is Sissy's sink.  The left one is
7        our Jacuzzi tub.
8     A.   For some reason there's not even a
9  picture of my son's on there, but we are about to
10  replace that whole thing.
11     Q.   When did you notice -- how long after
12  you took possession of the home did you notice the
13  problem with your son's?
14     A.   My son's was definitely within the first
15  year.  The rest of them I wouldn't say it was in
16  the first year, but my son's definitely was.
17     Q.   Did you make that problem known to Stacy
18  Alliston Design and Building?
19     A.   I don't remember.
20     Q.   All right.  Page eight.  There are two
21  pictures at the top and it states the gross HVAC
22  return system requires at least one-inch clearance
23  under rooms being supplied.  Had you ever noticed
24  or thought that to be a problem before this
25  inspection?

Page 66

1     A.   I wouldn't think, no.
2     Q.   All right.  The next photograph is
3  closet light fixture has come loose and broken.
4     A.   That's not Stacy's responsibility.
5     Q.   The third photograph is closet
6  pass-through door skin is broken.
7     A.   That wasn't his fault either.
8     Q.   The next, on page nine of the report it
9  states upstairs hallway smoke detector was found
10  unplugged.
11     A.   That was not his doing.
12     Q.   And then the next photograph is water
13  staining under the foyer window.
14     A.   Yes.
15     Q.   And we have already talked about that.
16     A.   Correct.
17     Q.   Let me ask you this on the water
18  staining, is there still staining as we sit here
19  today evident on the wall?
20     A.   We just had it fixed.
21     Q.   And I will get to that once we get
22  through with the report.  Page ten there is a
23  photograph of a door hinge being incomplete.  Had
24  you ever noticed that as a problem before this
25  inspection?

Page 67

1     A.   Not that I'm aware of.
2     Q.   Page 11, the top photograph states that
3  several exterior windows do not seal properly at
4  sill.  Had you noticed that as a problem before
5  this inspection?
6     A.   Yes.
7     Q.   All right.  It says, several.  How many
8  is that?
9     A.   I'm not exactly sure.
10     Q.   And when it says not sealing properly
11  it's just not -- there is space left in between the
12  window and the seal?
13     A.   Yes.
14     Q.   Okay.  The photograph at the bottom of
15  page eleven is one of the brick exterior cladding.
16  It states that it has no weep holes.  Did you know
17  that was a problem before this inspection?
18     A.   No.
19     Q.   Have you had to your knowledge any
20  moisture problems as a result of improper brick
21  cladding?
22        MR. EDGE:  Object to the form.
23     A.   Not that I can think of.
24     Q.   On page 12 of the report the top two
25  photographs show the half column and brick and it

Page 68

1  states that the half column is not sealed at the
2  brick.  Did you notice that before this inspection?
3     A.   I did.
4     Q.   Did you ever call Stacy Alliston Design
5  and Building to come out and correct that problem?
6     A.   No.
7     Q.   The bottom photograph is a photograph of
8  two columns with a tape measure and it states
9  excess spacing was noted between the full columns
10  over elevated area.  Did you ever consider that a
11  problem?
12     A.   No.
13     Q.   All right.  Page 13 top photograph,
14  garage door was swapped around, leaving hinge butt
15  cut through.  Did you think that was a problem
16  before this inspection?
17     A.   Yes.  That's the door we discussed
18  earlier.
19     Q.   All right.  The misaligned door or is
20  that a different issue?
21     A.   It's misaligned.  It's been cut
22  through.  The hinges were put in improperly and the
23  whole door was supposed to be replaced.
24     Q.   The bottom photograph states rear
25  exterior doors to open patio are defective, skin is

Page 69

18 (Pages 66 to 69)

A50B525
ROBERT BARTON          JANUARY 4, 2012

1 warping and underside was improperly cut. Was that
2 a problem you noticed before this inspection?
3    A.   Yes. The doors are dramatically warped
4 now. They are going to have to be replaced.
5    Q.   Is that something that you had a
6 conversation with my client as far as him
7 addressing it and fixing it?
8    A.   No, I didn't know that it was cut
9 improperly. I think over time the water has
10 damaged the door because it's basically just
11 sucking the water up.
12    Q.   So is it fair to say that you didn't
13 notice that problem until after the one-year
14 warranty period?
15    A.   Yes.
16    Q.   Okay. Page 14. Brick rowlock coursing
17 under several windows does not meet minimum
18 standard for slope. Was that a problem that you
19 noticed before this inspection?
20    A.   No.
21    Q.   The bottom photograph through-wall
22 flashing is not installed and/or not consistent.
23 Was that a problem you noticed before this
24 inspection?
25    A.   I don't even know what through-wall

Page 70

1 flashing is to be honest with you. So no.
2    Q.   Page 15 weep holes are missing in
3 several locations and are inconsistent; is that a
4 problem you noticed before this?
5    A.   I didn't notice.
6    Q.   The bottom two photographs the caption
7 states, basement water purifier leaks.
8    A.   We put those on after the fact. Stacy
9 didn't do that.
10    Q.   Page 16. Top two photographs it states
11 hot water heaters do not have drip legs on gas
12 lines as required. Did you know that to be a
13 problem before this inspection?
14    A.   No.
15    Q.   Bottom photograph shows where the brick
16 cladding meets -- is that Hardie plank?
17    A.   I'm not sure. It's whatever our siding
18 is.
19    MR. EDGE: The type of siding whether
20 it's Hardie plank or Celotex.
21    Q.   Where the brick cladding meets something
22 else other than brick?
23    A.   Correct.
24    Q.   It says, this similar exterior materials
25 are not sealed to protect from the weather. Was

Page 71

1 that ever a problem that you were aware of before
2 this inspection?
3    A.   Yes. Because there has been some issues
4 with it since then.
5    Q.   Since when?
6    A.   Prior to them telling me that it was
7 unsealed right there, the siding has started to
8 bulge and pop out in certain spots.
9    Q.   When did you first notice that?
10    A.   I am not real sure time frame wise.
11    Q.   Was it after the one-year period from
12 the date of closing?
13    A.   Well, it was never sealed at the
14 closing. So I am not exactly sure of time frame.
15 I didn't mention it to Stacy, put it that way. It
16 wasn't something I would pick up on.
17    Q.   Page 17 the top photograph says driveway
18 corner is cracked. I am guessing you noticed that
19 before this inspection?
20    A.   Yes.
21    Q.   Did you ever consider that to be a
22 problem?
23    A.   No.
24    Q.   The bottom two photographs on page 17 it
25 says improper siding application noted on all roof

Page 72

1 rake and wall areas. Is that a problem or did you
2 think that was a problem before this inspection?
3    A.   Honestly it says manufacturer specs. I
4 am not exactly sure what that means.
5    Q.   Page 18 top photograph is of the
6 retaining wall. And it states front retaining wall
7 does not have weep/relief outlets installed. Did
8 you know that was a problem before this inspection?
9    A.   I didn't know to look for it. No, I did
10 not.
11    Q.   The bottom photograph -- what windows
12 are those? Are those to the left of the foyer
13 window?
14    A.   The left side of the house over above
15 the garage -- it would be on this side of the house
16 above the lower garage.
17    Q.   And just so we are clear, when we say
18 the left, that's the left when we are facing the
19 house?
20    A.   Facing on the left side of the house,
21 that's correct.
22    Q.   And is that the issue from the dormer
23 windows?
24    A.   No, these windows, they started
25 having -- it looked like what we thought was fungus

Page 73

19 (Pages 70 to 73)

A50B525
ROBERT BARTON        JANUARY 4, 2012

**Page 74**

1  growth. It showed black fairly early. Definitely
2  within the first year. And we finally got somebody
3  to go up there and inspect it and said it wasn't
4  fungus growth. The windows had never been primed
5  and that was just a slight layer of paint that had
6  been put on there that's flaking off. So that
7  black stuff is actually exposed wood that has
8  weathered and the paint is flaking off.
9      Q.   So it's not excessive fungus growth?
10     A.   No. The windows were never painted and
11  that's just bare wood that's showing right there.
12         MR. EDGE: Object to the form.
13     Q.   Who did you get to come up there and
14  tell you that that was a problem with the window?
15     A.   Well, we had several people come out.
16  Don Atkin, from Atkin Construction came out, Scott
17  Holcomb who does all of the work for Signature
18  Homes came out. I am not sure.
19         THE WITNESS: Mindy, was there somebody
20     else that came out?
21         MS. BARTON: Yes.
22     A.   We had several people come out and look
23  to give us opinions on the water damage and stuff
24  like that. But they are the ones who said that --
25  stuck their head out the window and said this isn't

**Page 75**

1  -- because it looks like fungus from the street.
2  But it's high up. And said this window was never
3  primed but the paint has flaked off because primer
4  was never put on it.
5      Q.   And has Don Atkin done any work on your
6  home?
7      A.   No, he's just one of the ones that came
8  to take a look at. Scott Holcomb is the one who
9  did all of the work on the home.
10     Q.   Okay. Page 19 the caption states, rear
11  patio arched windows have the brick veneer pulling
12  away along the upper arch. Did you know that was a
13  problem before this inspection?
14     A.   Yes. The concrete, basically the lines
15  have all fallen out.
16     Q.   When did you first notice that?
17     A.   I am not sure.
18     Q.   Was it within the one year that you
19  closed on the house?
20     A.   I don't think so.
21     Q.   And that's the last photograph of the
22  report. Is it fair to say that the inspection
23  report created by Crown Consulting and the punch
24  list items that we went over, the five-page punch
25  list items, does that encapsulate all of the

**Page 76**

1  problems that you know of with this house or are
2  there others that aren't included in those two
3  documents?
4      A.   I think that pretty much -- can I ask my
5  wife does that -- I can't think of anything else.
6  I think that pretty much has it.
7      Q.   Looking at now again your complaint,
8  paragraph 58 of the complaint, the allegation is,
9  the defendant willfully, wantonly fraudulently or
10  recklessly suppressed material facts from the
11  plaintiffs including but not limited to that their
12  home was not built in compliance with the
13  applicable building code and in a good and
14  workman-like manner in accordance with the
15  residential construction industry standards. So
16  are you making that allegation against Stacy
17  Alliston or Grant McCaleb or the company in
18  general?
19         MR. EDGE: Object to the form. If you
20     know.
21     A.   That seems like a lot of legal
22  terminology. And if it would be appropriate for me
23  to say I think that some things were done
24  inappropriate in our home that caused ultimate
25  financial burden on us.

**Page 77**

1      Q.   Sure. Let me ask you a better
2  question. Do you think there are any facts that my
3  client purposely hid from you or -- let's just go
4  with that question. Are there any facts about the
5  home that you feel like he purposely concealed?
6      A.   Not that I'm aware of, no.
7      Q.   Is there anything about the construction
8  process or the work that was done after the
9  construction process that you feel like my client
10  purposely lied to you about?
11     A.   No.
12     Q.   One of the allegations in the complaint
13  states that my client made material representations
14  including but not limited to that they would
15  correct all problems associated with the window and
16  that all problems identified in the punch list and
17  subsequent issues would be corrected. Now, are you
18  claiming that when my client made those
19  representations that he had no intention of doing
20  those things?
21     A.   No, I believe his intent was good. I
22  believe that he was a victim of the market.
23     Q.   Let's talk about Scott Holcomb and H&H
24  Repair. You said he's the contractor that does
25  work for Signature Homes?

20 (Pages 74 to 77)

ATKINSON-BAKER, INC.                          1-800-288-3376

A50B525
ROBERT BARTON        JANUARY 4, 2012

1    A.   Yes.  My understanding is that any punch
2 work, any problems after a close on a house that
3 come in -- his team comes in and fixes it.
4    Q.   He's the warranty crew?
5    A.   Yeah, that's a good definition.
6    Q.   Is he the only contractor that's done
7 work on your home since it was built?
8        MR. EDGE:  You are talking about
9    exclusive of anybody Mr. Alliston may have
10    sent out there?
11    Q.   Yeah.  Other than people that might have
12 a connection with Mr. Alliston, that Mr. Alliston
13 might have asked to go out there and work on punch
14 list items, is he the only contractor that's done
15 work on your home?
16    A.   No.
17    Q.   All right.  Who else?
18    A.   John Bradley.
19    Q.   Let's start with Mr. Holcomb.  To your
20 knowledge -- and again I know I am going to ask
21 your wife most of these questions so she can clean
22 up whatever.  What work did Scott Holcomb do on
23 your house?
24    A.   Scott has been the contractor for having
25 our roof repaired, the part of the roof that we had

Page 78

1    A.   Well, they had a roofing crew that came
2 out that they hired to come out and do that work.
3 And that team came to work on the roof first.  And
4 they wanted to make sure that all of that was fixed
5 before they started painting, and then they have a
6 team of painters that also does the painting and
7 the caulking and all of that stuff as well.  They
8 did some Sheetrock -- they cut out some Sheetrock
9 out of the walls to make sure the water had not
10 gone through -- water hadn't gone between and the
11 brick and the framing to make sure those were not
12 affected.  So they did a little bit of Sheetrock
13 work in that aspect as well.
14    Q.   How long -- all of the crews that you
15 just talked about that did all of that work, how
16 long of a time period were they at your house to do
17 all of that stuff?
18    A.   I am not sure.  My wife could tell you.
19 But I would say it's probably in the process of two
20 months or something like that.  Maybe not that
21 long.  A month or two months.
22    Q.   And just, again, I will ask Mindy about
23 this, but do you know what the final cost was that
24 you paid to Scott Holcomb for that work?
25    A.   It's still been compiled.  I am not

Page 80

1 asked to be fixed.  He has gone in and inspected
2 the dormers.  He has fixed the window that was
3 initially an issue.  I am not certain what kind my
4 wife called that, the one above the front door,
5 he's gone in and fixed that.  He's done all of the
6 caulking, gone in and painted the water stains,
7 those rooms that had the water stains in them,
8 which would be my daughter's and my son's room and
9 the foyer have all been painted.  He painted the
10 outside windows.  They have essentially painted the
11 entire house now that needed to be painted on the
12 outside, the areas that were affected on the
13 outside.  And they have waterproofed -- they have
14 done a water treatment, a sealant of some sort of
15 the inside of the attic that they didn't feel like
16 it needed to be replaced.  We could get by by
17 sealing a few things up.  They have done that.  And
18 I can't think of anything -- my wife may have some
19 other things they've done but I can't think of
20 anything else.
21    Q.   When did they start that work?
22    A.   I'm not exactly sure.  My wife would
23 probably know specifically.
24    Q.   It was him and like two or three other
25 guys?  How many people were out there with them?

Page 79

1 sure.  We have not written the final checks yet.
2    Q.   Is it over $10,000?
3    A.   Yes.
4    Q.   Over 20?
5    A.   I don't think so.  It may be in the 20
6 range but they basically took care of only the
7 necessary--.
8        MR. EDGE:  You've answered the
9    question.  He just wanted to know how much.
10    Q.   And are his crews done out there or do
11 they have any plans to come back?
12    A.   They will be coming back for other
13 things.  We just had them take care of what had to
14 be fixed to keep the problem from getting worse
15 right now.
16    Q.   What other things?
17    A.   More paint, probably more paint work.
18    Q.   Inside or outside?
19    A.   Inside.
20    Q.   Do you plan on them looking at anything
21 else or addressing any other problems?
22    A.   Not that I'm aware of.  From a
23 functional aspect I think it's all been taken care
24 of from the actual water damage aspect, but they
25 are going to keep a close watch to make sure that

Page 81

21 (Pages 78 to 81)

A50B525
ROBERT BARTON          JANUARY 4, 2012

**Page 82**

1 the work that they have done is done completely.
2    Q.   To your knowledge, has the problem been
3 corrected with the water?
4       MR. EDGE:  Object to the form.
5    A.   With the water, yes.
6    Q.   I'm guessing we've had some rain since
7 the time that he worked on this problem until
8 today?
9    A.   Yes.
10    Q.   Have you seen any of the water stains or
11 anything like that?
12    A.   No.
13    Q.   Now, tell me what John Bradley did.
14    A.   John came back in and painted areas that
15 were poorly painted.  We had -- I believe our
16 hallways upstairs, the main parts of our house that
17 were all one color more or less, the kitchen area,
18 the hallways, did not do the foyer because it's a
19 two-story foyer.  He did not want to get up on the
20 ladders, I believe that's correct.  I think that's
21 pretty much it.  Just went back and repainted some
22 areas that were never really painted very well.
23 Went back and used a better paint.  Just never
24 really looked very good.
25    Q.   When did he do that?

**Page 83**

1    A.   I really don't know.  I would have to
2 find out.  I could tell you but I don't know off
3 the top of my head.
4    Q.   How long was he at your house?
5    A.   I really don't know off the top of my
6 head.
7    Q.   More than a week?
8    A.   Probably so.
9    Q.   And do you know what you paid him for
10 his work?
11    A.   Off the top of my head I don't know.
12    Q.   Was it just him or did he have other
13 people out there with him?
14    A.   He had other people with him.  I believe
15 his cousin works with him.  They both came out
16 there and worked together.
17    Q.   And it was strictly painting?
18    A.   Painting and caulking.  That's pretty
19 much it.
20    Q.   Do you remember what areas he caulked?
21    A.   I think it was just the molding inside
22 the house.  Just the molding in the hallways that
23 split from the temperature changes and stuff like
24 that.
25    Q.   Did he do that work within the one year

**Page 84**

1 that you closed on the house or after?
2    A.   After.  I believe it was after.
3    Q.   All right.  Have we now talked about all
4 of the work that's been performed on your home by
5 contractors that are not associated with Stacy
6 Alliston Design and Building?
7    A.   No, we have the Air Force Heating and
8 Air, Jason Bell Snider still that part.  The line
9 that was leaking, they went back and replaced that.
10 Was there anything?  I can't think of anything else
11 off the top of my head that they did.  It seems
12 like there may have been something else that he
13 did.  They put water filters in the house but that
14 had nothing to do with any of this at all.
15    Q.   When did Air Force Heating and Air come
16 out and do that work?
17    A.   Specifically I couldn't tell you, but I
18 think within the last two or three years.
19    Q.   And you may have already said this and
20 forgive me if I am asking this again.  Do you plan
21 on them coming out and doing anything else?
22    A.   No plans.
23    Q.   All right.  Have we now talked about all
24 of the work on your home by contractors other than
25 people with Stacy Alliston and Design?

**Page 85**

1    A.   Just landscaping stuff is the only think
2 that I can think of, but it doesn't really pertain
3 to this that I can think of.
4    Q.   What kind of landscaping have you had
5 done?
6    A.   Just redoing the landscape, just
7 additional plants put in, things like that.  We had
8 a fence added to our yard and finished off some
9 landscaping.  Put in some more irrigation.
10    Q.   But that wasn't to address any problems
11 from the construction of the home?
12    A.   No.
13    Q.   Do you know how much you paid Air Force
14 Heating and Air to replace that line?
15    A.   I think he only charged me $100.  I
16 think that's correct.
17    Q.   Are there any other problems with the
18 home that you plan on calling a contractor to come
19 out and look at and maybe work on?
20    A.   We probably will have to get that door
21 replaced that goes in the basement, the one that we
22 said is messed up.  Just paint outside of that.
23 That's really about it that I can think of.  My
24 wife may have some things to add to it, but I can't
25 think of anything else right now.

22 (Pages 82 to 85)

A50B525
ROBERT BARTON        JANUARY 4, 2012

1    Q.    Painting on the outside?
2    A.    Painting on the outside and the inside.
3 Actually I take that back.  Just the inside.
4    Q.    What parts of the inside still need
5 painting?
6    A.    Just mostly the rooms that haven't been
7 painted yet need painting.  Probably the molding
8 and the trim and the ceiling and stuff like that.
9    Q.    All right.  Now, are you -- were those
10 rooms supposed have been painted by Stacy Alliston
11 and Design?
12    A.    They were painted by Stacy Alliston and
13 Design.
14    Q.    But you are saying they need to be
15 repainted?
16    A.    Yeah.
17    Q.    How come?
18    A.    Just not a real good layer of paint put
19 on.  The paint was just not quite to our
20 satisfaction as far as painting in there.
21    Q.    And there are two rooms that you want to
22 do that in?
23    A.    Well, we had one room already painted
24 back when John Bradley did that.  But I am trying
25 to think of where else didn't get painted.

Page 86

1 don't know what it would be.
2    Q.    All right.  You made a homeowner's claim
3 with All State at one point.
4    A.    Yes.
5    Q.    When did you make that claim?
6    A.    I am not sure when it was made
7 date-wise.
8    Q.    Was it within one year of you taking
9 possession of the home?
10    A.    Yeah.
11    Q.    What was the reason for making the
12 claim?
13    A.    When we found the water problems it just
14 seemed a logical source to call our homeowner's
15 insurance first to see if it would be covered by
16 homeowner's insurance.
17    Q.    And did All State send someone out there
18 to look at it?
19    A.    Yes.
20    Q.    And they denied coverage on the water
21 issues?
22    A.    They said it was a construction flaw.
23    Q.    They did pay you $780.32, though?
24    A.    Yes.
25    Q.    What was that for, painting?

Page 88

1 Probably -- maybe two rooms that I can think of,
2 yeah.
3    Q.    Do you plan on calling Scott Holcomb for
4 the door replacement?
5    A.    I don't know who we will call for that.
6    Q.    And do you plan on using John Bradley
7 for the painting?
8    A.    He's retired.  I would probably use
9 Scott if we did any other painting.
10    Q.    Are you satisfied with the work that
11 Scott Holcomb did on the house?
12    A.    Yes.
13    Q.    Do you have opinion as to how much
14 market value your home has lost as a result of all
15 of these problems?
16         MR. EDGE:  Object to the form.
17    A.    I don't have a --
18    Q.    Do you have an opinion as to the current
19 market value of your house?
20    A.    I don't know what it is.
21    Q.    Do you think it's more or less than what
22 you paid for?
23    A.    More.  Because we finished off some
24 areas.  Well, can I change that?  I am not sure
25 what kind of decline the market has had so I really

Page 87

1    A.    That was to paint over the affected area
2 that would continue to be a problem.
3    Q.    You're making a claim in this lawsuit
4 for mental anguish and emotional distress.  How
5 have the problems that you have alleged in your
6 complaint affected you mentally and emotionally?
7    A.    Well, it's been emotionally taxing
8 because we have been dealing with it for quite a
9 while now.  The time we've had to go get
10 contractors to take a look at it, just spent a lot
11 of time out of our schedule with the building
12 inspectors, the contractors coming to take a look
13 and see what the problem is.  It's been stressful
14 quite honestly because we never sued anybody ever
15 in our entire lives and that's not the way we do
16 things.  But it seems like this is the only option
17 we have.  And it's been stressful because I know
18 this puts a lot of stress on Stacy Alliston as
19 well.  So we don't want anything bad to happen to
20 him.  But it's been a long process.  And we've had
21 concerns, obviously, when people say that your
22 outlets are full of water and your house can burn
23 to the ground from it and your children live on the
24 third floor and on the top floor where that
25 happens, that's very stressful as well.  My

Page 89

23 (Pages 86 to 89)

ATKINSON-BAKER, INC.                    1-800-288-3376

A50B525
ROBERT BARTON          JANUARY 4, 2012

Page 90

1  daughter is a type I diabetic. And having that
2  mold and stuff produced around her room was
3  stressful as well; we were concerned about health,
4  problems with health with her because she already
5  has compromised health and having something else
6  happen to her isn't a good thing. But the time
7  that we put into it to have it done away from our
8  schedules is quite taxing.
9      Q.   What physical injuries have you incurred
10 as a result of the problems with this home?
11     A.   None.
12     Q.   Now, you have made a complaint to the
13 home builders licensure board regarding the
14 construction of this home, correct?
15     A.   I believe so.
16     Q.   Okay. And you understand that
17 Mr. Alliston has to go down to Montgomery for a
18 hearing on January 24th to deal with that.
19     A.   No, I don't know that.
20     Q.   And that they are -- they are talking
21 about issuing fines and making him go to classes.
22 Did you understand that?
23     A.   I did have a discussion with Stacy
24 recently about the fines. He had called us to tell
25 us that. But that process is new to my wife and

Page 91

1  myself. We didn't really know anything about that
2  at all. So we were just following a process
3  instructed to us by our lawyer to do, to follow a
4  process and that's what we did.
5      Q.   Do you think Stacy Alliston should be
6  fined?
7      A.   I don't think that's my call to make.
8      Q.   Looking now at the form that was sent in
9  to the home builder's licensure board. Do you
10 recall filling this out?
11     A.   Yes.
12     Q.   And you said that you were advised to
13 submit this complaint from your attorneys?
14     A.   That's correct.
15     Q.   Would you have done it otherwise?
16     A.   I don't know if I can really answer
17 that. I think in a situation like this whatever my
18 attorney would advised me to do would be the
19 correct course of action to take.
20     Q.   Let me ask you this. Would you have
21 thought to do this if you had not been told to do
22 it?
23     A.   I was not educated in doing this.
24 That's correct. This whole process is very
25 unfamiliar for my wife and myself.

Page 92

1      Q.   Right here where it says
2  contract/purchase amount you have 715,000/768?
3      A.   Right.
4      Q.   768,569.23 that was the contract price?
5      A.   The contract price was 715. That was
6  the total we ended up writing up at closing because
7  that was the extras that we had.
8      Q.   I am with you.
9          MR. POTTS: Give me one second. I am
10 almost done.
11         (Break held.)
12         MR. POTTS: I don't have anything
13 further.
14         (End of deposition, 11:32 a.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 93

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA  )
4  JEFFERSON COUNTY  )
5
6      I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype, and the questions and answers thereto
9  were reduced to computer print under my
10 supervision, and that the foregoing represents a
11 true and correct transcript of the deposition
12 given by said witness upon said hearing.
13     I further certify that I am neither of
14 counsel nor of kin to the parties to the action,
15 nor am I in anywise interested in the result of
16 said cause.
17
18         /s/Karen Kelley
19         Karen Kelley, CCR #317
20         CCR #317, Expires 9/30/12
21         Commissioner for the
22         State of Alabama at Large
23         My Commission Expires: 8/27/12
24
25

24 (Pages 90 to 93)

A50B525
ROBERT BARTON      JANUARY 4, 2012

1

## A

**Abbott** 11:19 12:1,1,3
**abbreviated** 46:5
**able** 32:19,23 33:12 34:4
34:5,6 35:5 64:20
**about** 10:9 11:9 13:22
16:15 17:6,8,13 18:15
18:16,17 23:10 25:14
25:19 29:22 32:24
34:14,24 35:1,4,7,24
36:6,20 43:20 44:4,5
46:6 48:7,9,17 49:9,18
50:18 51:1,16,22 52:3
52:22 53:20 54:5,6
55:19 56:21,22 60:11
62:20 63:2 64:25 65:3
65:11 66:9 67:15 77:4
77:7,10,23 78:8 80:15
80:22 84:3,23 85:23
90:3,21,24 91:1
**above** 5:8 48:23 73:14,16
79:4 93:6
**absent** 37:24 38:1
**Acceptance** 4:14 27:8
**accepted** 28:1
**accomplished** 37:5
**accordance** 76:14
**account** 10:6,16,17 12:6
**accounted** 57:12
**accounting** 10:5
**Acknowledgments** 4:16
28:15
**act** 15:7,14
**acting** 5:3
**action** 50:14 52:8 64:1
91:19 93:14
**actively** 47:4
**activity** 52:11
**actual** 81:24
**actually** 12:3 30:8 39:5
43:10 66:1 74:7 86:3
**add** 18:8 26:10,11 42:3
85:24
**added** 17:22,23,25 26:2
26:5,6,15 27:4 37:19
85:8
**addendum** 4:10 23:12
**adding** 26:17
**addition** 39:8
**additional** 27:3 30:7,24
31:13,16 37:19 38:5
39:25 42:4,10 85:7
**additions** 24:21,24 40:3
**address** 5:21 8:1,6,7,15
8:19,23 9:2 50:20 53:6
59:15 85:10
**addresses** 23:13
**addressing** 70:7 81:21
**advised** 91:12,18
**affected** 57:22 79:12
80:12 89:1,6
**affidavit** 4:14 27:7,22,23
**afford** 54:17
**after** 9:11,21,22 10:10,25
17:2 28:4 35:9 37:19
39:17 41:18,21,23
43:20,25 44:13,14,17
46:8,11 47:1,20,24,25
49:12 52:9,22 54:24

55:9 56:1 58:7 59:12
59:15 63:5 66:11 70:13
71:8 72:11 77:8 78:2
84:1,2,2
**afterwards** 38:3 39:23
**again** 6:21 32:15 35:13
36:16 44:13 48:2 76:7
78:20 80:22 84:20
**against** 6:9 29:17 30:22
76:16
**age** 14:16
**agent** 15:5,7,10,14 28:9
**ago** 63:3,3
**AGREED** 2,2,10,16
**agreement** 4:11 23:22
53:5
**ahead** 40:12,13
**al** 50:8 62:24,25 84:7,8
84:15,15 85:13,14
**al** 1:9
**Ala** 13:1
**Alabama** 1:2,15 2:8 3:6
3:14 5:2,3,7,22 8:2 9:3
12:7 93:3,22
**ALAN** 3:11
**allegation** 76:8,16
**allegations** 29:23 77:12
**alleged** 89:5
**Alliston** 1:8 3:23 6:8
22:13 25:16 30:1,2,16
55:8 59:14 63:22,23
66:18 69:4 76:17 78:9
78:12,12 84:6,25 86:10
86:12 89:18 90:17 91:5
**almost** 10:24 92:10
**along** 75:12
**already** 38:4 67:15 84:19
86:23 90:4
**Alumni** 16:20
**always** 17:2 60:7
**American** 13:1
**amount** 42:13 55:10 92:2
**and/or** 70:22
**angioplasty** 11:24
**angle** 31:6
**anguish** 89:4
**another** 33:13 34:4
**answer** 6:10,14,22 7:4
91:16
**answered** 36:12 81:8
**answering** 53:23
**answers** 93:8
**anybody** 78:9 89:14
**anyone** 7:22 19:9
**anything** 12:12 15:22
16:21 20:16 26:6,9,19
34:20 47:18 54:17
56:10 57:12 62:9,15,17
76:5 77:7 79:18,20
81:20 82:11 84:10,10
84:21 85:25 89:19 91:1
92:12
**anywise** 93:15
**apartment** 30:10,12 38:7
42:7 44:15
**apologize** 41:6
**appears** 23:12
**applicable** 76:13
**application** 72:25

**appropriate** 36:7 76:22
**approximately** 2:9
**arch** 75:12
**arched** 75:11
**architect** 21:18
**architectural** 40:7
**area** 17:24 19:14 34:6
40:6,8 48:2,3 60:15
69:10 82:17 89:1
**areas** 50:4,7 52:9 64:4
73:1 79:12 82:14,22
83:20 87:24
**around** 17:7 42:21 43:1
44:1 45:14 48:5 49:1
64:5 69:14 90:2
**arrested** 12:7
**ARTHUR** 3:3
**asked** 37:6 42:4 50:22,24
78:13 79:1
**asking** 6:9 25:12 51:16
54:10 84:20
**aspect** 80:13 81:23,24
**assign** 2:20
**associated** 77:15 84:5
**Association** 16:21
**assume** 6:22
**assumed** 48:10
**assumes** 51:14
**Atkin** 74:16,16 75:5
**ATKINSON-BAKER** 1:18
attic 26:3,18 34:15,17,18
40:6 48:5,13 49:2,15
49:16 50:18,20 51:3,8
52:7,15,23 54:7 55:1,4
56:8 58:3 59:22 60:24
79:15
**attics** 50:6
**attorney** 91:18
**attorneys** 91:13
**Auburn** 9:13,14,20,22
16:20
**Avenue** 1:14 2:7 3:5 5:7
5:8,12,19 6:1 8:10
14:20 15:19 19:17
46:16 56:1 58:22 64:21
65:11 66:4 74:21
**base** 25:17
**based** 11:25
**basement** 13:15 45:10

## B

**back** 9:24 12:11 23:10
30:14 34:1 40:11 53:25
59:10 81:11,12 82:14
82:21,23 84:9 86:3,24
**backwards** 46:22
**backyard** 33:12,14
**bad** 89:19
**bankruptcy** 15:24
**Baptist** 16:5,13
**bare** 74:11
**Barton** 1:4,5,13 2:5 3:24
5:8,12,19 6:1 8:10
14:20 15:19 19:17
46:16 56:1 58:22 64:21
65:11 66:4 74:21

**62:2** 71:7 85:21
**basically** 12:6,18 33:20
34:13,19 35:16 57:3,8
70:10 75:14 81:6
**bath** 65:16
**beam** 59:21,25
**beams** 34:3 49:23 60:2,6
**becoming** 11:5
**before** 2:6 5:6 6:2,5 7:4
8:25 16:10 17:15,19
19:12 20:23 22:4,13
26:23 27:8 29:19 32:17
37:17 44:1,10 51:7,12
51:24,25 59:10,25,25
61:15,24 63:14 66:24
67:24 68:4,17 69:2,16
70:2,19,23 71:4,13
72:1,19 73:2,8 75:13
80:5
**beforehand** 56:5
**began** 46:8
**behalf** 53:13
**behind** 13:17 48:13
56:17
**being** 5:13 25:9 30:5
36:10 37:19 38:6 45:18
47:6 49:15 66:23 67:23
**believe** 13:21 14:11
19:13,20 23:4 24:4
29:20,20 31:19,25 40:2
43:5,22 45:13,16 46:21
50:24 51:23 55:2 59:6
59:9 64:12 65:23 77:21
77:22 82:15,20 83:14
84:2 90:15
**Bell** 62:24 84:8
**belongings** 42:8
**Bennet** 59:6 60:1 61:9
**Besalski** 5:19
**better** 43:9 45:25 46:4
77:1 82:23
**between** 2:2 31:20 60:13
68:11 69:9 80:10
**beyond** 53:20
**bifurcation** 39:21
**big** 32:21 54:1
**biggest** 33:1 66:2
**Birmingham** 1:15 2:7 3:6
3:14 5:2,7 9:3,5,24
10:20 12:9
**birth** 5:24
**Bishop** 3:12
**bit** 21:14 80:12
**black** 74:1,7
**blanket** 45:1
**Blue** 3:13
**board** 54:23 90:13 91:9
**boards** 34:20
**bonus** 32:12 33:17
**books** 21:11
**born** 8:20 9:4 17:3,3
**Boston** 11:6,6
**both** 24:11 32:16 38:1,1
44:16 83:15
**bottom** 23:15 24:7 29:1
60:9,10 65:15 68:14
69:7,24 70:21 71:6,15
72:24 73:11
**bought** 11:6

**Boulevard** 1:20
**Bradley** 18:5 78:18 82:13
86:24 87:6
**Brand** 1:20
**break** 7:2,3,5 55:20,23
92:11
**brick** 68:15,20,25 69:2
70:16 71:15,21,22
75:11 80:11
**Bridge** 18:25 19:1,14,23
20:2,12 28:18
**briefly** 29:22
**bringing** 40:11
**broken** 67:3,6
**Brooke** 7:15,20
**build** 14:1 16:25 18:20
21:8,15 39:16 40:5
**builder** 19:3 33:7 36:10
53:6 56:25 57:1,8 58:8
**builders** 90:13
**builder's** 56:11 91:9
**building** 1:9 4:17,18 6:8
12:21 13:4 18:17 21:18
24:16 25:10 28:24
29:11 30:17 32:25 33:4
33:13 47:4 54:13 56:15
66:18 69:5 76:13 84:6
89:11
**built** 14:2 17:15 19:11,20
20:5 22:17 28:2 31:23
32:16 56:20,22 58:4
76:12 78:7
**bulge** 72:8
**bulldozer** 39:21
**bunch** 54:19
**burden** 76:25
**burn** 89:22
**Butler** 5:22 7:7,22
**butt** 69:14

## C

**C** 3:1 93:1,1
**California** 1:21 12:3,4
**call** 47:9,17 49:12 52:21
57:15,16 69:4 87:5
88:14 91:7
**called** 10:2,11 11:1 47:10
59:14 79:24 90:24
**calling** 58:13 85:18 87:3
**calls** 53:5
**came** 5:6 13:16 19:3
25:15 30:23 31:4,7
32:25 34:1 37:2,3
41:18 42:4 46:20 47:24
52:5 53:12 55:3,8
60:22 62:3 64:12 74:16
74:18,20 75:7 80:1,3
82:14 83:15
**capable** 19:5 26:16
**capacity** 11:11
**caption** 71:6 75:10
**captive** 15:10,12
**cardiology** 11:23
**care** 44:17,19,22,25
45:12,13 81:6,13,23
**career** 12:21
**Carolyn** 14:20
**CASE** 1:7

ATKINSON-BAKER, INC.                                    1-800-288-3376

A50B525
ROBERT BARTON      JANUARY 4, 2012

caulk 45:12
caulked 83:20
caulking 79:6 80:7 83:18
cause 5:8 51:11,20 93:16
caused 76:24
CCR 1:24 93:19,20
ceiling 86:8
Celotex 71:20
certain 28:2 30:22 31:2
  32:18 33:22 35:8 37:14
  37:15,17,18 72:8 79:3
certify 5:4 93:6,13
change 25:24 31:6 39:2
  39:2 54:17 87:24
changed 26:7 38:24 60:6
changes 24:16,22,23
  25:1,9,15,19 40:3
  83:23
charged 85:15
check 58:1
checked 45:17,19
checking 54:21 58:18
checks 81:1
child 17:2
children 7:12 14:15
  30:13 89:23
children's 40:7
Chinese 57:22 58:1,19
chunk 45:9
church 16:1,5,9,13
Circle 8:2
CIRCUIT 1:1
circumstances 38:23
civic 16:16
Civil 5:5
cladding 68:15,21 71:16
  71:21
claim 88:2,5,12 89:3
claiming 77:18
Clara 12:2,4
classes 90:21
clean 13:14 78:21
cleanly 6:17
clean-up 12:18,19,22
  13:12,15,24
clear 20:16 44:3 73:17
clearance 66:22
client 18:20,24 19:8
  20:23 22:6,7 23:23
  25:24 29:17 32:5 34:24
  36:25 53:8 70:6 77:3,9
  77:13,18
close 36:14,19 78:2
  81:25
closed 39:5 51:7,24,25
  60:6 75:19 84:1
closet 31:5,11 67:3,5
closing 15:17 38:17 39:4
  42:22 43:1,20 44:1,17
  51:12 54:24 72:12,14
  92:6
closure 37:16
clubs 16:16
coat 31:5,11
code 76:13
collections 10:5
college 10:1 13:3
Collins 3:4
color 65:25 82:17

column 68:25 69:1
columns 69:8,9
come 30:14 39:18,21
  49:22 50:2 53:6,25
  54:17 55:14 57:17 58:1
  58:22 62:20 65:17 67:3
  69:5 74:13,15,22 78:3
  80:2 81:11 84:15 85:18
  86:17
comes 33:16 78:3
coming 17:4 46:18 47:5
  50:3,10,11 51:2 52:13
  52:14 55:11,16 58:11
  61:12 84:21 89:12
commence 38:19
commencement 38:21
commencing 2:8
Commission 93:23
commissioner 5:3 93:21
common 50:6
commonplace 50:9
communication 47:15
company 10:2,11 11:1,3
  11:5,16,18 13:23 14:6
  14:8 42:10 76:17
competent 21:6
compilation 43:22
compiled 44:5 80:25
complaint 29:16,19,23
  29:24 36:24 46:7 76:7
  76:8 77:12 89:6 90:12
  91:13
complaints 53:7,8
complete 19:22 20:13
  32:23 35:4 37:15,20
  40:9
completed 30:8 32:13
  38:6 43:20 45:2,18,21
  53:17
completely 53:24 82:1
compliance 2:13 76:12
comprehended 21:16
compromise 31:8,12,20
  33:5
compromised 31:2 90:5
computer 93:9
concealed 77:5
concept 19:1
concern 50:3,9,18 51:12
  51:20 58:11
concerned 51:22 90:3
concerning 19:9
concerns 51:1 89:21
concrete 75:14
consider 61:23
condensation 62:13
condition 33:18 60:5
  61:18
confident 21:7
confirm 22:25 23:22,24
connection 78:12
consider 61:13 69:10
  72:21
consistent 70:22
construction 4:12,21
  12:13 20:10 24:4,13
  25:1,3 26:10 29:25
  30:11,17,23 31:19 32:4
  32:6,7 34:23 35:13

37:15 38:2,16,18 39:9
  40:4,16,18,24 41:15,17
  41:21,23 47:16,20
  57:14 58:14,25 59:3
  74:16 76:15 77:7,9
  85:11 88:22 90:14
Consulting 4:21 57:14
  75:23
contacted 58:24
contemplating 18:17
continue 89:2
continuing 56:3
contract 4:9,10 18:19,23
  19:7,12,21 20:23 22:4
  22:14 23:1,13 38:15,20
  92:4,5
contractor 12:20 13:4,8
  77:24 78:6,14,24 85:18
  89:10,12
contract/purchase 92:2
conversation 34:24
  35:20 52:7 54:25 64:24
  70:6
conversations 19:4
  20:22 21:1 22:12
copper 61:25 62:3,4,19
copy 29:11,21 48:20
corner 24:7 29:2 72:18
Corporate 12:1
correct 7:9,12 8:9 14:13
  15:1 18:18,21 24:10
  29:9 34:22 35:21 38:8
  39:7 40:17 41:11,23
  49:4 51:6 53:18 58:18
  59:22 60:25 64:2 67:16
  69:5 71:23 73:21 77:15
  82:20 85:16 90:14
  91:14,19,24 93:11
corrected 77:17 82:3
correspondence 47:21
corroded 62:5
cost 27:3 30:12,25 32:1,1
  33:4 42:10 80:23
counsel 2:3,18,19 5:6
  93:14
County 1:2 14:17,25 16:2
  16:18 93:4
couple 49:20 55:2,14
course 27:23 51:19
  91:19
coursing 70:16
court 1:1,19 2:14 5:1
  20:15
cousin 14:24 83:15
cover 31:25 32:1
coverage 88:20
covered 88:15
cracked 72:18
created 42:21 43:1,2,21
crew 12:18 78:4 80:1
crews 80:14 81:10
Crown 4:21 57:14 58:13
  58:17,24 59:3 75:23
culprit 60:20
current 5:20 11:16 87:18
currently 56:12
cut 39:21 69:15,21 70:1,8

80:8
cutting 54:20
CV-11-900187 1:7

D

dad 13:10
dad's 13:10
damage 54:21 60:11
  74:23 81:24
damaged 70:10
Daniel 4:15
dark 61:4 65:24
date 5:24 30:11 38:17,19
  38:20 39:4 43:24 60:6
  72:12
date-wise 88:7
daughter 26:4 90:1
daughter's 79:8
David 21:24 22:2 59:6,25
days 38:19,20
deal 21:4 22:16 90:18
dealing 36:9 89:8
dealings 45:23 46:2
debt 10:5
decided 16:25 25:18
  33:22 40:5
decision 26:14
decking 49:6,24 54:1
  60:17
declared 15:24
decline 87:25
defective 69:25
defendant 3:10 30:1,5
  76:9
Defendants 1:10
Defendant's 4:8 22:24
  23:2,11,16,20,25 24:3
  24:8 25:6 26:21,24
  27:7,10 28:7,11,14,20
  28:23 29:4,10,13 38:14
  41:3,9 42:2,19,23
  57:15,18
define 15:12 24:20 25:3
definitely 28:5 50:17
  66:14,16 74:1
definition 78:5
degree 9:21,23
denied 88:20
dental 13:10
deposition 1:12 2:4,11
  2:12,22 6:2 20:17
  92:14 93:7,11
depositions 2:15
Deroyal 10:11,13 11:10
describe 46:15
Design 1:8 6:8 30:1,3,16
  63:23 66:18 69:4 84:6
  84:25 86:11,13
designed 21:9 33:22
detector 67:9
developing 32:24
diabetic 90:1
different 16:9 21:14 26:7
  26:12 31:3 35:12,12
  43:18,23 48:7 52:4
  55:17 69:20
differently 35:10
diligent 41:14
dimension 35:8

direction 54:5
directly 18:3
disappointed 36:11
discussed 17:2 32:10
  46:6 49:17 51:1 52:14
  54:15 69:17
discusses 38:16
discussion 52:19 90:23
distress 89:4
division 12:2
document 4:15 22:23
  23:19,21 26:21,23 27:6
  27:8 28:3,8,15,24 29:3
  29:18 41:2 42:1 43:13
documents 23:9 76:3
doing 19:5 64:6 67:11
  77:19 84:21 91:23
Don 74:16 75:5
done 12:12,24 17:18
  18:12 36:3,4 45:3
  53:17 54:19 62:15,17
  75:5 76:23 77:8 78:6
  78:14 79:5,14,17,19
  81:10 82:1,1 85:5 90:7
  91:15 92:10
door 31:8,9 45:7,8,9,10
  45:11,11 56:14,18 57:8
  63:10,10 64:14,16,21
  64:25 65:7,9,10,12
  67:6,23 69:14,17,19,23
  70:10 79:4 85:20 87:4
doors 25:21,21 45:13
  63:11,17 69:25 70:3
doorway 48:23
dormer 34:8 49:2,4,5,19
  51:5 54:22 58:3,5
  60:12,18 61:2 73:22
dormers 60:14 79:2
down 6:16 12:8 27:3 31:3
  31:18 33:23 35:2,6
  37:2 46:18,23 49:8,22
  49:23 50:2,4 52:13
  54:11,12,15 62:1 90:17
  93:7
downstairs 45:10 62:5
dozens 21:10,11
do-it-all 12:19,22
drainage 62:1
dramatically 70:3
draw 21:20
drawn 38:21,22
drew 22:2
drip 71:11
drive 3:13 17:7
driveway 39:22 72:17
driveways 39:19
drove 39:23
dry 57:23 58:1,19
Ds 14:10
due 27:3 30:11 40:7
  48:22
duly 5:13
during 13:11 29:24 30:17
  30:23 31:19 32:4,6,7
  37:14,23 38:2 40:4,18
  41:15,17
D-E-R-O-Y-A-L 10:14

E

ATKINSON-BAKER, INC.                                    1-800-288-3376

A50B525

**ROBERT BARTON    JANUARY 4, 2012**

E 3:1,1 93:1,1
each 24:6 25:7 58:5
earlier 40:2 42:4 62:20
  64:15 69:18
early 20:13 47:16 74:1
easier 20:15 44:24
easy 40:10
economics 9:19,21
Eden 8:2 17:23
EDGE 3:3 22:1 24:23
  25:11 27:20 34:17
  36:12 39:11 40:22,25
  44:3,21 45:22 49:7
  50:1 51:14,18 52:16,18
  53:19 55:21 56:17 62:9
  62:14 64:23 68:22
  71:19 74:12 76:19 78:8
  81:8 82:4 87:16
educated 91:23
education 9:11,22
effect 2:13
eight 8:10 16:15 25:18
  66:20
eight-foot 25:20 31:8
either 53:12 67:7
elaborates 30:4
elevated 69:10
elevation 21:12 26:11
  60:16
eleven 68:15
emotional 89:4
emotionally 89:6,7
employee 63:23
encapsulate 75:25
encompassing 31:1
end 17:13 18:16 35:15
  92:14
ended 11:5 44:6 92:6
enter 18:19,23 21:4
entered 19:12,21 22:13
  23:23
entering 19:7
entertainment 34:9
entire 35:17 62:7 79:11
  89:15
entitled 28:15,24 29:11
episode 56:14,19,23
episodes 55:11
especially 22:10
essentially 18:10 57:1
  60:13,14 62:6 79:10
estate 13:23 14:6 15:5
et 1:9
even 66:1,8 70:25
events 37:3
ever 6:1,4 12:12 15:21,24
  17:15,18 18:12 31:23
  37:25 45:16,17 51:11
  52:21 53:8 59:24 63:14
  63:22 64:1,5 66:23
  67:24 69:4,10 72:1,21
  89:14
every 41:14
everything 6:16 12:23
  33:11,16 37:10 41:12
evidence 2:22 60:11
evident 44:10 67:19
exact 9:1 43:24
exactly 27:19 48:4 68:9

72:14 73:4 79:22
examination 4:1,2 5:9,16
examined 5:13
except 2:18 15:1 52:12
  53:9
excess 69:9
excessive 74:9
exclusive 78:9
exhibit 4:7,8 22:24 23:2
  23:11,16,20,25 24:4,8
  25:6 26:21,24 27:7,10
  28:7,11,15,20,23 29:4
  29:10,13 38:14 41:3,9
  42:2,17,19,23 44:7
  57:18
existed 44:12
expectation 32:19 33:21
  34:5,11
expected 33:15
expense 38:5
expenses 30:7 31:13,16
  42:5
experience 32:16
experienced 32:4
expert 60:3
expired 56:2
Expires 93:20,23
explained 32:17 34:2
  36:1
explanation 35:22 36:2
exposed 34:19 74:7
expressed 50:17
exterior 45:13 68:3,15
  69:25 71:24
extra 30:24
extras 4:13 26:22 92:7
e-mails 47:18

**F**

F 93:1
facing 49:9 73:18,20
fact 28:9 33:8 35:9 51:1
  58:7 71:8
facts 76:10 77:2,4
fair 6:24 56:1 70:12
  75:22
fairly 35:14 37:22 40:1
  74:1
fallen 75:15
family 14:21
far 17:11 19:4 24:21 49:5
  49:9 57:9,10 62:19
  70:6 86:20
fashion 32:14
faucet 65:16
fault 30:21 67:7
feel 32:5 39:9 40:23
  41:20 77:5,9 79:15
feet 56:21,22
felt 6:23 19:5 21:7,8,16
  22:9 31:23 33:4 37:16
  37:25 39:23
fence 85:8
few 8:21 37:3 47:2 52:12
  54:15 55:12 79:17
fiasco 57:2
file 1:25 38:12 42:15
filed 6:9 29:17
filling 91:10

filters 84:13
final 27:25 44:1,10 80:23
  81:1
finalized 45:24
finally 74:2
financial 76:25
find 18:2 61:21 64:18,23
  83:2
fine 20:9
fined 91:6
fines 90:21,24
finger 50:10
finish 33:23 34:6 35:2,23
  36:15 40:10,13
finished 19:16 20:6,8
  26:2,3,15 33:19 34:9
  34:25 38:20 85:8 87:23
finishing 35:1 40:15
fire 58:10 61:9
first 5:13 10:1,2 12:11
  14:23 31:23 47:2 48:22
  52:5 55:3 66:14,16
  72:9 74:2 75:16 80:3
  88:15
first-time 36:10
five 10:24 22:19 30:9,10
  30:13 38:7,10 44:14
  53:2 56:21,22 60:24
  61:11
five-page 75:24
fix 50:14 55:15
fixed 45:11 46:24 62:18
  67:20 79:1,2,5 80:4
  81:14
fixes 78:3
fixing 70:7
fixture 67:3
fixtures 65:16
flaked 75:3
flaking 74:6,8
flashing 46:22 48:11
  70:22 71:1
flaw 88:22
flexible 62:7
floor 1:20 32:10,11 33:17
  34:8,13 35:7 89:24,24
Florida 8:17
focus 41:25
folks 8:18
follow 91:3
following 5:9 91:2
follows 5:14
force 2:13 62:24 84:7,15
  85:13
foregoing 5:5 93:7,10
forgive 84:20
form 2:19 40:22,25 44:6
  68:22 74:12 76:19 82:4
  87:16 91:8
former 25:22
forward 36:21,23
found 26:16 67:9 88:13
four 10:23 60:23 61:1
fourth 32:10,11 33:17
  34:7,13
Foxford 8:16
foyer 46:14 52:5 54:6
  55:3 56:8 67:13 73:12
  79:9 82:18,19

frame 17:13 48:4,6 55:6
  59:16 63:4,10 72:10,14
framed 33:21 34:1,3
framing 40:9 80:11
fraudulently 76:9
friends 57:24
from 8:7 9:14,20,21
  12:23 13:24 19:9,20
  25:20 29:21 38:19,19
  38:20 41:7,7 45:14
  46:1 54:22 56:8,11
  60:6,22 61:6 71:25
  72:11 73:22 74:16 75:1
  76:10 77:3 81:14,22,24
  83:23 85:11 89:23 90:7
  91:13
front 6:11 18:3 21:12
  29:8 33:2 39:11,13
  48:21 60:15,16 73:6
  79:4
full 2:13 5:18 58:15 59:1
  69:9 89:22
functional 81:23
fungal 60:11,21
fungi 23:13
fungus 73:25 74:4,9 75:1
funny 44:23
further 2:10,16 92:13
  93:13

**G**

Gaines 3:12
garage 17:24 45:7 64:22
  69:14 73:15,16
gas 61:12 71:11
Gault 3:12
gave 35:22 57:8 58:15
general 26:9 76:18
getting 34:25 37:5 45:4
  45:24 53:21 58:13
  81:14
give 9:1 57:1,21 74:23
  92:9
given 6:1 93:12
Glendale 1:21
go 9:7,24 12:8 16:14 23:8
  23:10 31:10 39:22
  40:13 56:24 57:9 59:19
  74:3 77:3 78:13 89:9
  90:17,21
goes 62:1 65:9 85:21
going 6:9,10,22 12:11
  16:6 17:5 21:19 22:23
  23:10,14,19,21 25:7,16
  25:20 26:13,18,20 27:6
  30:14 31:5 36:14,19
  38:16 39:19 40:10 41:2
  42:19,20 44:18 54:4
  55:19 64:22 65:2,6,7
  70:4 78:20 81:25
gone 19:18 21:10 33:25
  58:2 79:1,5,6 80:10,10
good 21:5,7,8 22:10,16
  32:24 33:7 40:23 47:15
  76:13 77:21 78:5 82:24
  86:18 90:6
gotten 19:8
grade 33:12
graduate 9:9,14

graduated 9:20,21
Grant 21:22 35:20 37:4,6
  37:10,12 38:1 40:19,23
  41:4,14,20 42:18 44:12
  46:1,21 47:17 49:15,16
  50:5,13,19 52:8,14,21
  52:23 53:12 54:13,25
  64:10,12,13,25 65:2
  76:17
great 58:12
Greystone 19:18 20:20
gross 66:21
ground 89:23
grounds 2:20
growth 60:11,21 74:1,4,9
  guess 27:20 35:6
guessing 72:18 82:6
guest 26:4
guy 12:18,22 13:15,24
  21:5
guys 79:25

**H**

H 3:3
half 10:9,24 11:9 31:25
  32:1 68:25 69:1
halfway 33:9
hallway 67:9
hallways 82:16,18 83:22
handed 48:15
handled 64:13
handles 65:16
handling 37:10
handwriting 43:5
happen 63:1 89:19 90:6
happened 57:21
happening 31:21
happens 89:25
hard 22:15
Hardie 71:16,20
having 31:8 64:24 73:25
  78:24 90:1,5
hazard 58:10 61:9
head 6:15 26:5,8 38:11
  74:25 83:3,6,11 84:11
heading 54:1
health 90:3,4,5
heard 20:25
hearing 21:3 90:18 93:12
heaters 71:11
Heating 62:25 84:7,15
  85:14
held 55:23 92:11
help 15:17 48:18
helped 13:12
hence 50:7
Hendrix 3:12
her 14:19 15:13 20:17
  43:15 46:1,1 64:23
  90:2,4,6
hey 25:16
hid 77:3
high 9:7,8 12:16 13:3
  75:2
Hills 9:8
him 6:9 13:6,12,15 19:4
  19:21 47:9,10 48:15,18
  48:18 57:16 59:7 65:11
  70:6 79:24 83:9,12,13

A50B525

**ROBERT BARTON    JANUARY 4, 2012**

4

83:14,15 89:20 90:21
hinge 67:23 69:14
hinges 65:10 69:22
hired 80:2
history 57:21
Holcomb 74:17 75:8
  77:23 78:19,22 80:24
  87:3,11
hold 49:24
holding 30:21
holes 54:23 68:16 71:12
home 8:12 18:13,20 20:5
  22:3 30:7 36:10 46:9
  46:10 47:12 55:9 56:4
  56:12 66:12 75:6,9
  76:12,24 77:5 78:7,15
  84:4,24 85:11,18 87:14
  88:9 90:10,13,14 91:9
Homeowner 4:13 26:22
homeowner's 88:2,14,16
Homes 4:15 74:18 77:25
honest 46:3 59:18 62:12
  71:1
honestly 73:3 89:14
Hoover 5:22 8:2
Horsley 3:4
hose 62:7
hospital 10:17
hospitals 12:7
hot 50:8 71:11
hour 55:20
house 13:9 15:8 16:25
  17:5,15,19,23 18:17
  19:16 21:9,10,13,15,18
  21:20 22:18 24:5,16
  25:16 26:17 27:25
  30:10,13 31:4,23 32:17
  32:20,21,25,25 34:7
  35:17 36:14,19 37:20
  38:3,6 40:12 42:8,11
  44:10,13 49:10 51:7
  53:11 54:8,20,22 56:15
  56:18,18 57:9,17 58:1
  58:2,4,15,17 60:16
  62:7 63:18 73:14,15,19
  73:20 75:19 76:1 78:2
  78:23 79:11 80:16
  82:16 83:4,22 84:1,13
  87:11,19 89:22
houses 12:21 13:4,24
  14:1,2 17:8,11 19:11
  19:19,22,24,25 20:1,19
  57:22
house-building 21:11
huge 58:9
Hunter 7:15,16,17 8:20
Huntsville 12:8
HVAC 61:12,22 66:21
H&H 77:23

**I**

IC 10:2
idea 21:16
ideas 22:10
identification 23:3,17
  24:1,9 26:25 27:11
  28:12,21 29:5,14 41:10
  42:24 57:19
identified 77:16

identify 44:22,24
II 3:11
Illinois 12:2
important 33:6
improper 68:20 72:25
improperly 46:23 65:8
  69:22 70:1,9
inappropriate 76:24
INC 1:18
include 12:5
included 76:2
includes 47:20
including 76:11 77:14
incomplete 67:23
inconsistent 71:3
incur 30:7
incurred 30:11 31:14,16
  38:5 39:25 90:9
INDEX 4:1,7
industry 12:13 76:15
inform 63:22
information 18:2 28:25
informed 30:8
initial 29:8
initially 58:16 79:3
initials 23:14,18 24:6
  27:15,16 28:6 29:1,7
injuries 90:9
inside 79:15 81:18,19
  83:21 86:2,3,4
inspect 60:1 74:3
inspected 61:15 79:1
inspection 4:21 27:25
  48:20 57:14 58:15 59:8
  61:24 63:15 66:25
  67:25 68:5,17 69:2,16
  70:2,19,24 71:13 72:2
  72:19 73:2,8 75:13,22
inspector 57:25 58:14
inspectors 89:12
inspector's 56:12
installed 46:22 65:17
  70:22 73:7
instances 52:4
instead 31:7,8 40:10
instructed 91:3
insulation 12:23
insurance 88:15,16
intent 77:21
intention 77:19
interested 93:15
interpretation 26:8
interpretations 25:14
interventional 11:5,23
  12:7
involuntary 25:20
involved 6:4
irrigation 85:9
issue 30:15 32:21 37:21
  48:12,22,25 49:13
  57:25 69:20 73:22 77:9
issues 33:11 37:20 45:3
  46:8,10,12 52:22 53:6
  53:14,19,25 54:5,6,7,9
  56:7,8,12 72:3 77:17
  88:21
issuing 90:21
items 43:8 47:13,14
  75:24,25 78:14

**J**

Jackson 7:15,18
Jacuzzi 66:7
JAMES 3:11
January 1:16 2:8 5:4
  18:20 22:14 23:1 90:18
Jason 62:24 84:8
Jay 3:11 6:7 48:15
Jefferson 1:2 14:17,25
  16:2,17 93:4
job 10:1,2 12:11 21:8
  22:10 30:6 36:25 37:13
  40:23
jobs 13:2
John 18:5 78:18 82:13
  82:14 86:24 87:6
joint 26:13
joists 35:7,7,12 52:13,16
judge 6:11
jury 6:12 14:23,24
just 6:11 13:11,15,23,24
  14:18,22 18:8,10,15
  19:6,20 20:15 22:25
  23:14 28:8 29:18 32:15
  34:14,19 35:5 36:4,5,6
  36:21 37:7 41:25 44:3
  45:5,20 47:8,17 54:2
  54:16 63:25 64:5 67:20
  68:11 70:10 73:17 74:5
  74:11 75:7 77:3 80:15
  80:22 81:9,13 82:21,23
  83:12,21,22 85:1,6,6
  85:22 86:3,6,18,19
  88:13 89:10 91:2

**K**

Karen 1:24 2:6 5:1 93:19
keep 81:14,25
Kelley 1:24 2:6 5:1 93:18
  93:19
kept 65:8
kids 8:4
kin 93:14
kind 12:18,18,21,22 17:6
  21:3,12,16 26:13 32:12
  34:14 43:18 54:21 79:3
  85:4 87:25
kitchen 82:17
know 44:11,12 51:15,21
  51:23
know 6:20 7:2 13:16 17:1
  21:14 25:17 26:1 28:17
  30:18 31:21,24 32:11
  35:6,11,13 36:5,10,13
  36:18 38:9 39:15 43:10
  43:17,17,20 45:6 47:3
  47:21 48:11,17 50:6,8
  50:16,25 54:10 60:7
  61:23 63:19 64:4 68:16
  70:8,25 71:12 73:8,9
  75:12 76:1,20 78:20
  79:23 80:23 81:4 83:1
  83:2,5,9,11 85:13 87:5
  87:20 88:1 89:17 90:19
  91:1,16
knowledge 61:20 68:19
  78:20 82:2
known 66:17

**L**

L 2:1
ladders 82:20
Lake 3:13
Lakeside 16:13
land 57:2
landscape 12:25,25 13:1
  13:2 85:6
landscaped 57:5
landscaping 85:1,4,9
lapse 36:5
large 2:7 5:3 41:24 93:22
last 21:25 23:6,24 28:19
  43:18 75:21 84:18
later 20:16 33:23 34:6,9
  40:11 65:13
Lawn 13:1
laws 2:14
lawsuit 6:8 17:16 29:18
  89:3
lawsuits 6:5
lawyer 29:21 59:4 91:3
lay 32:18
layer 74:5 86:18
layout 40:7
lays 25:6
lead 18:23
leading 2:19
leak 46:17
leaking 62:5 84:9
leaks 48:12 71:7
learning 32:15
least 6:23 66:22
leaving 69:14
left 13:17 41:19 49:5,9
  66:4,6 68:11 73:12,14
  73:18,18,20
Legacy 19:17,18,19
legal 43:11 76:21
legs 71:11
length 62:6
less 54:13 82:17 87:21
let 6:20 7:2 25:11 27:14
  50:13 57:13 59:10,11
  64:23 65:25 67:17 77:1
  91:20
let's 36:20,22 77:3,23
  78:19
Liberty 15:5,11,13,18,19
  34:7
licensure 90:13 91:9
lied 77:10
life 14:22
light 67:3
like 6:23 10:6 12:24
  13:25 14:4 16:21 17:9
  17:12 19:5,6 20:4 21:5
  21:6,6,8,16,19,21 22:9
  24:6 25:20 28:3,8 29:1
  30:23 31:2,11,23 32:5
  33:5 34:10,15,17,20
  36:8 37:16,25 38:18
  39:9,23 40:23 41:20
  42:25 43:4 45:17 46:5
  47:18 58:7 60:3,7
  73:25 74:24 75:1 76:21
  77:5,9 79:15,24 80:20
  82:11 83:23 84:12 85:7
  86:8 89:16 91:17

liked 18:25,25 19:1,3
  20:25
limited 4:11 23:22 53:4
  63:5 64:8 76:11 77:14
line 38:21 47:15 61:12,23
  61:25 62:1,2,6,11,15
  62:19 84:8 85:14
lines 45:12 62:13 71:12
  75:14
list 4:19 28:1 37:22 41:18
  41:24 42:21,25 43:2,11
  43:19,21,22 44:4,12,16
  44:18 45:19,24 46:2
  47:13,14 53:9,16 55:12
  57:11 64:15,18,19
  75:24,25 77:16 78:14
little 21:14 57:21 80:12
live 7:10,22,25 8:6,14,23
  17:9 42:7 89:23
lived 7:7 8:7,10,18,21,25
  9:3 17:23 18:13 32:21
lives 89:15
living 14:17 28:17 30:12
  44:14
LLC 4:15
located 10:18
locations 71:3
lock 65:8,9
logical 88:14
long 8:6,23 10:8,22 11:8
  16:6,14 37:22 39:15
  47:1,25 54:24 66:11
  80:14,16,21 83:4 89:20
longer 32:22
look 19:11,24,25 20:1
  22:25 23:21 34:15
  42:25 43:4 44:20 45:17
  57:17 60:7 73:9 74:22
  75:8 85:19 88:18 89:10
  89:12
looked 19:19 20:19
  64:15 73:25 82:24
looking 17:8,11 24:12
  29:16 38:14 48:21 49:7
  52:2 61:2,11,21 76:7
  81:20 91:8
looks 24:6,10 28:8 29:1
  34:17 38:18 46:5 75:1
loose 65:18 67:3
lost 87:14
lot 14:3 19:1,2,3 22:16
  26:7,22 30:25 36:9
  45:1,4,5 56:16 57:21
  58:9 76:21 89:10,18
loud 6:14
lower 73:16

**M**

made 2:18 21:4 24:17
  25:19 29:23 34:9 40:3
  44:10 46:19 53:7,8
  77:13,18 88:2,6 90:12
magazines 21:11
main 82:16
maintain 33:7
major 9:18 12:7 41:25
  57:25 60:20
make 2:20 8:9 14:23 31:6
  32:11 36:7,7 53:21

A50B525
ROBERT BARTON     JANUARY 4, 2012

5

54:2 57:23 66:17 80:4
80:9,11 81:25 88:5
91:7
making 32:11 35:5 76:16
88:11 89:3 90:21
manager 10:6,16,17 12:6
34:2 35:10,19 56:25
manner 76:14
manufacturer 73:3
many 22:12 36:25 37:5
52:25 55:7,18 63:17
68:7 79:25
marathon 7:1
mark 24:3 26:20 27:6
28:14 42:2,19 57:14
marked 4:8 23:2,9,16,25
24:8 26:24 27:10 28:11
28:20 29:4,14 41:10
42:24 44:6 57:19
market 77:22 87:14,19
87:25
marking 22:24 23:11,20
28:7,23 29:10 41:3
Mary 7:15,20
master's 9:23
material 76:10 77:13
materials 71:24
matter 29:17
may 2:6,20 5:25 8:7 26:7
43:9 45:19 53:21 54:1
58:21 78:9 79:18 81:5
84:12,19 85:24
maybe 17:10 18:1,1
80:20 85:19 87:1
McCaleb 4:20 21:23
35:20 38:1 41:14,20
46:21 50:19 54:25
76:17
McCaleb's 40:19 41:4
42:18
Meadowbrook 12:21
13:5,9
mean 15:13 60:4
means 73:4
measure 69:8
medical 10:16 11:12
meet 16:17 41:21 59:7
70:17
meeting 33:9 41:14
meets 71:16,21
member 16:1,9,16,20
memory 49:4
mental 89:4
mentally 89:6
mention 72:15
mentioned 38:4
mess 13:17 55:15
messed 85:22
met 21:18 52:23
middle 65:23 66:6
might 48:18 64:20 78:11
78:13
Mike 12:17 13:19
mildew 23:13
mind 33:16
Mindy 1:5 3:24 7:10 8:3
45:23 74:19 80:22
minimal 18:10
minimum 70:17

misaligned 63:12,17,21
69:19,21
misalignment 64:14,25
missing 71:2
moisture 68:20
mold 23:13 90:2
molding 25:17 83:21,22
86:7
mom 13:22 14:5
money 35:3
Montgomery 90:17
month 43:20 80:21
months 8:22 47:3 55:2
80:20,21
more 21:15 22:19,21
26:2,17 30:25,25 36:2
40:5 53:2 54:12 81:17
81:17 82:17 83:7 85:9
87:21,23
Morris 1:14 2:7 3:5 5:7
most 13:17 30:19 31:12
33:5,15 46:2 54:22
57:10 64:13 78:21
mostly 13:15 14:2 46:12
86:6
mother 14:18 15:1 28:9
Mountain 16:5
move 30:9 36:21,22
42:11
moved 8:11 37:17 42:8
46:8,11 47:1 54:13
55:9
moving 42:10
much 20:13 33:10 37:10
38:9 40:8 46:3 76:4,6
81:9 82:21 83:19 85:13
87:13
myself 35:14 91:1,25

N
N 2:1 3:1
nail 54:23
name 5:18 6:7 11:18
12:20 14:19 21:25
58:20 59:6
names 7:14
Natter 12:17,17,17 13:19
14:9
near 60:12,13
necessarily 51:20 65:20
necessary 2:17 81:7
need 7:2 32:18 41:15
86:4,7,14
needed 37:16 79:11,16
needs 39:24 41:21
neighborhood 17:12
18:1 28:18 47:4 56:25
57:22
neighborhoods 15:15
neighborhood's 56:23
neighbors 56:14
neither 93:13
never 22:17 32:16 44:19
45:2,11,11 47:18 53:17
72:13 74:4,10 75:2,4
82:22,23 89:14
new 8:12 18:17 20:12
22:17 35:14 65:7 90:25
next 17:6 26:20 42:19

48:25 56:14,15,17,18
57:8 67:2,8,12
nice 32:22
nine 67:8
nobody 14:25
nods 6:15
None 90:11
North 1:20
nos 6:15
Notary 2:6 5:2
noted 69:9 72:25
nothing 84:14
notice 46:10,25 52:9
59:24 60:3 65:18 66:11
66:12 69:22 70:13 71:5
72:9 75:16
noticed 52:4 63:14 66:23
67:24 68:4 70:2,19,23
71:4 72:18
noticing 46:8
notified 47:7,11
notify 64:7,10
number 1:7 2:3,16,25
24:8 26:24 27:10 28:11
28:20 29:4,13,24 38:23
41:9 42:13,23 45:15,15
46:15 57:18
N-A-T-T-E-R 14:12

O
O 2:1
oath 6:11
Object 40:22,25 68:22
74:12 76:19 82:4 87:16
objections 2:17,20
observed 63:11
obviously 89:21
occasions 55:17
occur 56:13
October 7:8 39:6 56:3
59:13
off 26:2,3,5,8,15,18
33:23 34:6,9 35:2
38:11 40:10,14,15 41:4
45:17,19 52:18 74:6,8
75:3 83:2,5,11 84:11
85:8 87:23
offered 2:22
office 13:10 15:13 17:22
18:8
Off-the-record 52:19
okay 7:5 8:8 9:4 11:15
15:21 16:23 19:7 24:19
26:20 28:14 36:15,20
36:22 48:14 63:8 68:14
70:16 75:10 90:16
old 7:16,18,20
older 14:16
once 32:15 35:13 44:13
67:21
one 13:9,21,22 16:4,12
17:16 20:5 37:6 39:11
39:12,13 41:13 44:5
46:18 49:17,23 51:9
52:5 53:5 56:2,14
59:10 62:10 63:25
64:16,22 65:1,19,20,22
66:2,2,6,6 68:15 75:7,8
75:18 77:12 79:4 82:17

83:25 85:21 86:23 88:3
88:8 92:9
ones 44:22,24,25 53:20
65:20 74:24 75:7
one-inch 66:22
one-year 59:12 63:5 64:7
70:13 72:11
only 26:14 32:8 34:17
78:6,14 81:6 85:1,15
89:16
onto 22:11
open 69:25
operation 54:13,15
opinion 60:4,8 87:13,18
opinions 74:23
option 89:16
oral 5:8
order 51:21
organizations 16:17
original 40:16
originally 25:25 26:18
35:24 38:18 39:18
other 6:5 13:12 14:15
15:14 17:14 18:12 30:15
30:15 32:1 40:3 47:12
47:14 52:8 53:11,13,19
53:24 54:7 56:13 57:9
65:20 71:22 78:11
79:19,24 81:12,16,21
83:12,14 84:24 85:17
87:9
others 76:2
otherwise 91:15
ourselves 21:10
out 6:14 10:1,20 11:6,25
12:1,2,3 13:24 15:10
18:2 20:13 25:5,6 26:9
26:16 28:1 31:4,7
32:18 33:11 35:9 42:8
42:11 43:8 45:4,10
46:20 47:5,5,6,24
48:19 50:8 52:5 54:3
54:17 55:8,11,14,16
57:17 58:1,15,16,25
59:7 60:1,19 61:15
62:3,21 69:5 72:8
74:15,16,18,20,22,25
75:15 78:10,13 79:25
80:2,2,8,9 81:10 83:2
83:13,15 84:16,21
85:19 88:17 89:11
91:10
outlet 61:8
outlets 58:4,6,9 73:7
89:22
outside 19:20 49:20,21
50:4,7 51:4,17 79:10
79:12,13 81:18 85:22
86:1,2
over 14:16 24:12 30:10
41:19,22,24 43:22
56:22 69:10 70:9 73:14
75:24 81:2,4 89:1
overall 64:16
overdue 30:13
owned 19:2

P
P 2:1 3:1,1

packet 28:25
pad 43:11
page 4:2 23:6,15,24 24:6
28:19 29:2,8,12 45:15
48:21 59:20 60:15,23
61:1,11,22 63:8 65:14
66:20 67:8,22 68:2,15
68:24 69:13 70:16 71:2
71:10 72:17,24 73:5
75:10
pages 24:11
paid 38:9 80:24 83:9
85:13 87:22
paint 18:15 45:2,5,12
56:7 74:5,8 75:3 81:17
81:17 82:23 85:22
86:18,19 89:1
painted 74:10 79:6,9,9
79:10,11 82:14,15,22
86:7,10,12,23,25
painters 45:4 80:6
painting 45:14 53:17
54:20 80:5,6 83:17,18
86:1,2,5,7,20 87:7,9
88:25
paper 21:17 22:11 43:14
paragraph 29:23 46:7
76:8
Park 12:1 15:6,11,14,18
15:19 34:7
part 13:17 32:19 40:16
43:19 56:19,20 57:3
60:18 78:25 84:8
particular 24:1
parties 2:3,20 93:14
parts 82:16 86:4
party 5:8
passing 45:5
pass-through 67:6
past 59:17
Pat 12:17 13:18
patio 69:25 75:11
pay 88:23
PC 3:12
Pensacola 8:16
people 21:14 74:15,22
78:11 79:25 83:13,14
84:25 89:21
performed 30:5 84:4
period 8:21 13:5,18
16:23,24 33:25 37:9,23
42:9 59:12,15 63:6
64:8 70:14 72:11 80:16
peripheral 11:4
permission 15:16
person 12:19 21:20,22
45:25 46:4 56:15 57:16
58:16,17,25 59:3 62:3
pertain 63:5
pharmaceutical 11:12
phone 47:9,17
photo 65:25 66:1
photograph 49:8 61:19
62:16 63:10 67:2,5,12
67:23 68:2,14 69:7,7
69:13,24 70:21 71:15
72:17 73:5,11 75:21
photographs 48:16
60:23 65:15 68:25 71:6

A50B525
ROBERT BARTON        JANUARY 4, 2012

71:10 72:24
physical 90:9
pick 47:8 64:20 72:16
picked 13:16
picture 60:9 61:22 63:9,9
63:9 65:23 66:9
pictures 59:20 60:10
61:2,11 66:21
piece 43:14
place 34:12 49:25
places 49:21
PLAINTIFF 3:2
plaintiffs 1:6 29:25 30:6
76:11
plan 21:7,19 22:2 26:10
81:20 84:20 85:18 87:3
87:6
plane 31:9
plank 71:16,20
planned 25:25
plans 21:21 24:17,20,20
31:4 32:9 36:7 81:11
84:22
plants 85:7
play 37:3
playroom 26:4
please 5:18 6:14
point 14:3 15:17 19:22
20:14 27:17 29:21
32:14,20 34:23 35:2,3
35:15,18 36:8,8 37:11
37:16 48:1,18 50:12
51:10 88:3
points 37:14 43:23
poorly 82:15
pop 72:8
portion 41:7
portions 28:2
possessed 43:10
possession 28:4 38:18
66:12 88:9
possible 44:14
Potts 3:11 4:3 5:17 6:7
24:25 25:22 44:8 48:15
51:16 52:20 55:19,25
92:9,12
powder 66:2,4
Powell 10:19
present 3:22 11:12 33:18
presume 15:2
presumes 51:21
pretty 18:11 28:25 33:10
37:10 39:19,22 76:4,6
82:21 83:18
pre-prerequisites 53:5
price 27:3 92:4,5
primary 45:23
primed 74:4 75:3
primer 75:3
print 93:9
prior 2:22 7:25 8:14 19:7
72:6
probably 13:21,22 17:5
17:10,13 31:3 43:5,15
43:16 46:3 55:5 63:2
63:20 79:23 80:19
81:7 83:8 85:20 86:7
87:1,8
problem 30:1 37:1 47:7

50:20 55:4,4 61:13,23
63:24 65:18,21 66:13
66:17,24 67:24 68:4,17
69:5,11,15 70:2,13,18
70:23 71:4,13 72:1,22
73:1,2,8 74:14 75:13
81:14 82:2,7 89:2,13
problems 29:25 30:16,19
30:20,20 31:17 32:3
37:7 40:19 44:19 47:12
53:11 55:14 56:4,5
57:10 59:24 60:22
64:17 68:20 76:1 77:15
77:16 78:2 81:21 85:10
85:17 87:15 88:13 89:5
90:4,10
Procedure 5:5
proceedings 5:9
process 22:17 24:15
25:10 30:17,23 31:19
32:4,6,7,24 34:24
35:13 37:15 39:10 40:4
40:19,24 41:17,21,24
42:12 47:16,21 55:16
77:8,9 80:19 89:20
90:25 91:2,4,24
produced 90:2
product 11:22
progressed 17:11
project 18:11 34:2 35:4
35:10,19 41:15 56:25
projected 38:17 39:4
projects 18:13
prolonged 37:21 39:9
properly 53:18 65:17
68:3,10
Properties 12:17 14:9
15:20
property 26:12 28:1,2,4
56:23 57:4,8
protect 71:25
provision 38:15
provisions 28:16
pry 14:21
Public 2:6 5:2
pulled 41:4
pulling 75:11
punch 4:19 37:22 41:18
41:24 42:20,25 43:10
44:4,12,16 45:24 46:2
47:13,14 53:9 55:12
57:11 64:13,15,18
75:23,24 77:16 78:1,13
Purchasers 4:16 28:16
purifier 71:7
purposely 77:3,5,10
pursuant 5:4
put 21:17 24:6 25:7
30:24 45:9 50:10 58:4
58:6 65:7 69:22 71:8
72:15 74:6 75:4 84:13
85:7,9 86:18 90:7
puts 89:18
putting 22:10
P.C 3:4

Q
Quality 4:17,18 28:24
29:11

question 6:19,21,23 7:3
7:4 25:12 27:12 36:12
42:3 51:14,19 62:14
77:2,4 81:9
questions 2:18,19 6:10
78:21 93:8
quick 22:25 40:1
quickly 17:11 39:20,22
quite 57:2 86:19 89:8,14
90:8

R
R 3:1 93:1
rafters 50:1,2,5 52:16,17
59:21,25 60:2,5
rain 82:6
rained 46:18 52:12
raining 49:22
raised 9:4
rake 73:1
range 81:6
rather 6:15
read 6:17 27:22 41:6
reading 2:11
ready 44:15
real 13:23 14:5 15:5
20:12 21:21 22:25
72:10 86:18
realization 17:4
realize 40:8
really 17:10 18:15 21:9
22:8,9,15 26:5 28:16
37:19 41:5 59:17 60:8
62:4 63:19 82:22,24
83:1,5 85:2,23 87:25
91:1,16
rear 39:12 69:24 75:10
reason 23:4 66:8 88:11
reasonable 25:13 33:9
recall 8:25 10:25 16:23
24:12,15 25:2,9 27:18
28:3,5 29:2,6 49:1
50:22 51:13 55:7 64:11
64:24 91:10
Receipt 4:18 29:11
receiving 29:2
recently 90:4
recklessly 76:10
recollection 43:9 45:20
recommend 58:12
recommendations 19:8
reconciled 37:23
record 6:17 38:12 52:18
redoing 85:6
reduced 93:9
refer 8:8 59:3
reflected 27:3
reflects 28:9 55:13
reframe 35:17
regarding 90:13
regularly 16:17
reins 37:4
relating 2:14
relationship 33:7
relatives 14:16
relieved 54:14
remedy 39:20
remember 12:20 14:3
17:7 20:8,11 21:17

26:14 37:5,8 38:23
39:1,17,19 46:21 47:5
49:14,15 50:5,17,25
52:11 55:10,11,16
58:20,21 59:5 66:19
83:20
remodeling 17:18 18:13
rent 38:9
repainted 82:21 86:15
Repair 77:24
repaired 78:25
rephrase 6:20
replace 53:25 54:18
62:21 66:10 85:14
replaced 45:8 60:15,18
60:20 62:3 69:23 70:4
79:16 84:9 85:21
replacement 87:4
report 4:21 48:21 57:11
57:15,16 59:1,11,20
61:1 67:8,22 68:24
75:22,23
REPORTED 1:24
reporter 5:1 20:16
REPORTERS 1:9
represent 6:7 27:21,23
representations 77:13
77:19
represents 93:10
request 33:9
required 71:12
requires 66:22
resident 5:20
residential 76:15
resolved 57:6
respective 2:3
response 36:13,18,22
responsibilities 54:14
responsibility 67:4
responsible 19:2
rest 66:15
result 31:17 38:5 68:20
87:14 90:10 93:15
retained 22:6,6,7
retaining 26:11 30:24
33:2,13 37:18 39:8,25
56:20,21 57:3,5 73:6,6
retired 15:2 18:7 87:8
return 66:22
revisit 65:12
revolves 45:14
ridge 8:2 17:23 59:21,25
60:2,5
right 6:4 7:6 8:4 17:14
18:3,19 19:6 20:18
22:5 24:3,7 25:8 26:1
29:2 38:13 42:1,14,15
43:13 45:15 46:13
48:23,23 52:3 53:4
54:9 56:19 59:19 60:17
66:5,20 67:2 68:7
69:13,19 72:7 74:11
78:17 81:15 84:3,23
85:25 86:9 88:2 92:1,3
Riverchase 14:4
road 33:23 35:2,6 54:11
Robert 1:4,13 2:5 5:7,12
5:19
roof 49:6 54:1,18,23

58:11 60:17,18 72:25
78:25,25 80:3
roofing 49:21 80:1
room 17:24,25 25:7 26:4
32:12 33:17 34:4,10,14
34:25 35:6 36:18 65:19
65:22 66:3,5 79:8
86:23 90:2
rooms 26:3,16 37:19
40:5,7,14,15 66:23
79:7 86:6,10,21 87:1
Ross 18:25 19:1,14,22
20:2,12 28:17
rotting 54:19
roughly 16:24 17:1
rowlock 70:16
rules 2:14 5:5
run 62:6
running 50:4

S
S 2:1,1 3:1
sales 4:5,10 11:12 23:1
23:12 38:15
same 2:13 8:18 13:23
48:6 55:6 56:5 61:18
62:11
sandbagging 53:23
Santa 12:2,4
sat 31:18
satisfaction 86:20
satisfactory 39:24
satisfied 35:24 53:14
87:10
saw 27:18 48:1,3,4,22
49:12 52:12
says 26:22 30:4 41:12
45:12 68:7,10 71:24
72:17,25 73:3 92:1
schedule 89:11
schedules 90:8
Schneider 11:1
school 9:7,8 12:16 13:3
Scientific 11:6,7
Scott 74:16 75:8 77:23
78:22,24 80:24 87:3,9
87:11
seal 68:3,12
sealant 79:14
sealed 69:1 71:25 72:13
sealing 68:10 79:17
second 30:15 52:6 59:10
59:20 92:9
see 48:1 49:20,21 50:4,7
51:4,17 61:4 64:19,19
65:24 88:15 89:13
seeing 34:19 43:23 49:1
seem 32:20 35:15
seemed 19:6 21:5,5,6,19
21:21 33:8 36:8 88:14
seems 76:21 84:11 89:16
seen 26:23 27:8,13,17
29:19 34:7 48:5 49:22
50:2 82:10
sell 11:22
send 88:17
sense 30:21 34:3

ATKINSON-BAKER, INC.                                    1-800-288-3376

A50B525
ROBERT BARTON   JANUARY 4, 2012

7

sent 53:12 78:10 91:8
separate 13:20 48:10
separated 43:18
September 39:5
served 28:9
serves 49:4
set 25:5
seven 12:7 63:8 65:14
seven-foot 25:21
several 26:1 31:24 55:17
 63:11 64:17 68:3,7
 70:17 71:3 74:15,22
Shades 16:5
share 33:3
Sheetrock 13:25 34:20
 40:11 46:19 54:20 80:8
 80:8,12
short 8:21
shorter 44:21
show 22:23 23:11,19
 30:6 36:25 37:7 41:2
 42:1 65:25 68:25
showed 74:1
showing 74:11
shows 71:15
shut 54:12,15
shutters 37:21
side 65:10 73:14,15,20
siding 71:17,19 72:7,25
signature 2:11 23:6,24
 24:2,11 28:6,18 29:12
 74:17 77:25
signed 22:4 44:16
signing 20:23 28:3
sill 68:4
similar 71:24
simple 18:11 33:8
since 7:8 11:10 31:22
 49:7 72:4,5 78:7 82:6
sink 66:5,6
sir 6:3,6,13 14:7 17:17
Sissy's 66:6
sit 67:18
site 30:6 36:25 37:13
situation 91:17
situations 31:24 48:10
six 61:22
sixes 49:24
six-foot 31:9
six-inch 25:17
skin 67:6 69:25
skipped 42:17
slight 74:5
slope 30:25 70:18
small 17:5 41:6
Smelcer 21:24 22:2
smoke 67:9
Snider 62:24 84:8
sodded 57:4
some 7:12 8:20 11:11
 12:24 19:19 20:10,19
 20:22 21:14 24:16
 26:10 27:17 29:21,22
 31:13 33:11 34:23 37:7
 37:16,20,20 45:3,3
 46:5 48:5 49:23 52:6
 53:24 55:13 56:13
 57:24 61:4 62:8,12
 66:8 72:3 76:23 79:14

79:18 80:8,8 82:6,21
 85:8,9,24 87:23
somebody 22:5 34:8
 43:6 62:20 74:2,19
someone 88:17
something 28:8 31:22
 32:9 34:10 35:6 41:4
 42:3 49:1 55:15,15
 60:3 65:3 70:5 71:21
 72:16 80:20 84:12 90:5
sometimes 44:23
somewhat 33:14 37:24
Somewhere 63:3
son's 65:19,22 66:9,13
 66:14,16 79:8
soon 44:14
sort 25:19 62:8 79:14
sound 18:21
source 88:14
space 17:22 18:9 26:3,17
 26:18 34:15,18,18 51:4
 51:16 68:11
spacing 69:9
spec 20:5
special 15:16
specific 52:11 55:10
specifically 13:9 15:18
 26:6,15 28:1 31:18
 32:8 37:6,8 46:13 49:3
 49:5 50:5,11,16,25
 52:2 55:18 64:19 65:1
 65:5,19 79:23 84:17
specification 40:16
specifications 4:12 24:5
 24:13 25:2,4,10
specs 73:3
spell 11:20 21:25
spent 89:10
split 83:23
spots 60:14 72:8
Springs 5:22 7:8,23
Stacy 1:8 3:23 6:7 19:2
 21:5,16 22:13 30:1,2
 30:16 31:1,20,25 32:10
 32:23 33:8 37:4,7,9,12
 37:23 38:1 39:2,17
 44:12 46:19,20 47:3,7
 47:11,16,17,24 49:12
 49:14 50:13,19 52:5,21
 53:12 54:12,14,16 55:8
 57:7 59:14 63:22,23
 64:10 66:17 69:4 71:8
 72:15 76:16 84:5,25
 86:10,12 89:18 90:23
 91:5
Stacy's 67:4
staining 67:13,18,18
stains 79:6,7 82:10
staircase 31:3,6
stairs 31:7,10
stand 41:11,15
standard 70:18
standards 4:17,18 28:24
 29:12 76:15
start 18:17 38:16 78:19
 79:21
started 11:10 17:4,6
 29:18 46:17,18 62:5
 72:7 73:24 80:5

state 2:7 5:3,18 36:24
 41:13 88:3,17 93:3,22
stated 33:15 57:10
statement 41:16 45:1
 46:9
states 29:24 46:7 63:11
 65:16 66:21 67:9 68:2
 68:16 69:1,8,24 71:7
 71:10 73:6 75:10 77:13
stems 54:22
stenotype 93:8
stents 11:23
step 17:6 25:18
steps 50:20
still 15:3 18:6 31:10
 43:12,14 47:3,5 60:24
 65:14 67:18 80:25 84:8
 86:4
STIPULATED 2:2,10,16
stipulation 5:6
store 42:11
stored 42:9
street 8:16 75:1
stress 89:18
stressful 89:13,17,25
 90:3
strictly 83:17
stuck 74:25
stuff 10:6 12:24 13:25
 14:4 17:9,12 36:10
 40:12 74:7,23 80:7,17
 83:23 85:1 86:8 90:2
style 21:13
subcontractors 53:16
 55:8,14
subject 14:14 57:13
submit 91:13
subs 13:16
subsequent 77:17
sucking 70:11
sued 89:14
suggested 22:8
Suite 3:5,13
summer 13:2
summers 13:21
summertime 13:11
supervision 93:10
supplied 66:23
supply 61:12
support 34:3,4 35:5
 49:23
supports 35:12
supposed 45:8 69:23
 86:10
suppressed 76:10
sure 8:9 14:23 19:15,21
 20:4,6,7,7,11,18 22:19
 24:22 25:5 27:14,19
 33:24 38:12 42:6 46:15
 48:4 51:9 53:1,3 54:2
 55:21 57:20,23 59:5,16
 59:17 62:11 63:19
 64:17 65:24 68:9 71:17
 72:10,14 73:4 74:18
 75:17 77:1 79:24 80:4
 80:9,11,18 81:1,25
 87:24 88:6
Surgical 10:12,14 11:11
surprise 32:13

survey 56:15
susceptible 25:13
swapped 69:14
sweeping 13:24
sworn 5:13
system 66:22
systems 10:3 11:24
S-C-H-N-E-I-D-E-R 11:2
S-M-E-L-C-E-R 22:1
s/Karen 93:18

| T |
|---|

T 2:1,1 93:1,1
table 7:4
take 7:2 38:17 40:13
 44:20 50:14,19 55:20
 75:8 81:13 86:3 89:10
 89:12 91:19
taken 2:6 7:5 44:17,19,22
 44:24 45:10,12,13 52:8
 59:21 60:19 64:1 81:23
 93:7
taking 2:15 6:16 37:4
 88:8
talk 23:10 29:22 45:25
 49:18 52:21 77:23
talked 22:16 35:1,24
 36:20 52:3 53:20 54:5
 54:6 59:17 65:11 67:15
 80:15 84:3,23
talking 25:14,19 34:14
 35:4 44:4,5 48:7,9,17
 49:8 62:20 78:8 90:20
talks 60:10
tallied 31:15
tape 69:8
tat 60:3
taxing 89:7 90:8
team 46:20 47:6,24
 53:13 78:3 80:3,6
tear 35:16
teenager 12:12
tell 43:3 46:13 55:17 65:5
 74:14 80:18 82:13 83:2
 84:17 90:24
telling 37:6 72:6
temperature 83:23
ten 22:21 67:22
Tennessee 10:19
terminology 76:22
territory 12:5
testified 5:13 40:2
testimonial 42:18
testimonials 4:20 41:7
texts 47:18
their 2:3 7:14 47:6 53:13
 74:25 76:11
thereabouts 39:6
thereto 2:23 93:8
thick 28:25
thing 13:23 19:6 26:14
 32:8 33:1,6 66:10 90:6
things 13:13 17:10 18:10
 21:3 26:2,10 27:4
 30:22 31:2,12,14 32:18
 32:25 33:10 37:5,17,18
 41:13,19 43:19 44:9,11
 46:4,5 54:16 55:12,13
 56:13 57:9 59:15 61:13

61:18 76:23 77:20
 79:17,19 81:13,16 85:7
 85:24 89:16
think 10:23 13:7,7,20
 16:19 17:2,3 22:12
 23:5 25:12 26:6,9,19
 32:9 33:1,5,10,15 36:1
 36:2,3,6 37:14 43:7,11
 43:12,16 45:23 47:15
 47:19,23 49:16,23
 51:19 53:22 56:10
 57:10,12 63:20 64:5,13
 67:1 68:23 69:15 70:9
 73:2 75:20 76:4,5,6,23
 77:2 79:18,19 81:5,23
 82:20 83:21 84:10,18
 85:1,2,3,15,16,23,25
 86:25 87:1,21 91:5,7
 91:17
thinking 17:6,8
third 1:20 17:2 60:9,23
 67:5 89:24
though 88:23
thought 26:12,17 31:1
 40:9 66:24 73:25 91:21
three 8:4 16:8 31:3 60:14
 63:3,20,25 65:15 79:24
 84:18
through 2:3 13:16 20:11
 21:10 22:25 23:8 27:24
 30:19 31:11 32:5 33:13
 38:22 40:12 44:18 45:5
 51:8 56:24 57:7 58:11
 67:22 69:15,22 80:10
through-wall 70:21,25
time 2:21,21 7:2 8:21
 11:13 12:10 13:5,18
 14:3 15:17 16:23,24
 17:13 19:22 20:6,14
 27:17 28:4 29:21 30:5
 30:8 31:15 32:15,20
 33:25 35:3,16,18 36:9
 36:15 37:6,9,11,23,25
 43:12 46:2,9,21 43:1,12
 44:2 46:18 47:11 48:1
 48:4,6 49:23 50:12
 51:10 52:7,22 55:6
 59:16 63:3 70:9 72:10
 72:14 80:16 82:7 89:9
 89:11 90:6
times 22:19 25:23 31:3
 37:1 52:9,12,25 55:7
 55:11,18 59:12,14
titled 27:7
today 6:10 27:9 29:19
 61:19 67:19 82:8
toe 54:23
together 83:16
told 36:17 52:14 54:16
 91:21
ton 58:10
top 26:5,8,21 35:17
 38:11 39:22 41:7 63:9
 66:21 68:2,24 69:13
 71:10 72:17 73:5 83:3
 83:5,11 84:11 89:24
tore 31:2
total 92:6
touch 58:13

ATKINSON-BAKER, INC.                    1-800-288-3376

A50B525
ROBERT BARTON     JANUARY 4, 2012

8

touching 45:4
touch-up 45:6
touch-ups 45:2
toward 54:1
traditional 21:15
transaction 15:8 28:10
transcribed 43:6,12 46:1
transcript 93:11
treatment 79:14
trial 2:21 14:22,23
trim 86:8
Triple 46:16,17
trucking 11:3
true 93:11
try 58:22
trying 44:13,23 86:24
Ts 14:10,11
tub 66:7
tubing 62:7
turned 35:9
Tuscaloosa 12:8
two 13:20 25:22 26:2,16
39:19 43:18 48:7,9,10
49:24 52:3 60:10 63:2
66:20 68:24 69:8 71:6
71:10 72:24 76:2 79:24
80:19,21 84:18 86:21
87:1
Two-and-a-half 8:24
two-story 82:19
type 21:13 45:9 71:19
90:1

___ U ___
U 2:1
Uh-huh 63:13
uh-uhs 6:16
ultimate 48:11 76:24
ultimately 34:11 54:10
54:11,12,18
under 6:10 20:10 49:19
58:3 61:8 63:10 66:23
67:13 70:17 93:9
underneath 58:4
underside 70:1
understand 6:12,20
90:16,22
understanding 27:2
46:24 78:1
understood 6:23 21:12
unexpected 31:22 33:2
36:9
unfamiliar 91:25
unfinished 17:24
University 9:13
unplugged 67:10
unsealed 72:7
until 11:12 36:14,19
46:10 70:13 82:7
unusable 33:20
upper 75:12
upside 46:23 49:8
upstairs 87:4
use 22:8,9 32:14,19
33:24 35:11 87:8
used 17:7 21:20 22:9
58:14 82:23
using 62:7 87:6
usually 47:17

___ V ___
v 1:7
vacation 33:25
value 87:14,19
vascular 14,19,21 12:3
veneer 75:11
version 43:11
versus 44:25
very 20:13 82:22,24
89:25 91:24
Vestavia 9:8,12
victim 77:22

___ W ___
waived 2:12
walk 51:8
walked 27:24
walking 20:11
walk-through 44:1,11
wall 26:11 30:24 33:2,13
37:18 39:8,25 56:20,21
57:3,5,23 58:1,19
67:19 73:1,6,6
walls 80:9
want 6:17 14:23 21:4
23:8 25:18,24 29:22
37:12 48:18 53:22
55:20 65:12 82:19
86:21 89:19
wanted 17:9 21:9,13,13
22:9 25:17 31:5 37:22
39:1,2,20 40:5 53:21
54:2 57:23 80:4 81:9
wantonly 76:9
warped 70:3
warping 70:1
warranty 4:11 23:22 53:4
56:2 59:12 63:6 64:8
70:14 78:4
wasn't 20:13 36:4 37:4,9
45:21 49:5 52:1 67:7
72:16 74:3 85:10
watch 81:25
water 46:12,18 47:1 48:2
48:3,4,5,22,25 49:22
50:2,9,18 51:2 52:4,9
52:12,14,22 53:14,19
54:5,6,7,21 56:7 58:9
58:10 60:11,21 61:6
67:12,17 70:9,11 71:7
71:11 74:23 79:6,7,14
80:9,10 81:24 82:3,5
82:10 84:13 88:13,20
89:22
waterproofed 13:14
79:13
waterproofing 12:23
way 5:22 7:8,23 25:12
31:4 32:18 33:22 35:7
35:23 36:4,4,18,20
62:1 72:15 89:15
weather 71:25
weathered 74:8
website 4:20 41:5,8
42:18
week 83:7
weeks 30:9,10,13 38:7
38:10

weep 68:16 71:2
weep/relief 73:7
well 12:25 13:13 14:1
15:13 21:17,19,20,21
24:11,22 27:14 30:18
35:10 40:9 42:9,12
48:13,21 49:19 51:14
54:4 56:13 57:6 72:13
74:15 80:1,7,13 82:22
86:23 87:24 89:7,19,25
90:3
went 10:11,25 11:1 13:24
21:21 25:23 31:9 40:12
45:7 61:15 75:24 82:21
82:23 84:9
were 5:10 8:20 9:4 11:6,8
13:2 16:9 19:22 20:12
21:3 24:16,17 25:1,19
25:23 26:1,16 27:4
31:2,5,10,13,16,24
32:3 33:1,11,12,24,25
34:8 35:4,24 36:9,11
36:15 37:3,17,18 38:1
39:18 40:3,4 43:19,23
44:9,10,13,15,19,22,24
44:25 45:2 46:9 47:4
49:20 51:25 53:7,14,19
53:24 54:3,7 56:3,5
57:22 58:18 59:11,14
62:20 63:11,20 65:10
69:22 72:1 74:10 76:23
79:12,25 80:11,16
82:15,17,22 86:9,12
90:3 91:2,12 93:9
weren't 65:17
we've 54:5,18,19,21 82:6
89:9,20
while 14:14 54:4 57:13
89:9
whole 35:17 60:16 62:2
66:10 69:23 91:24
wife 7:10 8:3,8 13:9
14:15 16:24 18:16 20:7
21:9 26:7 27:24 30:8
31:4 33:6,24 35:14
43:3,7 57:23 58:21
59:9 64:20 76:5 78:21
79:4,18,22 80:18 85:24
90:25 91:25
wife's 43:4
willfully 76:9
window 46:14,16,17,24
48:11,12,23 49:4,6
51:3 52:5 54:6 55:3
56:8 58:5 60:12 61:8
67:13 68:12 73:13
74:14,25 75:2 77:15
79:2
windows 34:8 46:15
47:25 48:8,16 49:2,19
50:7 51:5 54:23 58:3
60:19 61:2 68:3 70:17
73:11,23,24 74:4,10
75:11 79:10
wise 72:10
witness 2:12 74:19 93:12
wondering 45:20
wood 61:4 74:7,11
wording 50:17

work 10:8,20,22 12:23
12:25 13:5,18 18:4
19:9 30:4 32:5 33:12
40:20 45:5,6 47:6 52:6
53:12,13 54:19 56:24
64:13 74:17 75:5,9
77:8,25 78:2,7,13,15
78:22 79:21 80:2,3,13
80:15,24 81:17 82:1
83:10,25 84:4,16,24
85:19 87:10
worked 10:23 12:16,19
12:25 13:1,10,20,22
14:3,5 30:19 31:11
33:10 46:20,23 47:25
57:7 82:7 83:16
working 11:10 12:10
13:8,11 18:6 19:23
29:25 30:2 55:12
workman-like 76:14
works 15:3,18,19 83:15
world 35:15
worse 81:14
wouldn't 60:3 66:15 67:1
writing 41:5 43:3 47:8,12
53:7,8 92:6
written 81:1
wrong 44:9 45:9 65:10
wrote 43:8

___ Y ___
yard 56:21 57:3 85:8
yeah 13:14 18:11 56:11
58:7 78:5,11 86:16
87:2 88:10
year 9:9,16 10:9 11:9
17:10 56:2 59:17 66:15
66:16 74:2 75:18 83:25
88:8
years 8:10,24 10:24
11:17 13:6 16:8,15
63:2,3 84:18
yellow 43:11
yeses 6:15
y'all 7:12 16:6 19:12
35:23 38:17 39:5 49:18
57:15,16 58:6

___ $ ___
$10,000 81:2
$100 85:15
$780.32 88:23

___ # ___
#317 93:19,20

___ 0 ___
07 56:3 59:13

___ 1 ___
1 4:9 22:24 23:2 38:14
10 4:18 29:11,13
100 1:17 2:9
11 4:19 7:19 42:20,23
44:7 68:2
11:32 92:14
12 4:20 41:3,9 42:18

68:24
13 4:21 29:24 57:15,18
69:13
1383 8:2
14 7:17 11:16 38:19 46:7
70:16
15 39:5 71:2
16 13:7 71:10
17 13:21 72:17,24
18 13:22 26:22 73:5
19 14:16 75:10
1969 5:25
1985 13:8
1987 9:10
1991 9:17
1998 8:8

___ 2 ___
2 4:10 23:12,16
20 81:4,5
200 3:5
2000 18:1
2001 18:1
2003 17:3,13,13 18:16
2006 7:8 18:20 22:14
23:1 39:5,6
2012 1:16 2:8 5:4
2021 1:14 2:7 3:5 5:7
205)324-1834 3:7
205)980-5888 3:15
2108 8:16
23 4:9,10,11
235 38:22
24 4:12
24th 90:18
25 45:15
250 38:20,22
26 4:13 22:14
26th 23:1
27 4:14 39:6
28 4:15,16 45:16
29 4:17,18

___ 3 ___
3 4:11 23:20,25 24:8
317 1:24
3500 3:13
35203 3:6
35226 5:23
35243 3:14
3949 5:22 7:7,22

___ 4 ___
4 1:16 2:8 4:12 5:4 24:4
25:6
41 4:20
42 4:19
425 3:13

___ 5 ___
5 4:3,13 26:21,24
500 1:20
551-7300 1:22
57 4:21
58 76:8

___ 6 ___

**A50B525**
**ROBERT BARTON      JANUARY 4, 2012**

6 4:14 27:7,10

_____
**7**
7 4:15 28:7,11
7th 5:25
715 92:5
715,000/768 92:2
768,569.23 92:4

_____
**8**
8 4:16 7:21 28:15,20
8/27/12 93:23
818 1:22

_____
**9**
9 4:17 28:24 29:4
9/30/12 93:20
91203 1:21

EXHIBIT 3

*EXHIBIT II TO THE LIMITED HOME WARRANTY*

# DANIEL HOMES, LLC

## HOMEBUYER / BUILDER PRE-CLOSING WALKTHROUGH LIST

LOT # 18          BUTLER SPRINGS          ROSS BRIDGE

PURCHASER'S NAME   Barton

STREET ADDRESS   3949 Butler Springs Way   HOOVER, AL 35226

**LOCATION:**                              **DESCRIPTION:**

1. Tu Corner at top of Back stairs        ✓ OK
2. repaint Blue Wall Room for touch up is visible   ✓ OK
3. SPTu at ceiling joint light blue bath       ✓ OK
4. repaint blue bath for touch up          ✓ OK
5. Sand Corner above toilet blue bath      ✓ OK
6. Tu base joint in Bonus Room          ✓ OK
7. Tu to left of mini Door in bonus + roller mark on outside wall ✓
8. Sand + Tu Crown in upstairs hallway    ✓ OK
9. Adjust Arms on foyer fixture ✓ OK
10. Putty + paint medallion + Ring ✓ OK
11. Tu ceiling around ring ✓ OK
12. Tu spots on wall khaki Room blue ceiling ✓ OK
13. Tu two spots in blue Acove ✓ OK
*⑭ SPTu Corner of closet at ceiling
15. Putty Corner of window khaki Room ✓ OK

BUYER INITIALS

Page 1 of 5

16. SKTU behind light fixture ~~paint~~ ✓ OK

17. Sand top of door Jamb in pink extra room ✓OK

18. replace casing pink bathroom ✓ OK

※ ⑲ Sand joint in pink bedroom    repaint

20. Tu window seat        ✓OK

21. Nail pops in ceiling pink bath ✓OK

22. replace two mirrors up bed baths ✓ OK

23. Check water     ✓OK

24. Tu door to hall closet + repaint closet ✓OK

※ ㉕ remove paint hard woods    revisit few spots

※ ㉖ repaint study walls / Need to repaint left of window

27. Tu white mantle wall    ✓ OK

28. Putty nail holes in medallion DR    ✓OK

29. Tu crown Joints in DR ✓ OK

30. Check Mud Room light    ✓ OK

31. Tu knobs at bottom of stairs ✓OK

32. Tu bottom of stair in Mudroom ✓OK

※ �33 Add hooks in lockers

34. Putty bead board in Garage ✓OK

※ �35 patch at garage door main level

36. Tu Crown hall to laundry ✓OK

37. Install cabinet hardware ✓ OK

※ �38 repair holes at plugs in Island

39. repaint Pantry walls    ✓ok

40. repaint window seat in Nook    ✓OK

Page 2 of 5

BUYER INITIALS

16. repaint laundry room          √OK
* ⑰ Caulk + paint lines in Exterior doors   ~~OK~~
18. TU door to patio    √OK
* ⑲ Shoe mold in master bed
20. Paint bottom shelf in master · √OK
* ㉑ TU Crown above Master tub
22. Clean the Brick   √OK
* ㉓ Exterior Walk to be done after Exterior paint is complete
* ㉔ The following is new items added on second walk:
25. TU ceiling in light blue bath
26. repaint left of tub to blue bath
27. TU to left of thermostat in Bonus
28. TU Thumb print left of mini door in bonus
29. TU Casing mini door to bonus
30. 1 door stop cover in bonus
31. SR TU Ceiling in loft room
32. repaint above door in Blue bath w/ bead board
33. TU ceiling behind Khaki bonus room
34. Clean SR mud on grout pink bath
35. Clean paint on tile in pink bath
36. TU Paint pink bath on wall
37. TU Corner above shower in Pink bath
38. TU Stain at ~~bill~~ bullnose on stairs
39. remove paint at spindles on oak treads
40. TU rt book case at crown in study

page 3 of 5

BUYER INITIAL

16. repaint to rt of window in study
17. Tu Medalling ring
18. redo cracks in Exterior doors
19. Tu for left locker
20. Tu to left of garage door
21. Tu to right of oven
22. Cut back of drawer in powder
23. Tu Rt of vanity in master
24. Sand + paint flat jamb in water closet
25. Tu to rt of Shower
26. pt small area to left of tub in master
27. caulk tub at value
28. Tu base to left of fireplace in Great Room
29. 
30. On order items:  • 8 Knobs for master + utility
31.                     Item # B4060-ORB
32.                   • 1 globe for fan in Bonus room
33.                   • 2 crystals for foyer fixture
34.                   ◦ Shutters + Window Boxes
35.                     per Mindy's approval
36. 
37. 
38. 
39. 
40. 

page 4 of 5

All of the items listed above will be addressed by my Builder prior to closing.

**BUYER:**

_____

**BUYER:**

_____

Date Executed: _____

**SUPERVISOR:**

_____

**BUILDER:**

_____

Date Executed: _10 - 24 - 06_

All of the items listed above have been completed to my satisfaction. Any items listed above remaining unsatisfactory @ the time of closing are indicated with an Ⓧ and will be completed by _11 - 30_ , 20_06_.

**BUYER:**

_____

**BUYER:**

_____

Date Executed: _____

**SUPERVISOR :**

_____

**BUILDER:**

_____

Date Executed: _10 - 26 - 06_

**WITNESS:**

_____

_KbB_ _MLB_
BUYER INITIALS

Page 5 of 5

EXHIBIT 4

A50B525
**MINDY BARTON       JANUARY 4, 2012**

```
 1                 IN THE CIRCUIT COURT

 2               OF JEFFERSON COUNTY, ALABAMA

 3

 4  ROBERT BARTON and

 5  MINDY BARTON,

 6      Plaintiffs,

 7  v.                  CASE NUMBER: CV-11-900187

 8  STACY ALLISTON DESIGN

 9  and BUILDING, et al.,

10      Defendants.

11

12                  DEPOSITION OF:

13                  MINDY BARTON

14                2021 Morris Avenue

15                Birmingham, Alabama

16                January 4, 2012

17                   11:50 a.m.

18              ATKINSON-BAKER, INC.

19                 COURT REPORTERS

20       500 North Brand Boulevard, Third Floor

21             Glendale, California 91203

22                  (818) 551-7300

23

24  REPORTED BY:  KAREN KELLEY, CCR NO. 317

25              FILE NO.:  A50B525
```

A50B525
**MINDY BARTON        JANUARY 4, 2012**

1        S T I P U L A T I O N S
2        IT IS STIPULATED AND AGREED, by and between
3 the parties through their respective counsel, that
4 the deposition of:
5              MINDY BARTON
6 may be taken before Karen Kelley, Notary Public,
7 State at Large, at 2021 Morris Avenue, Birmingham,
8 Alabama on January 4, 2012 commencing at
9 approximately 11:50 a.m.
10       IT IS FURTHER STIPULATED AND AGREED that
11 the signature to and reading of the deposition by
12 the witness is waived, the deposition to have
13 same force and effect as if full compliance had
14 been had with all laws and rules of Court relating
15 to the taking of depositions.
16       IT IS FURTHER STIPULATED AND AGREED that it
17 shall not be necessary for any objections to be
18 made by counsel to any questions, except as to
19 form or leading questions, and that counsel for
20 the parties may make objections and assign grounds
21 at the time of the trial, or at the time said
22 deposition is offered in evidence, or prior
23 thereto.
24
              * * * * *
25
                                          Page 2

1              EXAMINATION INDEX
2 EXAMINATION                          PAGE
3   BY MR. POTTS                         5
4
5
6
7
8              EXHIBIT INDEX
9 EXHIBITS                            MARKED
10        (No exhibits marked.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 4

1        A P P E A R A N C E S
2 FOR THE PLAINTIFF:
3 H. ARTHUR EDGE
4 Collins & Horsley, P.C.
5 2021 Morris Avenue, Suite 200
6 Birmingham, Alabama  35203
7 (205)324-1834
8
9
10 FOR THE DEFENDANT:
11 JAMES (Jay) ALAN POTTS, II
12 Gaines, Gault, Hendrix & Bishop, PC
13 3500 Blue Lake Drive, Suite 425
14 Birmingham, Alabama  35243
15 (205)980-5888
16
17
18
19
20
21
22 ALSO PRESENT:
23 Stacy Alliston
24 Robert Barton
25
                                          Page 3

1     I, Karen Kelley, a court reporter of
2 Birmingham, Alabama, and a Notary Public for the
3 State of Alabama at large, acting as commissioner,
4 certify that on January 4, 2012 pursuant to
5 Rules of Civil Procedure and the foregoing
6 stipulation of counsel, there came before me at
7 2021 Morris Avenue, Birmingham, Alabama, MINDY
8 BARTON, party in the above cause, for oral
9 examination, whereupon the following proceedings
10 were had:
11
12           MINDY BARTON
13 Being first duly sworn, was examined and testified
14 as follows:
15
16           EXAMINATION
17 BY MR. POTTS:
18    Q.  Ms. Barton, my name is Jay Potts.  We
19 met before today and I represent Stacy Alliston
20 Design and Building in this lawsuit.  You were
21 present for your husband's deposition and you heard
22 me go over the ground rules.  I will briefly go
23 over them again.  But if I ask a question and you
24 don't understand, let me know.  Okay?
25    A.  Okay.
                                          Page 5

2 (Pages 2 to 5)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525
MINDY BARTON        JANUARY 4, 2012

**Page 6**

1    Q.   But if I ask a question and you answer
2  it I am going to assume that you at least felt like
3  you understood the question.  Okay?
4    A.   Okay.
5    Q.   If you would continue answering out loud
6  rather than "uh-uhs" and "uh-huhs" so she can take
7  down everything and the record will read cleanly.
8    A.   Okay.
9    Q.   And if at any time you need to take a
10  break, let me know and we will take a break.  Okay?
11    A.   Okay.
12    Q.   As far as the time periods of where
13  y'all have lived and when was your husband -- did
14  he have all of the right dates --
15      MR. EDGE:  Let him finish his question.
16    A.   Yes, he did.
17    Q.   -- and the residents?  Yeah, it's easier
18  on her if I go and then you go.  Something I forgot
19  to ask your husband, but what year were y'all
20  married?
21    A.   1996.
22    Q.   And neither one of y'all have been
23  married to anyone else?
24    A.   I have been.
25    Q.   Who were you married to?

**Page 7**

1    A.   His name is Keith Panley.
2    Q.   Does he live in the Jefferson County
3  area?
4    A.   No.
5    Q.   Where were you born and raised?
6    A.   Where was I born or where was I raised?
7  Because the hospital was in a different town from
8  where I raised.  I was born in Ravenna, Ohio
9  and raised in Manaway, Ohio.
10    Q.   Did you go to high school in Ohio?
11    A.   Yes.
12    Q.   What was the name of the high school?
13    A.   Crestwood High school.
14    Q.   And what year did you graduate?
15    A.   '89. 1989.
16    Q.   And do you have any education after
17  Crestwood High School?
18    A.   I went to beauty school and got my
19  cosmetology license as a hair dresser.
20    Q.   In Ohio?
21    A.   In Ohio.
22    Q.   How long did you do that?
23    A.   Four years.  Roughly three-and-a-half,
24  four.
25    Q.   What brought you to Alabama?

**Page 8**

1    A.   My ex-husband's job.
2    Q.   What did he do?
3    A.   He did mechanical engineering work for a
4  company called Swagelok.
5    Q.   What year did you move down here?
6    A.   1993.
7    Q.   Could you say the name of that company
8  again?
9    A.   Swagelok.  I think it's S-W-A-G-L-O-K
10  maybe or S-W-A-G-E-L-O-K.  It was over off of West
11  Oxmoor.
12    Q.   But he's no longer living in the
13  Birmingham area?
14    A.   Correct.  He moved back to Ohio.
15    Q.   Did you get a job when you came down
16  here in 1993?
17    A.   I went to real estate school and got my
18  real estate license and then got a job.
19    Q.   Who did you get a job with?
20    A.   First Real Estate.
21    Q.   What year was that?
22    A.   Well, that would have been '93.
23    Q.   How long did you work for them?
24    A.   I worked for them two years.
25    Q.   And what did you do after you went to

**Page 9**

1  First Real Estate?
2    A.   I went to Liberty Park and worked for
3  Liberty Park Properties as office manager.  It was
4  really a jack-of-all-trades.
5    Q.   Were you in the same office as your now
6  mother-in-law?
7    A.   Yes, but she was not there.  I was
8  instrumental in getting her that job when I was
9  leaving.
10    Q.   And you said at Liberty Park Properties
11  you did a little bit of everything?
12    A.   Correct.  Worked with builders, worked
13  with like their -- they have their own sewage
14  system.  Dealt with those people.  Dealt with the
15  realtors, architecture review committee.
16    Q.   What kind of work would you do with the
17  builders?
18    A.   I would be the in-between person where
19  they would come and submit plans and things of that
20  nature that would have to go to the architectural
21  review committee.  And I would be in a builders
22  meeting strictly to take notes of anything that
23  would be going on in the office.
24    Q.   Do you remember the names of any of the
25  builders that you worked with?

ATKINSON-BAKER, INC.                    1-800-288-3376

A50B525

**MINDY BARTON        JANUARY 4, 2012**

1    A.    Frank Haney and -- gosh I can see their
2  faces.  It's been years ago.
3         MR. EDGE:  If you remember them later on
4    you can come back.
5    A.    Yeah, I can probably come up with a
6  couple more.
7    Q.    And you said -- did you work with
8  developers when they were putting in
9  infrastructures like sewers and stuff like that?
10   A.    Just really the in-between person.  Like
11  I wasn't instrumental in much of that.  But if they
12  needed something, you know, to go with certain
13  plans or things of that nature.  I didn't know how
14  like the infrastructure was put in.
15   Q.    How long did you work at that job with
16  Liberty Park?
17   A.    A year and a half.
18   Q.    And what did you do once you left that
19  job?
20   A.    We got married and we moved to
21  Pensacola, Florida.  And I then worked for Adams
22  Homes and sold real estate.
23   Q.    Did you have to pass another test?
24   A.    Well, at that time Florida was not a
25  reciprocal state so I had to go back to real estate

Page 10

1  school and take another test.
2    Q.    How long did you work at Adams Homes?
3    A.    Well, it would be -- I had Hunter -- we
4  moved down there in '96.  Probably a year and a
5  half.  I think it was -- yeah, it was a year.  I
6  was thinking of when we moved.  I stopped working
7  after I had a baby.
8    Q.    Since you had your baby, have you had
9  any jobs outside the home?
10   A.    No.
11   Q.    Other than your time spent at Liberty
12  Park Properties, have you ever been in any other
13  jobs that had any connection to the construction
14  industry?
15   A.    No.  Well, Adams Homes is new
16  construction, so in essence they are connected.
17  But I had nothing to do with that aspect of it.  It
18  was strictly selling.  Connected, yes.  Me involved
19  in it, no.
20   Q.    All right.  All right.  I don't have any
21  reason to believe but I have to ask all of these
22  questions.  Have you ever been arrested for
23  anything?
24   A.    No.
25   Q.    Have you ever declared bankruptcy?

Page 11

1    A.    No.
2    Q.    Other than your mother-in-law, do you
3  have any relatives 19 or older living in Jefferson
4  County?
5    A.    No.
6    Q.    And do you go to Shades Mountain Baptist
7  with your husband?
8    A.    Yes.
9    Q.    Are you a member any of clubs or civic
10  organizations that regularly meet in Jefferson
11  County?
12   A.    No.
13   Q.    All right.  You were present when I
14  asked your husband about the circumstances under
15  which y'all decided to build a home and the
16  circumstances under which you eventually chose
17  Stacy Alliston to build it?
18   A.    Yes.
19   Q.    Do you recall hearing his answer to
20  those questions?
21   A.    Yes.
22   Q.    Do you agree with what he said?
23   A.    Yes.
24   Q.    That y'all had gone to look at some
25  homes in the Greystone area?

Page 12

1    A.    Right.  We -- the reason initially that
2  we talked with Stacy is because when I looked at
3  the plat map and I saw lot 18 it looked like the
4  largest and we wanted a large yard for our
5  children.  And at the time how Ross Bridge worked,
6  builders were assigned a lot.  Those were their
7  lots and you had to use that builder.  You couldn't
8  go and pick out a lot and pick out a builder.  So
9  from there, that's when we started talking with
10  Stacy.  And, yes, we went and looked at houses in
11  Greystone.  But they were not finished because I
12  specifically remember meeting Grant for the first
13  time at one of the houses in the Legacy.  It was
14  almost finished.  He was doing small touch-up type
15  work before it was completely finished.
16   Q.    So what you are telling me, though, is
17  you picked a lot first before you picked a builder?
18   A.    Yes.
19         MR. EDGE:  That's a simultaneous
20  process.
21   A.    Exactly.  You didn't have a choice to
22  pick a builder.  You could choose if I wanted this
23  lot Stacy was going to be the builder.  Now we
24  could choose to look at a different lot, but we
25  liked lot 18.  And we -- obviously if we had not

Page 13

4 (Pages 10 to 13)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525
**MINDY BARTON        JANUARY 4, 2012**

1 liked Stacy we would have moved on to a different
2 lot.
3      Q.    So what your husband said about the
4 conversations you had with Stacy and the houses you
5 looked at, you had a good feeling going into the
6 deal?
7      A.    Yes.
8      Q.    Did you ever talk to anyone who lived in
9 a house that Stacy had built before you signed the
10 contract?
11      A.    No.
12      Q.    Was it your understanding that he had
13 also built several homes in the Ross Bridge area or
14 was in the process of building several homes?
15      A.    He was in the process. Because we were
16 at the very beginning of Butler Springs. But, yes,
17 he was definitely in the process of several, I
18 believe.
19      Q.    Before you decided on the lot in Ross
20 Bridge, were there any other builders you talked to
21 about building a home?
22      A.    Yes. Bill Fargason, but we didn't --
23 it was more --
24         MR. EDGE:  He just wanted to know if you
25      talked to anyone else.

Page 14

1      A.    Okay.
2      Q.    Anybody else?
3      A.    No, not that I recall.
4      Q.    You were going to tell me the
5 circumstances under which you talked to Bill
6 Ferguson.
7      A.    Fargason.
8      Q.    F-A-R?
9      A.    Uh-huh, F-A-R-G-A.
10      Q.    All right.
11      A.    It was more of a question-and-answer
12 type of thing because we didn't have a lot. And we
13 were feeling him out. You know, we did go and look
14 at some of his homes in Liberty Park, but it wasn't
15 like we were anywhere near signing on the dotted
16 line with him. It was more because we were friends
17 with him. More of a question-and-answer process.
18      Q.    Had you ever done any work with him
19 while you were at Liberty Park Properties?
20      A.    I am not sure what you mean by that. I
21 can tell you I had contact with him because I was
22 in the office and I did administrative work. But
23 did we work together, no. Did he submit plans that
24 I could pass on, yes.
25      Q.    And do you recall ultimately why you

Page 15

1 decided not to go with him?
2      A.    Because we really weren't necessarily
3 even going to use him. It was more because we were
4 friends and we had questions about the building
5 process. And we didn't have a lot. And he didn't
6 build at Ross Bridge.
7      Q.    So how many conversations do you think
8 you had with Stacy Alliston before y'all entered
9 the sales contract on January 26 2006?
10      A.    I couldn't answer that. Numerous. Well
11 over ten.
12      Q.    And I am going to show you what I marked
13 as Defendant's Exhibit 1 to Mr. Barton's deposition
14 and ask you if that's your signature there at the
15 bottom?
16      A.    Yes.
17      Q.    And looking at Defendant's Exhibit 2,
18 are those your initials at the bottom?
19      A.    Yes.
20      Q.    Defendant's Exhibit 3, which is the
21 limited warranty agreement, is that your signature
22 at the bottom?
23      A.    Yes.
24      Q.    Looking at the sales contract, it looks
25 like the provision that deals with when

Page 16

1 construction will commence and when it will close,
2 there was a change made from 250 days after
3 commencement to 235 days. Do you know why that
4 change was made?
5      A.    I do not recall, no.
6      Q.    And do you recall whether you and your
7 husband wanted that change or Stacy wanted that
8 change?
9      A.    I just honestly cannot recall.
10      Q.    And would you agree that there were
11 changes -- during the process of construction there
12 were changes to the plans and specifications that
13 were made?
14      A.    I would have -- I need further
15 clarification on that. As far as changes, do you
16 mean upgrades?
17      Q.    Yes. I would include upgrades in
18 changes.
19      A.    There were definitely upgrades. Like I
20 went over budget on lighting, that is an example of
21 what I am referring to. But, yes, there were
22 changes and upgrades. And there was that adding --
23 there was that empty space that we were not aware
24 of until it was framed that they turned into two
25 rooms.

Page 17

5 (Pages 14 to 17)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525

**MINDY BARTON        JANUARY 4, 2012**

1  Q.   And turning those empty spaces into two
2  rooms, that wasn't part of the original plans and
3  specifications?
4     A.   That's correct.
5     Q.   And does Defendant's Exhibit 5, does
6  that reflect the changes and upgrades that were
7  made to the original plans and specs?
8     A.   Yes.
9     Q.   And is Defendant's Exhibit 4 a copy of
10 the original construction plans?
11    A.   Yes.
12    Q.   Defendant's Exhibit 6 is the affidavit
13 of acceptance.  Have you ever seen that document?
14 I guess you have because your initials are on
15 there.
16    A.   My initials are on there.  So obviously
17 I have seen that document because that is my
18 initial.
19    Q.   Do you know when you initialed that?
20    A.   I do not.  No.  The answer is no, not
21 K-N-O-W.
22    Q.   All right.  During the construction
23 process, would you go out to the site and look at
24 things?
25    A.   Yes.

                                    Page 18

1  was there, no.
2     Q.   But you might be there for 15 minutes,
3  and he could have been there at a different time of
4  the day?
5     A.   Absolutely.  And I think a lot of times
6  he was because he would call me.
7         MR. EDGE:  Just answer his questions or
8  we will be here all day.
9     Q.   How often in a week do you think you saw
10 Grant McCaleb at the job site?
11    A.   I don't know if I could give a fair
12 answer to that.  That would be me guessing.
13    Q.   Same question for Stacy Alliston?
14    A.   Yes, definitely.  I would see Grant more
15 but...
16    Q.   All right.  The allegation in the
17 complaint is that y'all had problems working with
18 defendant, Stacy Alliston.  His work was not being
19 performed on time.  Is that in reference to the
20 fact that the closing date was after the date
21 that's in the sales contract?
22    A.   Can I see that, what you are reading off
23 of?
24    Q.   Sure.
25    A.   Where are you reading off of, what

                                    Page 20

1     Q.   How often would you do that?
2     A.   Daily.
3     Q.   Every day?
4     A.   Sometimes twice.  But it would be fair
5  to say -- sorry, Stacy, I did.  But it would be
6  fair to say that there would be a day here and
7  there that we didn't.
8     Q.   Had you kind of planned all along to be
9  that involved or to be at the site that much, or
10 did you have to go out that many times due to
11 problems?
12        MR. EDGE:  Object to the form.
13    A.   It was not due to problems.
14    Q.   You just wanted to be out there?
15    A.   I was excited about it and I wanted to
16 see the process.
17    Q.   When you would go out there, was Grant
18 McCaleb out there every day, or how often was he
19 out there?
20    A.   I don't know if that's a fair question.
21 Because I don't -- you know, just because I was
22 there at a certain time doesn't mean he wasn't
23 there for the day.
24    Q.   Right.  That's a good point.
25    A.   Every time -- did I see him every time I

                                    Page 19

1  number?
2     Q.   Paragraph 13.
3     A.   Okay.  What were you going to ask me?
4     Q.   Is that allegation referencing the fact
5  that the closing date was not until October when
6  the projected closing date in the sales contract
7  was in September?  Is that what that is referring
8  to?
9     A.   Yes.  To my knowledge, yes.
10    Q.   There was ever a time during the
11 construction project that you had a conversation
12 with Stacy where you expressed concerns about the
13 time it was taking to build the house?
14    A.   Yes.
15    Q.   How many times did you have that
16 conversation with Stacy?
17    A.   Less than five for sure.  I don't know.
18 A couple.  Especially towards the end.
19    Q.   Did you ever have a conversation about
20 the timing of the completion with Grant McCaleb?
21    A.   Yes.
22    Q.   And y'all had to move into an apartment
23 for five weeks?
24    A.   Correct.
25    Q.   Do you know how much you paid in rent?

                                    Page 21

                                    6 (Pages 18 to 21)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525
**MINDY BARTON          JANUARY 4, 2012**

1    A.    $2500.
2    Q.    And do you recall what the charge was to
3 have your stuff moved into storage?
4    A.    I do not recall that. I couldn't even
5 guess. We in essence moved twice. And it was held
6 in storage and then moved out of storage and then
7 moved into our new home, which was a very large
8 expense.
9    Q.    During the construction process, did you
10 have any conversations with Stacy about the quality
11 of the work that was being performed?
12    A.    I don't recall specifically having a
13 conversation about that.
14    Q.    Did you ever express any concerns to
15 either Stacy or Grant during the construction
16 process about the fact that you didn't think that
17 the quality of the construction was sufficient?
18        MR. EDGE: Other than what may be in the
19    punch list.
20    A.    Okay. Other than the punch list, no,
21 because I have no knowledge of construction. I
22 wouldn't know if it was quality. I mean, I don't
23 recall a conversation like that.
24    Q.    And as the closing day approaches, y'all
25 do a final walk-through and that's when you come up

Page 22

1 with the punch list items?
2    A.    Correct.
3    Q.    Defendant's Exhibit 11, during
4 Mr. Barton's deposition we were trying to figure
5 out whose handwriting that is.
6    A.    It's Grant's.
7    Q.    And are those items, were they
8 transcribed from something you wrote down on a
9 piece of paper?
10    A.    Some of them. I had written some things
11 down and had my own list going by myself.
12    Q.    Do you still have that list?
13    A.    I don't know. I would have to look in
14 my file.
15    Q.    If you do, would you mind getting that
16 to your attorney so he can get it to me?
17        MR. EDGE: Would you send me a letter?
18    Q.    Have you had a chance to look through
19 that document before today?
20    A.    I haven't looked at this document in
21 years.
22    Q.    Okay. Would you mind looking through
23 that real quick and letting me know if that, to the
24 best of your recollection, matches up with the list
25 that you had?

Page 23

1    A.    I was looking at it over there, looking
2 for something. And, yes, to my recollection from
3 five years ago.
4    Q.    And it looks like y'all had a second
5 walk-through; and that's when items 24 through --
6 it doesn't exactly go in numerical order, but let's
7 say the 24 through the remaining items, that's when
8 you came up with those items, correct, after the
9 second walk?
10    A.    I don't remember that. But that's what
11 that says here. So I would say yes. I do remember
12 a second walk-through.
13    Q.    Would that second walk-through have been
14 before the closing?
15    A.    I don't know. I'm not sure.
16    Q.    You had a chance to look through this
17 during your husband's deposition. Can you look on
18 this and tell me which of these were never
19 addressed by Stacy Alliston?
20    A.    Some of these I don't even know --
21        MR. EDGE: Let me be clear, when you say
22    never addressed --
23    Q.    Let me state a better question. Which
24 of these items do you feel like were not corrected
25 to your satisfaction by Stacy Alliston Design and

Page 24

1 Building?
2    A.    Do you want me to go through this entire
3 list? We could be here for a really long time.
4 Some of these -- S-R-T-U -- I don't even know what
5 that means. S-R-T-U corner of closet. Do you know
6 what S-R-T-U stand for?
7        MR. ALLISTON: Sheetrock.
8    A.    Okay. Touch-up. Like number 10 was
9 never done. I mean, there are numerous. Honestly
10 I would have to have the list and go through my
11 house. This is so detailed.
12    Q.    Let me see if I can shorten this up.
13 You heard your husband's testimony about the
14 problems that were not corrected by Stacy Alliston
15 Design and Building. Was there anything that he
16 left out?
17    A.    Not to my knowledge.
18    Q.    Fair to say that the punch list items in
19 Defendant's Exhibit 11 and the problems noted in
20 the inspection, which is Defendant's Exhibit's 13,
21 and I know that some of the problems in the punch
22 list were addressed and corrected, some weren't.
23 But do the punch list items and the problems in the
24 inspection, does that encompass the problems with
25 the house?

Page 25

7 (Pages 22 to 25)

**ATKINSON-BAKER, INC.**                                    **1-800-288-3376**

A50B525

**MINDY BARTON          JANUARY 4, 2012**

1    A.   Would I say 100 percent, no.  Because in
2  this list and in that inspection --
3        MR. EDGE:  When you say in this list you
4    are referring to Exhibit --
5    A.   Exhibit 11 list and the inspection which
6  is 13 there -- we have a farmhouse sink in our
7  kitchen.  And underneath the cabinets have warped
8  and the paint has peeled and it was an installation
9  problem because the cabinet man came to fix the
10 cabinets and the water is running down the front of
11 the sink onto the cabinets.  And it puddles there.
12 And he said it was an installation of the sink.
13 That's not on Exhibit 11 or in Exhibit 13.  So this
14 is not a hundred percent.
15    Q.   Can you think of anything else as we sit
16 here that's not contained in Defendant's Exhibit 11
17 or 13?
18    A.   I cannot.
19    Q.   And you said you had somebody come out
20 and fix that problem?
21    A.   No, it's not been fixed.  The cabinet
22 man -- when I was saying came out to look at the
23 cabinets because the paint was chipping off and he
24 fixed the cabinets once, but they are in the same
25 condition that they were back then because the

Page 26

1  water is still the problem.
2    Q.   Do you remember who the cabinet man
3  was?
4    A.   Sherman -- I don't know his last name.
5  Sherman.
6    Q.   And did he do that work within the
7  one-year period after you closed on the house?
8    A.   Yes.
9    Q.   Do you have plans to get someone out to
10 the house to address that problem?
11    A.   I do not have plans at this time, no.
12    Q.   All right.  Defendant's Exhibit 12 to
13 your husband's deposition is the testimonial that's
14 on Grant McCaleb's website.  Do you agree with
15 everything that's in that testimonial?
16    A.   Ask me the question again after I read
17 it.
18    Q.   Sure.  Is there anything in that
19 testimonial that you disagree with?
20        MR. EDGE:  As we sit here today?
21        MR. POTTS:  Uh-huh.
22    A.   As we sit here today, yes.
23    Q.   Okay.  What would that be?
24    A.   And actually at the time it could have
25 been yes.  But in hindsight, where it says he was

Page 27

1  extremely knowledgeable in every aspect of our
2  building process and was -- wait a second.  Let me
3  stop right there.  We highly recommend Grant
4  McCaleb as a builder.  In hindsight I am not
5  certain that he is so educated in building.  I
6  don't know because I am not a builder and we like
7  Grant.  But am I qualified to say he's a good
8  builder, no.  Because I am not -- in hindsight, no,
9  probably not.
10    Q.   Do you know when y'all submitted that
11 testimonial, what date?
12    A.   No, I have no idea.
13    Q.   It would have been after your house was
14 built, right?
15    A.   Definitely.  It was after he left
16 Stacy.
17    Q.   Do you know about what time period that
18 was?
19    A.   I don't know.
20        MR. EDGE:  If you don't know just answer
21    the question.
22    Q.   Has it been in the last two years?
23    A.   I would say longer than the last two
24 years.  I would say maybe within the first two
25 years after we built the home.  But there is a lot

Page 28

1  -- I would agree with other things in there.
2    Q.   Fair to say, though, at the time you
3  submitted the testimonial, that's how you felt
4  about Grant McCaleb?
5    A.   Yes.
6    Q.   We have talked about the water issue
7  from the foyer window with your husband.  Do you
8  recall Stacy Alliston coming out to the house to
9  address that problem?
10    A.   Yes.
11    Q.   Do you recall how long after the closing
12 that occurred?
13    A.   I do not.
14    Q.   And do you know of any correspondence
15 that you might have that reflects where you
16 submitted a problem to Stacy Alliston in writing?
17 Do you have any?
18    A.   No.
19    Q.   So if y'all had a problem y'all just
20 picked up the phone?
21    A.   Yes, that is correct.
22    Q.   After Stacy came out and did some work
23 on the foyer window, did you continue seeing
24 problems of water coming from that foyer window?
25    A.   That's almost a two-fold question

Page 29

8 (Pages 26 to 29)

A50B525
**MINDY BARTON      JANUARY 4, 2012**

1 because the problem wasn't just the foyer window.
2 When Stacy came out they didn't really address the
3 foyer window. It was the dormers in the attic. So
4 to my knowledge nothing was done to that foyer
5 window because they said that's not where the water
6 was coming from.
7  **Q.   All right. So as far as you know, all**
8 **of the water was originating from the dormer**
9 **windows?**
10   A.   That's what I was told.
11  **Q.   By who?**
12   A.   Stacy.
13  **Q.   Have you learned anything different or**
14 **is that still your understanding?**
15   A.   For that particular problem at that time
16 that is still my understanding.
17  **Q.   In other words --**
18   A.   I do believe -- go ahead.
19  **Q.   Do you think there is a problem with the**
20 **foyer window?**
21   A.   Yes.
22  **Q.   What is that?**
23   A.   I believe it leaks.
24  **Q.   Okay. Was that problem with the foyer**
25 **ever addressed by Stacy Alliston?**
                                         Page 30

1       MR. EDGE: Other than what she's told
2 you?
3       MR. POTTS: Yeah, I guess I am confused.
4   A.   When he came out there was water coming
5 from the corner of that foyer window down the
6 wall. That's how I know that there was a problem.
7 They were saying it was stemming, though, from the
8 dormer windows. So did Stacy address it, I don't
9 really know what you mean by that, because we
10 addressed it in conversation.
11  **Q.   Did he do some work on the foyer**
12 **window?**
13   A.   To my knowledge, no.
14  **Q.   When he came out there to do work, where**
15 **did he do work?**
16   A.   The dormer windows.
17  **Q.   Just the dormers.**
18   A.   To my knowledge, yes.
19       MR. EDGE: Let's go off the record.
20       (Off-the-record discussion.)
21   A.   And there could have been work done on
22 that window. To my knowledge I remember the dormer
23 window problem.
24  **Q.   You said there might have been work done**
25 **on the foyer but you cannot specifically recall it?**
                                         Page 31

1   A.   That's correct.
2  **Q.   But you know that there was work done on**
3 **the dormer window?**
4   A.   That's exactly right.
5  **Q.   After that work was performed by Stacy**
6 **Alliston, did you continue seeing water problems**
7 **either coming from the dormer windows or the foyer**
8 **window?**
9   A.   Where? Did I continue seeing problems
10 where?
11  **Q.   That were originating from --**
12   A.   In the foyer? Are you asking me if I am
13 seeing water in the foyer like I saw it running
14 down the wall?
15  **Q.   Yes.**
16   A.   Okay. I did not see water running down
17 the wall.
18  **Q.   After Stacy came out there?**
19   A.   That's correct. There was water in the
20 attic but not -- there was never a stream of
21 water -- it was a stream of water coming down the
22 wall. I never saw a stream of water.
23       MR. EDGE: After they did the work?
24   A.   I'm sorry. After they did the work. I
25 saw the stream of water but it was after they did
                                         Page 32

1 the work there was never a stream of water coming
2 down the wall. But there was water in the attic.
3  **Q.   After they did the work?**
4   A.   Yes.
5  **Q.   Did you call or to your knowledge did**
6 **your husband call Stacy Alliston again after he had**
7 **done the work to let him know that there was still**
8 **water in the attic?**
9   A.   I know that my husband handled it. I am
10 not sure who called, if it was Stacy or Grant.
11  **Q.   All right. So you never called Stacy or**
12 **Grant after they came out and did that first work?**
13   A.   No. Wait. Let me stop you right there.
14 When, like ever from then on?
15  **Q.   Well, I am limiting the question to did**
16 **you call Stacy or Grant to talk about water in the**
17 **attic after they had done the initial work? Did**
18 **you ever call him?**
19   A.   I called Stacy before this whole process
20 started.
21       MR. EDGE: When you say this whole
22 process, what are you referring to?
23   A.   This whole process after the inspector,
24 after the construction defects inspector came out,
25 and after we were made aware of the major problems
                                         Page 33

9 (Pages 30 to 33)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525

**MINDY BARTON        JANUARY 4, 2012**

1  then, yes, I did call Stacy.
2      **Q.    After the inspection --**
3      A.    And I tried to call Grant but never
4  spoke to him.
5      **Q.    And when you called Stacy after the**
6  **inspection did you discuss the water in the attic?**
7      A.    Yes.
8      **Q.    Other than that phone call, did you ever**
9  **have any other phone calls with Stacy or Grant**
10 **after they did that initial work on the dormers?**
11     A.    No.  Not me.
12         MR. EDGE:  Again, limiting that question
13     to the water in the attic?
14         MR. POTTS:  Yes.
15         MR. EDGE:  Because the way he asked it
16     meant ever.  But it's the understanding that
17     the question is limited in going to additional
18     conversations about problems with water in the
19     attic.
20     **Q.    But it's your understanding that your**
21 **husband had a conversation with either Grant or**
22 **Stacy about that problem?**
23     A.    Correct.
24     **Q.    After they had done the initial work?**
25     A.    Yes.
                                              Page 34

1      **Q.    And your husband testified about a**
2  **meeting he had with Grant up in the attic?**
3      A.    Yes.
4      **Q.    Were you present for that meeting?**
5      A.    No.
6      **Q.    Do you recall what your husband told you**
7  **about the meeting?**
8      A.    No.
9      **Q.    Did Grant or Stacy ever come back out**
10 **and do any work on the attic after that meeting?**
11     A.    No.
12     **Q.    Within the one-year limited warranty**
13 **period, did you call Stacy about touching up paint**
14 **in the house?**
15     A.    I would have called Grant.
16     **Q.    Grant.  Okay.  Do you know how many**
17 **times you had to call Grant about paint issues?**
18     A.    No, I have no idea.
19     **Q.    All right.  More than five?**
20     A.    Well, it might not have just been paint
21 issues.
22         MR. EDGE:  The punch list in general.
23     A.    Yes.  The punch list items in general,
24 items which encapsulated more than painting.
25     **Q.    All right.  Let's leave aside the punch**
                                              Page 35

1  list items for a second.  I just want to ask you
2  about your recollection.  But other than the water
3  issues from the dormers and the foyer window, what
4  sticks out to you as items in the house that were
5  not corrected by Stacy or Grant?
6      A.    Other than punch list items or in
7  addition to?
8      **Q.    Well, it could be in the punch list.  I**
9  just want to know what sticks out -- what are the
10 big problems?
11     A.    Like hot spots to me necessarily?
12     **Q.    Yes.**
13     A.    Other than this problem.
14     **Q.    With the water, yes.**
15     A.    The door that would have been -- that
16 was supposed to have been replaced.  It's in our
17 bedroom and it goes to our main-level garage.
18     **Q.    Anything else?**
19     A.    A window in our bedroom, the master
20 bedroom that was cracked.  That supposedly was
21 ordered.
22         MR. EDGE:  When you say cracked, you are
23     talking about the facing?
24         THE WITNESS:  No, it was the glass.
25     **Q.    When you said supposedly ordered, did**
                                              Page 36

1  someone tell you they were going to --
2      A.    Grant told me along with the door.
3      **Q.    When did he tell you that the window**
4  glass was ordered?  When did y'all have that
5  conversation?
6      A.    Oh, probably within the first month that
7  we lived in the house.  The window was going to be
8  replaced because the glass couldn't be replaced.
9  He said the whole window had to be replaced and it
10 was on order.  And the door was going to be
11 replaced as well because it was their mistake and
12 that was on order.
13     **Q.    When did you have the conversation with**
14 Grant about the door?
15     A.    Before we ever closed, to my knowledge.
16 That's what I recall.  Or right after we closed,
17 one or the other.  It's right around that time.
18     **Q.    How many conversations did you have with**
19 Grant about the door?
20     A.    Numerous, because now I am recalling I
21 believe there was a door that was installed in that
22 area that was not solid, a solid wood door.  So I
23 remember them having to remove that.  And I
24 remember Grant saying when I asked why, he said
25 that this should be a solid wood door.  It was a
                                              Page 37

10 (Pages 34 to 37)

A50B525

**MINDY BARTON        JANUARY 4, 2012**

1 hollow door. So when the new door came out it was
2 wrong, but they installed it anyway.
3    **Q.   Okay. Other than the window and the**
4 **door, what are some other hot-button topics for**
5 **you?**
6    A.   Painting issues. But I would say those
7 are my hot buttons.
8    **Q.   Do you feel like there are still**
9 **painting issues that need to be addressed, worked**
10 **on?**
11    A.   Well, that's a hard question five years
12 later. I am not sure what you mean by that.
13    **Q.   Do you feel like you need to paint any**
14 **part of your house?**
15    A.   Yes.
16       MR. EDGE:  Are you talking about beyond
17 what they have already painted?
18       MR. POTTS:  Yes.
19    A.   Yes.
20    **Q.   And do you feel like whatever problems**
21 **you have as we sit here today, that those should**
22 **have been taken care of by my client?**
23    A.   Are you talking about the painting
24 problems?
25    **Q.   Yes.**
                                                Page 38

1    A.   Yes. That's what I am referring to, not
2 general wear and tear.
3    **Q.   And I know that John Bradley has come**
4 **out and corrected some of those problems, right?**
5    A.   That's correct.
6    **Q.   Is there any reason why Bradley didn't**
7 **correct all of the painting problems?**
8    A.   Because we couldn't invest that kind of
9 money to do that.
10    **Q.   Do you know how much you paid Bradley**
11 **for his work?**
12    A.   I do not know. I do not recall.
13    **Q.   Would you have that somewhere written**
14 **down?**
15    A.   I don't think so.
16       MR. EDGE:  Cancelled checks.
17    A.   Well, we would have a cancelled check
18 probably. Or John might have it.
19    **Q.   Would you have cancelled checks for the**
20 **money paid to Scott Holcomb for his work?**
21    A.   Yes. I mean, I don't know if we get
22 cancelled checks anymore. I am sure it would be
23 computer-generated, though. May not have a
24 physical check. I don't even think we get those
25 back anymore.
                                                Page 39

1    **Q.   Your husband felt like the amount you**
2 **paid to Scott Holcomb was in the $20,000 range,**
3 **does that sound about right to you?**
4    A.   I believe he said that we weren't
5 finished yet.
6    **Q.   I am just asking about what you've paid**
7 **so far.**
8    A.   I am not certain. I haven't added it up
9 because I haven't been the one responsible for
10 that.
11    **Q.   And I know y'all have plans for him to**
12 **come out and do some other things, right?**
13    A.   Yes.
14    **Q.   And what are you wanting him to do?**
15    A.   What would I want done next?
16    **Q.   Yes.**
17    A.   The next major thing would be replacing
18 the double French glass doors in the kitchen/eating
19 area that are rotten and warped.
20    **Q.   Do you recall when you noticed that**
21 **problem?**
22    A.   When it was pointed out to me by Dave
23 Bennett.
24    **Q.   Other than when Stacy came out there to**
25 **work on the dormers, did he ever come back out to**
                                                Page 40

1 the house to work on anything?
2    A.   No, not to my knowledge. Well, let me
3 double-check -- as far as punch list items ever?
4 You mean from the point that he fixed the dormers
5 after that, is that what you are referring to, that
6 time frame?
7    **Q.   Yes.**
8    A.   Then, yes, that's correct. He's not
9 been back to work on anything.
10    **Q.   Before he did the work on the dormers**
11 **did he come to the house to work on punch list**
12 **items?**
13    A.   Yes.
14    **Q.   Do you know how many times?**
15    A.   No, I have no idea. It was more so
16 Grant but Stacy would come out too.
17    **Q.   At some point, I guess about a**
18 **year-and-a-half ago now, y'all had somebody come to**
19 **the house to check for Chinese drywall?**
20    A.   Correct.
21    **Q.   Do you remember that person's name?**
22    A.   Blake Foshee.
23    **Q.   And he's the one that referred you to**
24 **David Bennett?**
25    A.   That's correct.
                                                Page 41

11 (Pages 38 to 41)

A50B525

**MINDY BARTON        JANUARY 4, 2012**

1   Q.   Did David Bennett refer you to your
2   lawyer?
3   A.   I am not sure if it was Dave Bennett or
4   if it was Blake Foshee.  It was one of them.
5   MR. POTTS:  Let's go off the record for
6   a second.
7   (Off-the-record discussion.)
8   BY MR. POTTS:
9   Q.   Ms. Barton, during your husband's
10  deposition you were taking copious notes about his
11  testimony.  We discussed, when we were off the
12  record, some of what you wrote down we have already
13  talked about.
14  A.   Yes.
15  Q.   But if you wouldn't mind, just to kind
16  of fill in the gaps from your husband's deposition,
17  if we could go through what you wrote down and just
18  tell me what you've wrote down.
19  A.   Tell you exactly what I wrote down?  Or
20  this was like a queue for me so I would know to
21  revisit it.  So what would you like me to do?
22  Q.   You don't have to read exactly what you
23  wrote down.
24  MR. EDGE:  Reading it the way she wrote
25  it -- and without waiving any privilege -- I

Page 42

1   asked her to write down things that would
2   queue her to elaborate in areas where she felt
3   like Bobby had left something out or maybe was
4   off a little bit on something.  And since
5   these are her notes I just say what you
6   intended them to prompt you to say.  And if
7   that's not in keeping with what you are
8   looking for, we will revisit it and fill that
9   in another way.
10  Q.   Yeah.  I really don't have a concern
11  about exactly what you wrote down.  Just whatever
12  what you wrote down prompted you to say.
13  A.   Okay.  The attic area that was
14  discussed, when we discovered that we had been out
15  of town and when we came back to the house they
16  had -- I'm not sure of the correct terminology but
17  I am assuming they are called rafters -- but the
18  things that crisscrossed in the attic, I'm not sure
19  what those are called, the way they were installed
20  and then the -- all of the duct work and everything
21  running coming off in all different directions and
22  it was running down the middle of the attic, it was
23  quite a shock and we were very upset about it
24  because we wanted to finish off that space in the
25  future.  Couldn't afford to do it at the time.

Page 43

1   Q.   Let me interrupt you real quick.  You
2   said you went out of town and came back and that's
3   when you noticed the problem?
4   A.   That's when we went up to the attic and
5   all of that had been done.  Yes.
6   Q.   Was that discovery made during the
7   construction process or after y'all had taken
8   possession of the home?
9   A.   During the construction process.
10  Q.   Did you make that concern known to Grant
11  or Stacy?
12  A.   Grant.
13  Q.   And what was his response to that?
14  A.   His response was the house would -- I am
15  paraphrasing.  This is not verbatim.  His response
16  was basically in a nutshell, that whole area would
17  have to have been built completely differently.
18  Different size pieces of wood, completely
19  different.  The whole thing would have to be ripped
20  out and it would cost an enormous amount of money.
21  Q.   And y'all decided to go through with the
22  closing with it being in the condition that it was
23  in?
24  A.   That's right.  So I wanted to clarify
25  that, you know, what we had communicated and then

Page 44

1   what was done and then what was told us was
2   completely different.  Like all of a sudden it
3   would have had to have been built a certain way
4   with certain types of boards and certain types of
5   stuff I can't even remember.  And I am not a
6   builder so I couldn't even come up with anything
7   any knowledgeable as far as the verbatim of what he
8   said.  But it would have had to have been
9   constructed differently to be able to support a
10  room and have the Sheetrock.
11  Q.   Okay.  Tell me about your next entry.
12  And, again, if we have already talked about it you
13  can skip it.
14  A.   Okay.  I wanted to address that it
15  seemed to me --
16  MR. EDGE:  Don't do all of the prefatory
17  stuff.  Just go straight into it.
18  A.   The delay in the closing, you were
19  asking my husband if it was because of the
20  retaining wall that that was an addition and
21  absolutely, no, I do not believe that at all.
22  Because there were numerous times that the house
23  was not worked on at all for days.  So I -- the
24  retaining wall and things of that nature that were
25  additions, which really were not additions by us,

Page 45

12 (Pages 42 to 45)

A50B525

**MINDY BARTON        JANUARY 4, 2012**

1 it was additions by need and by engineering. That
2 was definitely not a delay in the closing.
3     Q.   So is it your opinion the only reason
4 the closing was delayed is because there were days
5 that there was no work done on the house?
6     A.   I would think that that's a major
7 reason, yes.
8     Q.   Could the fact that there were changes
9 made, for instant to those rooms, finishing those
10 rooms, could that have delayed the closing?
11     A.   No, not by a month and a half.
12     Q.   It could have delayed it by a day?
13     A.   Probably, yes.
14     Q.   All right. What's your next entry?
15     A.   Okay. When Stacy came back to fix the
16 problem, the water problem with the one I saw the
17 stream of water coming down and they said it was
18 coming from the dormer windows. I was told that
19 the problem was fixed with the dormer windows and
20 that they would come back and paint, repaint that
21 foyer, and it was never done.
22     Q.   Stacy told you --
23     A.   It has been done now as of a couple of
24 weeks ago by our people. But they were supposed to
25 come back and finish the problem and it was not

Page 46

1 five feet. Now, it narrowed as it came to the
2 road. But we paid for that retaining wall and that
3 was supposedly on our property all along. And
4 without the help -- and we did contact Stacy. And
5 I know he did call Bobby Beecham regarding that,
6 but if it had not been for one of our
7 neighbors/friends that was the head of Ross Bridge
8 that knew Bobby Beecham, we would have been in a
9 world of trouble. And that was not something that
10 was an oversight on our part.
11     Q.   That problem was eventually resolved,
12 though?
13     A.   Correct.
14     Q.   Did you have to come out of pocket at
15 all to get that problem resolved?
16     A.   Well, yes. We had to have our yard
17 resurveyed. And file. It was quite a process.
18 You don't just get to move stakes.
19     Q.   All right. How much did the survey
20 cost?
21     A.   I am not sure. I think we need to
22 investigate that.
23     Q.   Who did you pay to do the survey?
24     A.   I would have to look. We have it at
25 home. We would have that document.

Page 48

1 finished.
2     Q.   All right. Stacy told you he was going
3 to do that?
4     A.   Yes. He personally wasn't going to do
5 it but...
6     Q.   Did he tell you he was going to come
7 back and do anything else other than paint?
8     A.   No.
9     Q.   With regards to that dormer window
10 issue?
11     A.   Correct.
12     Q.   All right. What's your next entry?
13     A.   I wanted to revisit the retaining wall
14 that was built on the neighbor's property because I
15 was the one that was at home and started -- my
16 husband came in on it later. But when Bobby
17 Beecham, the builder that built the spec home next
18 door to us, looking at our house to the right,
19 when he was selling that house he had it surveyed
20 and that's when I looked in my backyard and -- the
21 retaining wall is here and this is our backyard,
22 there were survey stakes in the middle -- not in
23 the middle but on the edge of our yard like
24 completely -- way more than five feet. My husband
25 said five feet. It was a much larger area than

Page 47

1        MR. EDGE: Weygand did all of the survey
2    work at Ross Bridge.
3     Q.   All right. So your lawyer is saying it
4 was probably Weygand that surveyed it. You're not
5 sure?
6     A.   I'm not 100-percent sure. But I am
7 aware of Weygand. We do have -- you know, it was
8 recorded and everything obviously.
9     Q.   Right. And then did you say there was
10 another expense for refiling?
11     A.   Yes. To my knowledge. But I am not a
12 hundred percent. I couldn't tell you what that
13 would be.
14     Q.   What other out-of-pocket expenses did
15 you have stemming from the retaining wall problem?
16     A.   To my knowledge, none.
17     Q.   All right. What other entries do you
18 have?
19     A.   Okay. The faucets. You had addressed
20 the faucets. Grant had come out at one point and
21 just tightened them. That didn't fix the
22 problems. He was aware of the faucets. And I am
23 not sure if my husband knew he was aware of it or
24 not. I believe he said he wasn't aware, but he was
25 of certain ones.

Page 49

13 (Pages 46 to 49)

A50B525
**MINDY BARTON      JANUARY 4, 2012**

1    Q.    All right.  When did -- did Grant come
2  out and work on the faucets or just tighten the
3  faucets?
4    A.    He was out there regarding other things,
5  but definitely within the first year.
6    Q.    All right.  Have you had anybody else
7  come out there and do anything to the faucets?
8    A.    No.
9    Q.    Do you have any plans to have someone do
10  something with the faucets?
11    A.    It's my understanding they would have to
12  be replaced.
13    Q.    Who told you that?
14    A.    Dave Bennett.
15    Q.    Do you have any plans to have someone
16  come out there and replace them?
17    A.    I have no plans at this time, no.
18    Q.    What other entries?
19    A.    Okay.  You addressed the brick weep
20  holes from the Exhibit 13.  And I am not even sure
21  what part of the house that you were referring to
22  when you were asking if we have seen moisture or a
23  problem because of the lack of weep holes.  And in
24  all fairness I want to revisit.  We can't see
25  behind the brick.  So there could be problems that
                                                        Page 50

1  strictly to repair some paint.  It was not the
2  problem.  It was just cosmetic because there was
3  water staining in numerous rooms.  And I am not
4  sure if he stated that specifically.
5    Q.    How many different rooms have there been
6  water staining in?
7    A.    Three.
8        MR. EDGE:  Is that including the foyer?
9    A.    Yes.
10    Q.    Do you feel like Scott Holcomb has fixed
11  the water issues?
12    A.    Yes.
13        MR. EDGE:  Object to the form.
14    A.    I guess I should say the water issues in
15  the attic, to my knowledge, yes.
16    Q.    Are there other water issues in the
17  home?
18    A.    Not to my knowledge.
19        MR. EDGE:  Object to the form.
20    Q.    Do you believe that Stacy Alliston or
21  Grant McCaleb or anybody that has been employed
22  with Stacy Alliston Design and Building has
23  purposely lied to you about anything?
24    A.    No.
25    Q.    Do you feel like Stacy Alliston or Grant
                                                        Page 52

1  we are unaware of that aren't visible to the eye.
2    Q.    Are you aware of any problems?
3        MR. EDGE:  Object to the form.
4    A.    To my knowledge, no.  But there could be
5  problems.  Under Scott Holcomb when you were
6  referring to the work he had done, my husband said
7  the roof was repaired.  It was replaced.  The front
8  section was replaced, not repaired.
9    Q.    And that includes the decking, shingles,
10  felt, all of it?
11    A.    Yes.
12    Q.    All right.
13    A.    When you asked if there were any other
14  contractors or people who had done work in our home
15  and my husband had referred to John Bradley and the
16  painting, John Bradley also finished our basement
17  within the first year after we moved in.
18    Q.    That work wasn't due to any problems
19  with the home, was it?
20    A.    No.
21    Q.    Other than John Bradley and Scott
22  Holcomb, have any other contractors been out there?
23    A.    No.  The All State check, the claim that
24  we made against our homeowner's insurance, the
25  seven-hundred-some-odd dollars that we received was
                                                        Page 51

1  McCaleb have purposely hidden things from you?
2    A.    No.
3    Q.    You're making a claim in this lawsuit
4  for mental anguish, emotional distress.  How has
5  the construction of this home affected you mentally
6  and emotionally?
7    A.    The construction of the home or the
8  problems due to the construction of the home?
9    Q.    The problems arising from the
10  construction.
11    A.    Stress, stress on our family, stress
12  financially, stress in our marriage.  Health
13  issues, health concerns.  I was terrified for a
14  while when I was informed it was a fire hazard, the
15  water in the outlets in the attic.  I would just
16  say overall we thought -- I mean, we are fairly
17  young, especially at that time, not so much now --
18        MR. EDGE:  Beats the alternative.
19    A.    That's right.  To this degree and at
20  this expense and then to be having the problems
21  with it that we are having is very upsetting.
22    Q.    You said health issues.  Are you talking
23  about the potential health issues?
24    A.    Potential health issues that could arise
25  from water from mold.
                                                        Page 53

14 (Pages 50 to 53)

A50B525

**MINDY BARTON        JANUARY 4, 2012**

| | |
|---|---|
| 1  **Q.**    Nobody in your family has been<br>2  physically harmed?<br>3      A.    Correct.<br>4      **Q.**    All right.  Let's go through the<br>5  inspection, and I will try to go through this as<br>6  quickly as possible.  On page two of the<br>7  inspection, the photographs dealing with the<br>8  rafters and the ridge beam, did you note those to<br>9  be a problem before the inspection?<br>10     A.    No.<br>11     **Q.**    On page three, the pictures of the<br>12 roof/wall flashing and the toe board, did you<br>13 consider that to be a problem before this<br>14 inspection?<br>15     A.    This is really hard to even see what it<br>16 is, but before the inspection did I think it was a<br>17 problem?  I saw the problem before he came out and<br>18 inspected it, the water and the molding, is that<br>19 your question?<br>20     **Q.**    Well --<br>21     A.    I see now.  Okay.  Unsealed toe board<br>22 now.  Did I know they were unsealed?  No.<br>23     **Q.**    All right.  Page four.  And this is the<br>24 issue with the dormer windows and we've already<br>25 talked about that.  And is that black part, is that<br>Page 54 | 1  deals with the HVAC return system.  Did you note<br>2  that to be a problem before the inspection?<br>3      A.    No.<br>4      **Q.**    And photographs 13 and 14, are those<br>5  problems that you attribute to Stacy Alliston's<br>6  work on the home?<br>7      A.    No.<br>8      **Q.**    Page nine, the smoke detector that was<br>9  unplugged.<br>10     A.    That's not Stacy's fault.<br>11     **Q.**    And the next photograph is water<br>12 staining on the foyer and we have already talked<br>13 about that.  On page ten it talks about the front<br>14 door ball bearing hinge is incomplete.  Did you<br>15 note that to be a problem before this inspection?<br>16     A.    No.<br>17     **Q.**    Page 11, the top photograph discusses<br>18 that several exterior windows do not seal<br>19 properly.  Did you note that as a problem before<br>20 this inspection?<br>21     A.    I noticed it was a problem.<br>22     **Q.**    Okay.  How soon after you moved in did<br>23 you notice that to be a problem?<br>24     A.    I couldn't even say.<br>25     **Q.**    Would it have been within the first<br>Page 56 |
| 1  from water staining?<br>2      A.    Yes.  And I did see that before the<br>3  inspection.<br>4      **Q.**    Page five, any of the problems on -- any<br>5  of the things noted on page five, did you consider<br>6  those to be problems before the inspection?<br>7      A.    No.<br>8      **Q.**    Page six, HVAC condensate line<br>9  inverted.  Did you note that to be a problem before<br>10 the inspection?<br>11     A.    No.<br>12     **Q.**    Page seven, the top photograph deals<br>13 with misaligned doors and this says several were.<br>14 You already talked about the fact that you had a<br>15 conversation with Grant about the door leading into<br>16 the garage, right?<br>17     A.    Correct.<br>18     **Q.**    That's the one that's misaligned and the<br>19 hinges are not on there correctly?<br>20     A.    Correct.<br>21     **Q.**    Did you ever have any conversations with<br>22 Grant or Stacy about any other doors in the house?<br>23     A.    Me, no, I did not.<br>24     **Q.**    And we've already talked about the bath<br>25 fixtures.  On page eight, the top two photographs<br>Page 55 | 1  year?<br>2      A.    I'm not so sure.<br>3      **Q.**    And then the next photograph discusses<br>4  the lack of weep holes.  Did you ever make a note<br>5  that there weren't sufficient weep holes in the<br>6  brick before this inspection?<br>7      A.    No.<br>8      **Q.**    Number 20, the half column is not sealed<br>9  at brick.  Did you ever note that to be a problem<br>10 before this inspection?<br>11     A.    I knew it wasn't sealed and honestly<br>12 didn't know if it would be a problem or not.<br>13     **Q.**    Did you ever call Grant or Stacy to come<br>14 out and correct that?<br>15     A.    No.<br>16     **Q.**    And the next photograph talks about<br>17 excessive spacing between the columns.  Did you<br>18 ever think that was a problem?<br>19     A.    No.<br>20     **Q.**    Number 22 discusses the garage door that<br>21 we have been talking about, the hinges are wrong<br>22 and also you feel like it's misaligned?<br>23     A.    Correct.<br>24     **Q.**    All right.  Number 23, are those the<br>25 French doors that you referenced earlier?<br>Page 57 |

15 (Pages 54 to 57)

**ATKINSON-BAKER, INC.**                                    **1-800-288-3376**

A50B525
**MINDY BARTON        JANUARY 4, 2012**

Page 58

1    A.   Yes.
2        Q.   **Number 24, the brick rowlock coursing**
3    **under several windows does not meet minimum**
4    **standard for slope.  Did you know that was a**
5    **problem before this inspection?**
6    A.   No.
7        Q.   **Number 25, whatever is mentioned there**
8    **through wall flashing.  Did you know that was a**
9    **problem before this inspection?**
10   A.   No.
11       Q.   **Number 26 discusses weep holes that were**
12   **missing.  Did you know that to be a problem before**
13   **this inspection?**
14   A.   No.
15       Q.   **Number 27 states that the basement water**
16   **purifier leaks.**
17   A.   That's not Stacy's problem.
18       Q.   **Number 28 talks about hot water heaters**
19   **not having drip legs.  Did you know that was a**
20   **problem before this inspection?**
21   A.   No.
22       Q.   **Number 29 is the photograph showing**
23   **brick butting up against another material on the**
24   **outside of the home.  And it says it's not sealed**
25   **properly.  Did you know that was a problem?**

Page 59

1    A.   No.
2        Q.   **Number 30 shows the crack in the**
3    **driveway.  I am sure you saw that before this**
4    **inspection?**
5    A.   Yes.
6        Q.   **Did you ever call anybody to come out**
7    **and correct it?**
8    A.   No.
9        Q.   **Number 31 states that the siding**
10   **application is improper on the roof rake and wall**
11   **areas.  Did you note that to be a problem before**
12   **this inspection?**
13   A.   No.  Can I add I wouldn't know most of
14   these things.  I wouldn't know it was a problem.
15       Q.   **Number 32, front retaining wall does not**
16   **have weep/relief outlets.  You didn't know that to**
17   **be?**
18   A.   Correct.
19       Q.   **Number 33, states that there is**
20   **excessive fungus growth, but Mr. Barton testified**
21   **that that in fact was not fungus.  Is that your**
22   **recollection?**
23   A.   No.  My recollection is that it is
24   fungus.  But I assumed it was mold and it was water
25   damaged and rotten was my assumption until it was

Page 60

1    inspected closer.  And they said it was not mold,
2    that it was not rotten.  I assumed the wood would
3    have to be replaced.  And they said it was a fungal
4    growth due to the lack of painting.
5        Q.   **So there was fungus on the window?**
6    A.   To my knowledge, yes.
7        Q.   **Do you remember the person who told you**
8    **that?**
9    A.   Scott Holcomb and I believe the other --
10   another contractor that came out, but honestly I
11   don't have his name.  I might have his name at
12   home.  But he did not do any work on the home.  But
13   we had got more than one person to come out.
14       Q.   **Has that problem been fixed?**
15   A.   Yes.
16       Q.   **What did they do to fix it?**
17   A.   To my knowledge, what I was told, they
18   would wipe it with bleach to kill it, prime it and
19   paint it.
20       Q.   **And did Scott Holcomb do that?**
21   A.   Yes.
22       Q.   **Page 19, shows the brick veneer pulling**
23   **away from the upper arch.  Did you note that as a**
24   **problem before this inspection?**
25   A.   Yes.

Page 61

1        Q.   **Did you ever call Grant or Stacy to come**
2    **and correct that problem?**
3    A.   Did I talk to Stacy about that problem
4    or maybe it was Grant.  To one of them I pointed it
5    out and they explained that it was just cracking
6    mortar, that it was not a structural issue.  So did
7    I call and ask them to come and fix it, we
8    discussed it.
9        Q.   **Y'all talked about it?**
10   A.   Yes.
11       Q.   **I know I have asked you kind of in**
12   **segments what you've spent to repair the problems**
13   **with the home.  And it sounds like you may be able**
14   **to get to that information but you don't know**
15   **offhand what it is?**
16   A.   I do not.
17       Q.   **So if I asked you grand total what**
18   **you've had to spend on this home to correct the**
19   **problems, you can't really tell me.  Can you give**
20   **me a ballpark?**
21   A.   If I gave you a ballpark I would say
22   between 15 and 20,000 because we still owe more
23   money.
24       Q.   **To who?**
25   A.   To Scott.

16 (Pages 58 to 61)

A50B525
**MINDY BARTON        JANUARY 4, 2012**

1    Q.   And you also plan on getting him back
2  out there to do some things?
3    A.   Correct.  In the future.
4    Q.   Let me check my notes, but I am pretty
5  close to being done.  Do you have an opinion as to
6  what the fair market value of your home is?
7    A.    Well, I have an opinion.  Don't we all
8  for our homes?
9    Q.   And what is that opinion?
10   A.   I would -- if I could sell it for
11 850,000 --
12       MR. EDGE:  That isn't the question.  He
13 asked if you have an opinion of the fair
14 market value of your home.
15   A.   Yes, I do.
16   Q.   What is it in your opinion?
17   A.   850,000.
18   Q.   Other than the garage door problem and
19 the painting that needs to be done, do you feel
20 like all other problems with the home have been
21 corrected?
22       MR. EDGE:  Object to the form.
23   A.   No.
24   Q.   And I know you have the faucet issue.
25   A.   Correct.
                                          Page 62

1    Q.   What else?
2    A.   The French glass door issue.
3    Q.   Anything else?
4        MR. EDGE:  Object to the form.
5    A.   Yes.  Some other things on this report.
6  And I am not sure if even -- you might have
7  addressed it with my husband, but there is a gas
8  line that is completely flat that I have been told
9  is extremely bad.
10   Q.   Who told you that?
11   A.   Jason Bell Snider with Air Force Heating
12 and Air.  And he was not the only one.  Our
13 landscape person that's -- he doesn't actually do
14 the work.  He's the manager.  But Scott Thompson,
15 he's the one that pointed it out to me originally
16 and said that there is a big problem here.
17   Q.   What company is he with?
18   A.   American Lawn Care.
19       MR. POTTS:  Give me one second.
20           (Break held.)
21       MR. POTTS:  I don't have anything else.
22       THE WITNESS:  I want to revisit one
23 other thing.  When you asked if we had any
24 other problems with the lack of flashing, the
25 brick flashing, but it's noted in the report.
                                          Page 63

1    That's a problem with leaky windows.
2    Q.   Show me which photograph you are talking
3  about or photographs.
4    A.   Okay.  Number 25.  When Dave Bennett
5  came out to my house --
6        MR. EDGE:  He just asked you what
7  photographs.
8    Q.   All right.  What problems do you feel
9  like have been caused by the lack of flashing on
10 the brick?
11       MR. EDGE:  Object to the form.
12   A.   Leaking, I believe, will be a problem.
13 I am not a builder, but from my understanding, what
14 I was told that there should be flashing and there
15 is not.  And that's a construction issue.
16   Q.   And that was told to you by David
17 Bennett?
18   A.   Correct, the inspector.
19   Q.   And he told you that there could be
20 leaking in the future?
21   A.   He told me that the problems with our
22 windows was due to lack of flashing behind the
23 brick.
24   Q.   The problem with your dormer windows?
25   A.   Windows in general.  That there will --
                                          Page 64

1  he said there will be problems -- there could be
2  leaking problems due to lack of brick flashing
3  around the windows.  And there is supposed to be
4  brick flashing around the windows.
5    Q.   And you said there could be other?
6    A.   I can't remember exactly what he said.
7  I mean, we don't, to my knowledge, have any leaking
8  currently on the inside of our windows due to lack
9  of flashing.  I was told in the dormers that that
10 was a problem.
11   Q.   Okay.  But as far as you know, other
12 than the dormer windows, there are no other windows
13 that are leaking?
14   A.   That's correct.  That triple window in
15 the foyer was leaking and we had to cut a hole out
16 in the Sheetrock to look for damage, rotten wood.
17 And it was either that or pull the whole window
18 out, remove the brick and pull the whole window
19 out, and we felt the most cost-efficient way would
20 be to cut a hole in the Sheetrock and inspect it
21 interiorly.
22   Q.   That's the leaking foyer window?
23   A.   That's correct.
24   Q.   Has that leak been corrected?
25   A.   Yes.  To my knowledge.
                                          Page 65

17 (Pages 62 to 65)

A50B525
**MINDY BARTON          JANUARY 4, 2012**

```
 1      Q.   By Scott Holcomb?
 2      A.   Yes.
 3      Q.   Since Scott has been out there, have you
 4   seen any water coming out of there?
 5      A.   No.
 6      Q.   Have you seen any water coming from the
 7   dormer window?
 8      A.   No.
 9           MR. POTTS:  All right.  That's all I
10   have.
11           (End of deposition, 1:18 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                     Page 66
```

```
 1           C E R T I F I C A T E
 2
 3   STATE OF ALABAMA  )
 4   JEFFERSON COUNTY  )
 5
 6        I hereby certify that the above and
 7   foregoing deposition was taken down by me in
 8   stenotype, and the questions and answers thereto
 9   were reduced to computer print under my
10   supervision, and that the foregoing represents a
11   true and correct transcript of the deposition
12   given by said witness upon said hearing.
13        I further certify that I am neither of
14   counsel nor of kin to the parties to the action,
15   nor am I in anywise interested in the result of
16   said cause.
17
18           /s/Karen Kelley
19           Karen Kelley, CCR #317
20           CCR #317, Expires 9/30/12
21           Commissioner for the
22           State of Alabama at Large
23           My Commission Expires: 8/27/12
24
25
                                     Page 67
```

18 (Pages 66 to 67)

**ATKINSON-BAKER, INC.**                    **1-800-288-3376**

A50B525
MINDY BARTON      JANUARY 4, 2012

1

**A**

able 45:9 61:13
about 12:14 14:3,21 16:4
 19:15 21:12,19 22:10
 22:13,16 25:13 28:17
 29:4,6 33:16 34:18,22
 35:1,7,13,17 36:2,23
 37:14,19 38:16,23 40:3
 40:6 41:17 42:10,13
 43:11,23 45:11,12
 52:23 53:23 54:25
 55:14,15,22,24 56:13
 56:13 57:16,21 58:18
 61:3,9 64:3
above 5:8 67:6
absolutely 20:5 45:21
acceptance 18:13
acting 5:3
action 67:14
actually 27:24 63:13
Adams 10:21 11:2,15
add 59:13
added 40:8
adding 17:22
addition 36:7 45:20
additional 34:17
additions 45:25,25 46:1
address 27:10 29:9 30:2
 31:8 45:14
addressed 24:19,22
 25:22 30:25 31:10 38:9
 49:19 50:19 63:7
administrative 15:22
affected 53:5
affidavit 18:12
afford 43:25
after 7:16 8:25 11:7 17:2
 20:20 24:8 27:7,16
 28:13,15,25 29:11,22
 32:5,18,23,24,25 33:3
 33:6,12,17,23,24,25
 34:2,5,10,24 35:10
 37:16 41:5 44:7 51:17
 56:22
again 5:23 8:8 27:16 33:6
 34:12 45:12
against 51:24 58:23
ago 10:2 24:3 41:18
 46:24
agree 12:22 17:10 27:14
 29:1
AGREED 2:2,10,16
agreement 16:21
ahead 30:18
Air 63:11,12
al 1:9
Alabama 1:2,15 2:8 3:6
 3:14 5:2,3,7 7:25 67:3
 67:22
ALAN 3:11
allegation 20:16 21:4
Alliston 1:8 3:23 5:19
 12:17 16:8 20:13,18
 24:19,25 25:7,14 29:8
 29:16 30:25 32:6 33:6
 52:20,22,25
Alliston's 56:5
almost 13:14 29:25
along 19:8 37:2 48:3

already 38:17 42:12
 45:12 54:24 55:14,24
 56:12
alternative 53:18
American 63:18
amount 40:1 44:20
anguish 53:4
another 10:23 11:1 43:9
 49:10 58:23 60:10
answer 6:1 12:19 16:10
 18:20 20:7,12 28:20
answering 6:5
answers 67:8
anybody 15:2 50:6 52:21
 59:6
anymore 39:22,25
anyone 6:23 14:8,25
anything 9:22 11:23
 25:15 26:15 27:18
 30:13 36:18 41:1,9
 45:6 47:7 50:7 52:23
 63:3,21
anyway 38:2
anywhere 15:15
anywise 67:15
apartment 21:22
application 59:10
approaches 22:24
approximately 2:9
arch 60:23
architectural 9:20
architecture 9:15
area 7:3 8:13 12:25
 14:13 37:22 40:19
 43:13 44:16 47:25
areas 43:2 59:11
arise 53:24
arising 53:9
around 37:17 65:3,4
arrested 11:22
ARTHUR 3:3
aside 35:25
asked 12:14 34:15 37:24
 43:1 51:13 61:11,17
 62:13 63:23 64:6
asking 32:12 40:6 45:19
 50:22
aspect 11:17 28:1
assign 2:20
assigned 13:6
assume 6:2
assumed 59:24 60:2
assuming 43:17
assumption 59:25
ATKINSON-BAKER 1:18
attic 30:3 32:20 33:2,8,17
 34:6,13,19 35:2,10
 43:13,18,22 44:4 52:15
 53:15
attorney 23:16
attribute 56:15
Avenue 1:14 2:7 3:5 5:7
aware 17:23 33:25 49:7
 49:22,23,24 51:2
away 60:23
a.m 1:17 2:9
A50B525 1:25

**B**

baby 11:7,8
back 8:14 10:4,25 26:25
 35:9 39:25 40:25 41:9
 43:15 44:2 46:15,20,25
 47:7 62:1
backyard 47:20,21
bad 63:9
ball 56:14
ballpark 61:20,21
bankruptcy 11:25
Baptist 12:6
Barton 1:4,5,13 2:5 3:24
 5:8,12,18 42:9 59:20
Barton's 16:13 23:4
basement 51:16 58:15
basically 44:16
bath 55:24
beam 54:8
bearing 56:14
Beats 53:18
beauty 7:18
bedroom 36:17,19,20
Beecham 47:17 48:5,8
before 2:6 5:6,19 13:15
 13:17 14:9,19 16:8
 23:19 24:14 33:19
 37:15 41:10 54:9,13,16
 54:17 55:2,6,9 56:2,15
 56:19 57:6,10 58:5,9
 58:12,20 59:3,11 60:24
beginning 14:16
behind 50:25 64:22
being 5:13 20:18 22:11
 44:22 62:5
believe 11:21 14:18
 30:18,23 37:21 40:4
 45:21 49:24 52:20 60:9
 64:12
Bell 63:11
Bennett 40:23 41:24 42:1
 42:3 50:14 64:4,17
best 23:24
better 24:23
between 2:2 57:17 61:22
beyond 38:16
big 36:10 63:16
Bill 14:22 15:5
Birmingham 1:15 2:7 3:6
 3:14 5:2,7 8:13
Bishop 3:12
bit 9:11 43:4
black 54:25
Blake 41:22 42:4
bleach 60:18
Blue 3:13
board 54:12,21
boards 45:4
Bobby 43:3 47:16 48:5,8
born 7:5,6,8
bottom 16:15,18,22
Boulevard 1:20
Bradley 39:3,6,10 51:15
 51:16,21
Brand 1:20
break 6:10,10 63:20
brick 50:19,25 57:6,9
 58:2,23 60:22 63:25
 64:10,23 65:2,4,18
Bridge 13:5 14:13,20

16:6 48:7 49:2
briefly 5:22
brought 7:25
budget 17:20
build 12:15,17 16:6
 21:13
builder 13:7,8,17,22,23
 28:4,6,8 45:6 47:17
 64:13
builders 9:12,17,21,25
 13:6 14:20
building 1:9 5:20 14:14
 14:21 16:4 25:1,15
 28:2,5 52:22
built 14:13,23 28:14,25
 44:17 45:3 47:14,17
Butler 14:16
butting 58:23
buttons 38:7

**C**

C 3:1 67:1,1
cabinet 26:9,21 27:2
cabinets 26:7,10,11,23
 26:24
California 1:21
call 20:6 33:5,6,16,18
 34:1,3,8 35:13,17 48:5
 57:13 59:6 61:1,7
called 8:4 33:10,11,19
 34:5 35:15 43:17,19
calls 34:9
came 5:6 8:15 24:8 26:9
 26:22 29:22 30:2 31:4
 31:14 32:18 33:12,24
 38:1 40:24 43:15 44:2
 46:15 47:16 48:1 54:17
 60:10 64:5
cancelled 39:16,17,19,22
care 38:22 63:18
CASE 1:7
cause 5:8 67:16
caused 64:9
CCR 1:24 67:19,22
certain 10:12 19:22 28:5
 40:8 45:3,4,4 49:25
certify 5:4 67:6,13
chance 23:18 24:16
change 17:2,4,7,8
changes 17:11,12,15,18
 17:22 18:6 46:8
charge 22:2
check 39:17,24 41:19
 51:23 62:4
checks 39:16,19,22
children 13:5
Chinese 41:19
chipping 26:23
choice 13:21
choose 13:22,24
chose 12:16
CIRCUIT 1:1
circumstances 12:14,16
 15:5
civic 12:9
Civil 5:5
claim 12:23 53:3
clarification 17:15
clarify 44:24

cleanly 6:7
clear 24:21
client 38:22
close 17:1 62:5
closed 27:7 37:15,16
closer 60:1
closet 25:5
closing 20:20 21:5,6
 22:24 24:14 29:11
 44:22 45:18 46:2,4,10
clubs 12:9
Collins 3:4
column 57:8
columns 57:17
come 9:19 10:4,5 22:25
 26:19 35:9 39:3 40:12
 40:25 41:11,16,18 45:6
 46:20,25 47:6 48:14
 49:20 50:1,7,16 57:13
 59:6 60:13 61:1,7
coming 29:8,24 30:6
 31:4 32:7,21 33:1
 43:21 46:17,18 66:4,6
commence 17:1
commencement 17:3
commencing 2:8
Commission 67:23
commissioner 5:3 67:21
committee 9:15,21
communicated 44:25
company 8:4,7 63:17
complaint 20:17
completely 13:15 44:17
 44:18 45:2 47:24 63:8
completion 21:20
compliance 2:13
computer 67:9
computer-generated
 39:23
concern 43:10 44:10
concerns 21:12 22:14
 53:13
condensate 55:8
condition 26:25 44:22
confused 31:3
connected 11:16,18
connection 11:13
consider 54:13 55:5
constructed 45:9
construction 11:13,16
 17:1,11 18:10,22 21:11
 22:9,15,17,21 33:24
 44:7,9 53:5,7,8,10
 64:15
contact 15:21 48:4
contained 26:16
continue 6:5 29:23 32:6
 32:9
contract 14:10 16:9,24
 20:21 21:6
contractor 60:10
contractors 51:14,22
conversation 21:11,16
 21:19 22:13,23 31:10
 34:21 37:5,13 55:15
conversations 14:4 16:7
 22:10 34:18 37:18
 55:21
copious 42:10

A50B525
**MINDY BARTON    JANUARY 4, 2012**

2

copy 18:9
corner 25:5 31:5
correct 8:14 9:12 18:4
    21:24 23:2 24:8 29:21
    32:1,19 34:23 39:5,7
    41:8,20,25 43:16 47:11
    48:13 54:3 55:17,20
    57:14,23 59:7,18 61:2
    61:18 62:3,25 64:18
    65:14,23 67:11
corrected 24:24 25:14
    25:22 36:5 39:4 62:21
    65:24
correctly 55:19
correspondence 29:14
cosmetic 52:2
cosmetology 7:19
cost 44:20 48:20
cost-efficient 65:19
counsel 2:3,18,19 5:6
    67:14
County 1:2 7:2 12:4,11
    67:4
couple 10:6 21:18 46:23
coursing 58:2
court 1:1,19 2:14 5:1
crack 59:2
cracked 36:20,22
cracking 61:5
Crestwood 7:13,17
crisscrossed 43:18
currently 65:8
cut 65:15,20
CV-11-900187 1:7

**D**

Daily 19:2
damage 65:16
damaged 59:25
date 20:20,20 21:5,6
    28:11
dates 6:14
Dave 40:22 42:3 50:14
    64:4
David 41:24 42:1 64:16
day 19:3,6,18,23 20:4,8
    22:24 46:12
days 17:2,3 45:23 46:4
deal 14:6
dealing 54:7
deals 16:25 55:12 56:1
Dealt 9:14,14
decided 12:15 14:19
    16:1 44:21
decking 51:9
declared 11:25
defects 33:24
defendant 3:10 20:18
Defendants 1:10
Defendant's 16:13,17,20
    18:5,9,12 23:3 25:19
    25:20 26:16 27:12
definitely 14:17 17:19
    20:14 28:15 46:2 50:5
degree 53:19
delay 45:18 46:2
delayed 46:4,10,12
deposition 1:12 2:4,11
    2:12,22 5:21 16:13

23:4 24:17 27:13 42:10
    42:16 66:11 67:7,11
depositions 2:15
Design 1:8 5:20 24:25
    25:15 52:22
detailed 25:11
detector 56:8
developers 10:8
different 7:7 13:24 14:1
    20:3 30:13 43:21 44:18
    44:19 45:2 52:5
differently 44:17 45:9
directions 43:21
disagree 27:19
discovered 43:14
discovery 44:6
discuss 34:6
discussed 42:11 43:14
    61:8
discusses 56:17 57:3,20
    58:11
discussion 31:20 42:7
distress 53:4
document 18:13,17
    23:19,20 48:25
doing 13:14
dollars 51:25
done 15:18 25:9 30:4
    31:21,24 32:2 33:7,17
    34:24 40:15 44:5 45:1
    46:5,21,23 51:6,14
    62:5,19
door 36:15 37:2,10,14,19
    37:21,22,25 38:1,1,4
    47:18 55:15 56:14
    57:20 62:18 63:2
doors 40:18 55:13,22
    57:25
dormer 30:8 31:8,16,22
    32:3,7 46:18,19 47:9
    54:24 64:24 65:12 66:7
dormers 30:3 31:17
    34:10 36:3 40:25 41:4
    41:10 65:9
dotted 15:15
double 40:18
double-check 41:3
down 6:7 8:5,15 11:4
    23:8,11 26:10 31:5
    32:14,16,21 33:2 39:14
    42:12,17,18,19,23 43:1
    43:11,12,22 46:17 67:7
dresser 7:19
drip 58:19
Drive 3:13
driveway 59:3
drywall 41:19
duct 43:20
due 19:10,13 51:18 53:8
    60:4 64:22 65:2,8
duly 5:13
during 17:11 18:22 21:10
    22:9,15 23:3 24:17
    42:9 44:6,9

**E**

E 3:1,1 67:1,1
earlier 57:25
easier 6:17

edge 3:3 6:15 10:3 13:19
    14:24 19:12 20:7 22:18
    23:17 24:21 26:3 27:20
    28:20 31:1,19 32:23
    33:21 34:12,15 35:22
    36:22 38:16 39:16
    42:24 45:16 47:23 49:1
    51:3 52:8,13,19 53:18
    62:12,22 63:4 64:6,11
educated 28:5
education 7:16
effect 2:13
eight 55:25
either 22:15 32:7 34:21
    65:17
elaborate 43:2
emotional 53:4
emotionally 53:6
employed 52:21
empty 17:23 18:1
encapsulated 35:24
encompass 25:24
end 21:18 66:11
engineering 8:3 46:1
enormous 44:20
entered 16:8
entire 25:2
entries 49:17 50:18
entry 45:11 46:14 47:12
especially 21:18 53:17
essence 11:16 22:5
estate 8:17,18,20 9:1
    10:22,25
et 1:9
even 16:3 22:4 24:20
    25:4 39:24 45:5,6
    50:20 54:15 56:24 63:6
eventually 12:16 48:11
ever 11:12,22,25 14:8
    15:18 18:13 21:10,19
    22:14 30:25 33:14,18
    34:8,16 35:9 37:15
    40:25 41:3 55:21 57:4
    57:9,13,18 59:6 61:1
every 19:3,18,25,25 28:1
everything 6:7 9:11
    27:15 43:20 49:8
evidence 2:22
exactly 13:21 24:6 32:4
    42:19,22 43:11 65:6
examination 4:1,2 5:9,16
examined 5:13
example 17:20
except 2:18
excessive 57:17 59:20
excited 19:15
Exhibit 4:8 16:13,17,20
    18:5,9,12 23:3 25:19
    26:4,5,13,13,16 27:12
    50:20
exhibits 4:9,10
Exhibit's 25:20
expense 22:8 49:10
    53:20
expenses 49:14
Expires 67:20,23
explained 61:5
express 22:14
expressed 21:12

exterior 56:18
extremely 28:1 63:9
ex-husband's 8:1
eye 51:1

**F**

F 67:1
faces 10:2
facing 36:23
fact 20:20 21:4 22:16
    46:8 55:14 59:21
fair 19:4,6,20 20:11
    25:18 29:2 62:6,13
fairly 53:16
fairness 50:24
family 53:11 54:1
far 6:12 17:15 30:7 40:7
    41:3 45:7 65:11
Fargason 14:22 15:7
farmhouse 26:6
faucet 62:24
faucets 49:19,20,22 50:2
    50:3,7,10
fault 56:10
feel 24:24 38:8,13,20
    52:10,25 57:22 62:19
    64:8
feeling 14:5 15:13
feet 47:24,25 48:1
felt 6:2 29:3 40:1 43:2
    51:10 65:19
Ferguson 15:6
figure 23:4
file 1:25 23:14 48:17
fill 42:16 43:8
final 22:25
financially 53:12
finish 6:15 43:24 46:25
finished 13:11,14,15
    40:5 47:1 51:16
finishing 46:9
fire 53:14
first 5:13 8:20 9:1 13:12
    13:17 28:24 33:12 37:6
    50:5 51:17 56:25
five 21:17,23 24:3 35:19
    38:11 47:24,25 48:1
    55:4,5
fix 26:9,20 46:15 49:21
    60:16 61:7
fixed 26:21,24 41:4 46:19
    52:10 60:14
fixtures 55:25
flashing 54:12 58:8
    63:24,25 64:9,14,22
    65:2,4,9
flat 63:8
Floor 1:20
Florida 10:21,24
following 5:9
follows 5:14
force 2:13 63:11
foregoing 5:5 67:7,10
forgot 6:18
form 2:19 19:12 51:3
    52:13,19 62:22 63:4
    64:11
Foshee 41:22 42:4
four 7:23,24 54:23

foyer 29:7,23,24 30:1,3,4
    30:20,24 31:5,11,25
    32:7,12,13 36:3 46:21
    52:8 56:12 65:15,22
frame 41:6
framed 17:24
Frank 10:1
French 40:18 57:25 63:2
friends 15:16 16:4
from 7:7 13:9 17:2 23:8
    24:2 29:7,24 30:6,8
    31:5,7 32:7,11 33:14
    36:3 41:4 42:16 46:18
    49:15 50:20 53:1,9,25
    53:25 55:1 60:23 64:13
    66:6
front 26:10 51:7 56:13
    59:15
full 2:13
fungal 60:3
fungus 59:20,21,24 60:5
further 2:10,16 17:14
    67:13
future 43:25 62:3 64:20
F-A-R 15:8
F-A-R-G-A 15:9

**G**

Gaines 3:12
gaps 42:16
garage 36:17 55:16
    57:20 62:18
gas 63:7
Gault 3:12
gave 61:21
general 35:22,23 39:2
    64:25
getting 9:8 23:15 62:1
give 20:11 61:19 63:19
given 67:12
glass 36:24 37:4,8 40:18
    63:2
Glendale 1:21
go 5:22,22 6:18,18 7:10
    9:20 10:12,25 12:6
    13:8 15:13 16:1 18:23
    19:10,17 24:6 25:2,10
    30:18 31:19 42:5,17
    44:21 45:17 54:4,5
goes 36:17
going 6:2 9:23 13:23
    14:5 15:4 16:3,12 21:3
    23:11 34:17 37:1,7,10
    47:2,4,6
gone 12:24
good 14:5 19:24 28:7
gosh 10:1
graduate 7:14
grand 61:17
Grant 13:12 19:17 20:10
    20:14 21:20 22:15
    27:14 28:3,7 29:4
    33:10,12,16 34:3,9,21
    35:2,9,15,16,17 36:5
    37:2,14,19,24 41:16
    44:10,12 49:20 50:1
    52:21,25 55:15,22
    57:13 61:1,4
Grant's 23:6

A50B525
**MINDY BARTON**      **JANUARY 4, 2012**

3

Greystone 12:25 13:11
ground 5:22
grounds 2:20
growth 59:20 60:4
guess 18:14 22:5 31:3
41:17 52:14
guessing 20:12

**H**

H 3:3
hair 7:19
half 10:17 11:5 46:11
57:8
handled 33:9
handwriting 23:5
Haney 10:1
hard 38:11 54:15
harmed 54:2
having 22:12 37:23
53:20,21 58:19
hazard 53:14
head 48:7
health 53:12,13,22,23,24
heard 5:21 25:13
hearing 12:19 67:12
heaters 58:18
Heating 63:11
hold 22:5 63:20
help 48:4
Hendrix 3:12
her 6:18 9:8 43:1,2,5
hidden 53:1
high 7:10,12,13,17
highly 28:3
him 6:15 15:13,16,17,18
15:21 16:1,3 19:25
33:7,18 34:4 40:11,14
62:1
hindsight 27:25 28:4,8
hinge 56:14
hinges 55:19 57:21
Holcomb 39:20 40:2 51:5
51:22 52:10 60:9,20
66:1
hole 65:15,20
holes 50:20,23 57:4,5
58:11
hollow 38:1
home 11:9 12:15 14:21
22:7 28:25 44:8 47:15
47:17 48:25 51:14,19
52:17 53:5,7,8 56:6
58:24 60:12,12 61:13
61:18 62:6,14,20
homeowner's 51:24
homes 10:22 11:2,15
12:25 14:13,14 15:14
62:8
honestly 17:9 25:9 57:11
60:10
Horsley 3:4
hospital 7:7
hot 36:11 38:7 58:18
hot-button 38:4
house 14:9 21:13 25:11
25:25 27:7,10 28:13
29:8 35:14 36:4 37:7
38:14 41:1,11,19 43:15
44:14 45:22 46:5 47:18

47:19 50:21 55:22 64:5
houses 13:10,13 14:4
hundred 26:14 49:12
Hunter 11:3
husband 6:13,19 12:7,14
14:3 17:7 29:7 33:6,9
34:21 35:1,6 40:1
45:19 47:16,24 49:23
51:6,15 63:7
husband's 5:21 24:17
25:13 27:13 42:9,16
HVAC 55:8 56:1

**I**

idea 28:12 35:18 41:15
II 3:11
improper 59:10
INC 1:18
include 17:17
includes 51:9
including 52:8
incomplete 56:14
INDEX 4:1,8
industry 11:14
information 61:14
informed 53:14
infrastructure 10:14
infrastructures 10:9
initial 18:18 33:17 34:10
34:24
initialed 18:19
initially 13:1
initials 16:18 18:14,16
inside 65:8
inspect 65:20
inspected 54:18 60:1
inspection 25:20,24 26:2
26:5 34:2,6 54:5,7,9,14
54:16 55:3,6,10 56:2
56:15,20 57:6,10 58:5
58:9,13,20 59:4,12
60:24
inspector 33:23,24 64:18
installation 26:8,12
installed 37:21 38:2
43:19
instant 46:9
instrumental 9:8 10:11
insurance 51:24
intended 43:6
interested 67:15
interiorly 65:21
interrupt 44:1
inverted 55:9
invest 39:8
investigate 48:22
involved 11:18 19:9
in-between 9:18 10:19
issue 29:6 47:10 54:24
61:6 62:24 63:2 64:15
issues 35:17,21 36:3
38:6,9 52:11,14,16
53:13,22,23,24
items 23:1,7 24:5,7,8,24
25:18,23 35:23,24 36:1
36:4,6 41:3,12

**J**

jack-of-all-trades 9:4
JAMES 3:11
January 1:16 2:8 5:4
16:9
Jason 63:11
Jay 3:11 5:18
Jefferson 1:2 7:2 12:3,10
67:4
job 8:1,15,18,19 9:8
10:15,19 20:10
jobs 11:9,13
John 39:3,18 51:15,16
51:21
just 10:10 14:24 17:9
19:14,21 20:7 28:20
29:19 30:1 31:17 35:20
36:1,9 40:6 42:15,17
43:5,11 45:17 48:18
49:21 50:2 52:2 53:15
61:5 64:6

**K**

Karen 1:24 2:6 5:1 67:19
keeping 43:7
Keith 7:1
Kelley 1:24 2:6 5:1 67:18
67:19
kill 60:18
kin 67:14
kind 9:16 19:8 39:8 42:15
61:11
kitchen 26:7
kitchen/eating 40:18
knew 48:8 49:23 57:11
know 5:24 6:10 10:12,13
14:24 15:13 17:3 18:19
19:20,21 20:11 21:17
21:25 22:22 23:13,23
24:15,20 25:4,5,21
27:4 28:6,10,17,19,20
29:14 30:7 31:6,9 32:2
33:7,9 35:16 36:9 39:3
39:10,12,21 40:11
41:14 42:20 44:25 48:5
49:7 54:22 57:12 58:4
58:8,12,19,25 59:13,14
59:16 61:11,14 62:24
65:11
knowledge 21:9 22:21
25:17 30:4 31:13,18,22
33:5 37:15 41:2 49:11
49:16 51:4 52:15,18
60:6,17 65:7,25
knowledgeable 28:1
45:7
known 44:10
K-N-O-W 18:21

**L**

L 2:1
lack 50:23 57:4 60:4
63:24 64:9,22 65:2,8
Lake 3:13
landscape 63:13
large 2:7 5:3 13:4 22:7
67:22
larger 47:25
largest 13:4

last 27:4 28:22,23
later 10:3 38:12 47:16
Lawn 63:18
laws 2:14
lawsuit 5:20 53:3
lawyer 42:2 49:3
leading 2:19 55:15
leak 65:24
leaking 64:12,20 65:2,7
65:13,15,22
loaks 30:23 58:16
leaky 64:1
learned 30:13
least 6:2
leave 35:25
leaving 9:9
left 10:18 25:16 28:15
43:3
Legacy 13:13
legs 58:19
Less 21:17
let 5:24 6:10,15 24:21,23
25:12 28:2 33:7,13
41:2 44:1 62:4
letter 23:17
letting 23:23
let's 24:6 31:19 35:25
42:5 54:4
Liberty 9:2,3,10 10:16
11:11 15:14,19
license 7:19 8:18
lied 52:23
lighting 17:20
like 6:2 9:13 10:9,9,10,14
13:3 15:15 16:25 17:19
22:23 24:4,24 25:8
28:6 32:13 33:14 36:11
38:8,13,20 40:1 42:20
42:21 43:3 45:2 47:23
52:10,25 57:22 61:13
62:20 64:9
liked 13:25 14:1
limited 16:21 34:17
35:12
limiting 33:15 34:12
line 15:16 55:8 63:8
list 22:19,20 23:1,11,12
23:24 25:3,10,18,22,23
26:2,3,5 35:22,23 36:1
36:6,8 41:3,11
little 9:11 43:4
live 7:2
lived 6:13 14:8 37:7
living 8:12 12:3
long 7:22 8:23 10:15
11:2 25:3 29:11
longer 8:12 28:23
look 12:24 13:24 15:13
18:23 23:13,18 24:16
24:17 26:22 48:24
65:16
looked 13:2,3,10 14:5
23:20 47:20
looking 16:17,24 23:22
24:1,1 43:8 47:18
looks 16:24 24:4
lot 13:3,6,8,17,23,24,25
14:2,19 15:12 16:5
20:5 28:25

lots 13:7
loud 6:5

**M**

made 2:18 17:2,4,13 18:7
33:25 44:6 46:9 51:24
main-level 36:17
major 33:25 40:17 46:6
make 2:20 44:10 57:4
making 53:3
man 26:9,22 27:2
manager 9:3 63:14
Manaway 7:9
many 16:7 19:10 21:15
35:16 37:18 41:14 52:5
map 13:3
marked 4:9,10 16:12
market 62:6,14
marriage 53:12
married 6:20,23,25 10:20
master 36:19
matches 23:24
material 58:23
may 2:6,20 22:18 39:23
61:13
maybe 8:10 28:24 43:3
61:4
McCaleb 19:18 20:10
21:20 28:4 29:4 52:21
53:1
McCaleb's 27:14
mean 15:20 17:16 19:22
22:22 25:9 31:9 38:12
39:21 41:4 53:16 65:7
means 25:5
meant 34:16
mechanical 8:3
meet 12:10 58:3
meeting 9:22 13:12 35:2
35:4,7,10
member 12:9
mental 53:4
mentally 53:5
mentioned 58:7
met 5:19
middle 43:22 47:22,23
might 20:2 29:15 31:24
35:20 39:18 60:11 63:6
mind 23:15,22 42:15
MINDY 1:5,13 2:5 5:7,12
minimum 58:3
minutes 20:2
misaligned 55:13,18
57:22
missing 58:12
mistake 37:11
moisture 50:22
mold 53:25 59:24 60:1
molding 54:18
money 39:9,20 44:20
61:23
month 37:6 46:11
more 10:6 14:23 15:11
15:16,17 16:3 20:14
35:19,24 41:15 47:24
60:13 61:22
Morris 1:14 2:7 3:5 5:7
mortar 61:6
most 59:13 65:19

A50B525
**MINDY BARTON      JANUARY 4, 2012**

4

mother-in-law 9:6 12:2
Mountain 12:6
move 8:5 21:22 48:18
moved 8:14 10:20 11:4,6
14:1 22:3,5,6,7 51:17
56:22
much 10:11 19:9 21:25
39:10 47:25 48:19
53:17
myself 23:11

**N**

N 2:1 3:1
name 5:18 7:1,12 8:7
27:4 41:21 60:11,11
names 9:24
narrowed 48:1
nature 9:20 10:13 45:24
near 15:15
necessarily 16:2 36:11
necessary 2:17
need 6:9 17:14 38:9,13
46:1 48:21
needed 10:12
needs 62:19
neighbor's 47:14
neighbor's/friends 48:7
neither 6:22 67:13
never 24:18,22 25:9
32:20,22 33:1,11 34:3
46:21
new 11:15 22:7 38:1
next 40:15,17 45:11
46:14 47:12,17 56:11
57:3,16
nine 56:8
Nobody 54:1
none 49:16
North 1:20
Notary 2:6 5:2
note 54:8 55:9 56:1,15
56:19 57:4,9 59:11
60:23
noted 25:19 55:5 63:25
notes 9:22 42:10 43:5
62:4
nothing 11:17 30:4
notice 56:23
noticed 40:20 44:3 56:21
number 1:7 21:1 25:8
57:8,20,24 58:2,7,11
58:15,18,22 59:2,9,15
59:19 64:4
numerical 24:6
numerous 16:10 25:9
37:20 45:22 52:3
nutshell 44:16

**O**

O 2:1
Object 19:12 51:3 52:13
52:19 62:22 63:4 64:11
objections 2:17,20
obviously 13:25 18:16
49:8
occurred 29:12
October 21:5
off 8:10 20:22,25 26:23

31:19 42:5,11 43:4,21
43:24
offered 2:22
offhand 61:15
office 9:3,5,23 15:22
Off-the-record 31:20
42:7
often 19:1,18 20:9
Oh 37:6
Ohio 7:8,9,10,20,21 8:14
Okay 5:24,25 6:3,4,8,10
6:11 15:1 21:3 22:20
23:22 25:8 27:23 30:24
32:16 35:16 38:3 43:13
45:11,14 46:15 49:19
50:19 54:21 56:22 64:4
65:11
older 12:3
once 10:18 26:24
one 6:22 13:13 37:17
40:9 41:23 42:4 46:16
47:15 48:6 49:20 55:18
60:13 61:4 63:12,15,19
63:22
ones 49:25
one-year 27:7 35:12
only 46:3 63:12
onto 26:11
opinion 46:3 62:5,7,9,13
62:16
oral 5:8
order 24:6 37:10,12
ordered 36:21,25 37:4
organizations 12:10
original 18:2,7,10
originally 63:15
originating 30:8 32:11
other 11:11,12 12:2
14:20 22:18,20 29:1
30:17 31:1 34:8,9 36:2
36:6,13 37:17 38:3,4
40:12,24 47:7 49:14,17
50:4,18 51:13,21,22
52:16 55:22 60:9 62:18
62:20 63:5,23,24 65:11
65:12
out 6:5 13:8,8 15:13
18:23 19:10,14,17,18
19:19 22:6 23:5 25:16
26:19,22 27:9 29:8,22
30:2 31:4,14 32:18
33:12,24 35:9 36:4,9
38:1 39:4 40:12,22,24
40:25 41:16 43:3,14
44:2,20 48:14 49:20
50:2,4,7,16 51:22
54:17 57:14 59:6 60:10
60:13 61:5 62:22 63:15
64:5 65:15,18,19 66:3
66:4
outlets 53:15 59:16
outside 11:9 58:24
out-of-pocket 49:14
over 5:22,23 8:10 16:11
17:20 24:1
overall 53:16
oversight 48:10
owe 61:22
own 9:13 23:11

Oxmoor 8:11

**P**

P 2:1 3:1,1
page 4:2 54:6,11,23 55:4
55:5,8,12,25 56:8,13
56:17 60:22
paid 21:25 39:10,20 40:2
40:6 48:2
paint 26:8,23 35:13,17
35:20 38:13 46:20 47:7
52:1 60:19
painted 38:17
painting 35:24 38:6,9,23
39:7 51:16 60:4 62:19
Panley 7:1
paper 23:9
Paragraph 21:2
paraphrasing 44:15
Park 9:2,3,10 10:16
11:12 15:14,19
part 18:3,2 38:14 48:10
50:21 54:25
particular 30:15
parties 2:3,20 67:14
party 5:8
pass 10:23 15:24
pay 48:23
PC 3:12
peeled 26:8
Pensacola 10:21
people 9:14 46:24 51:14
percent 26:1,14 49:12
performed 20:19 22:11
32:5
period 27:7 28:17 35:13
periods 6:12
person 9:18 10:10 60:7
60:13 63:13
personally 47:4
person's 41:21
phone 29:20 34:8,9
photograph 55:12 56:11
56:17 57:3,16 58:22
64:2
photographs 54:7 55:25
56:4 64:3,7
physical 39:24
physically 54:2
pick 13:8,8,22
picked 13:17,17 29:20
pictures 54:11
piece 23:9
pieces 44:18
PLAINTIFF 3:2
Plaintiffs 1:6
plan 62:1
planned 19:8
plans 9:19 10:13 15:23
17:12 18:2,7,10 27:9
27:11 40:11 50:9,15,17
plat 13:3
pocket 48:14
point 19:24 41:4,17
49:20
pointed 40:22 61:4 63:15
possession 44:8
possible 54:6
potential 53:23,24

Potts 3:11 4:3 5:17,18
27:21 31:3 34:14 38:18
42:5,8 63:19,21 66:9
prefatory 45:16
present 3:22 5:21 12:13
35:4
pretty 62:4
prime 60:18
print 67:9
prior 2:22
privilege 42:25
probably 10:5 11:4 28:9
37:6 39:18 46:13 49:4
problem 26:9,20 27:1,10
29:9,16,19 30:1,15,19
30:24 31:6,23 34:22
36:13 40:21 44:3 46:16
46:16,19,25 48:11,15
49:15 50:23 52:2 54:9
54:13,17,17 55:9 56:2
56:15,19,21,23 57:9,12
57:18 58:5,9,12,17,20
58:25 59:11,14 60:14
60:24 61:2,3 62:18
63:16 64:1,12,24 65:10
problems 19:11,13 20:17
25:14,19,21,23,24
29:24 32:6,9 33:25
34:18 36:10 38:20,24
39:4,7 49:22 50:25
51:2,5,18 53:8,9,20
55:4,6 56:5 61:12,19
62:20 63:24 64:8,21
65:1,2
Procedure 5:5
proceedings 5:9
process 13:20 14:14,15
14:17 15:17 16:5 17:11
18:23 19:16 22:9,16
28:2 33:19,22,23 44:7
44:9 48:17
project 21:11
projected 21:6
prompt 43:6
prompted 43:12
properly 56:19 58:25
Properties 9:3,10 11:12
15:19
property 47:14 48:3
provision 16:25
Public 2:6 5:2
puddles 26:11
pull 65:17,18
pulling 60:22
punch 22:19,20 23:1
25:18,21,23 35:22,23
35:25 36:6,8 41:3,11
purifier 58:16
purposely 52:23 53:1
pursuant 5:4
put 10:14
putting 10:8
P.C 3:4
p.m 66:11

**Q**

qualified 28:7
quality 22:10,17,22
question 5:23 6:1,3,15

19:20 20:13 24:23
27:16 28:21 29:25
33:15 34:12,17 38:11
54:19 62:12
questions 2:18,19 11:22
12:20 16:4 20:7 67:8
question-and-answer
15:11,17
queue 42:20 43:2
quick 23:23 44:1
quickly 54:6
quite 43:23 48:17

**R**

R 3:1 67:1
rafters 43:17 54:8
raised 7:5,6,8,9
rake 59:10
range 40:2
rather 6:6
Ravenna 7:8
read 8:7 27:16 42:22
reading 2:11 20:22,25
42:24
real 8:17,18,20 9:1 10:22
10:25 23:23 44:1
really 9:4 10:10 16:2 25:3
30:2 31:9 43:10 45:25
54:15 61:19
realtors 9:15
reason 11:21 13:1 39:6
46:3,7
recall 12:19 15:3,25 17:5
17:6,9 22:2,4,12,23
29:8,11 31:25 35:6
37:16 39:12 40:20
recalling 37:20
received 51:25
reciprocal 10:25
recollection 23:24 24:2
36:2 59:22,23
recommend 28:3
record 6:7 31:19 42:5,12
recorded 49:8
reduced 67:9
refer 42:1
reference 20:19
referenced 57:25
referencing 21:4
referred 41:23 51:15
referring 17:21 21:7 26:4
33:22 39:1 41:5 50:21
51:6
refiling 49:10
reflect 18:6
reflects 29:15
regarding 48:5 50:4
regards 47:9
regularly 12:10
relating 2:14
relatives 12:3
remaining 24:7
remember 9:24 10:3
13:12 24:10,11 27:2
31:22 37:23,24 41:21
45:5 60:7 65:6
remove 37:23 65:18
rent 21:25
repaint 46:20

# A50B525
## MINDY BARTON        JANUARY 4, 2012

5

repair 52:1 61:12
repaired 51:7,8
replace 50:16
replaced 36:16 37:8,8,9
 37:11 50:12 51:7,8
 60:3
replacing 40:17
report 63:5,25
REPORTED 1:24
reporter 5:1
REPORTERS 1:19
represent 5:19
represents 67:10
residents 6:17
resolved 48:11,15
respective 2:3
response 44:13,14,15
responsible 40:9
result 67:15
resurveyed 48:17
retaining 45:20,24 47:13
 47:21 48:2 49:15 59:15
return 56:1
review 9:15,21
revisit 42:21 43:8 47:13
 50:24 63:22
ridge 54:8
right 6:14 11:20,20 12:13
 13:1 15:10 18:22 19:24
 20:16 27:12 28:3,14
 30:7 32:4 33:11,13
 35:19,25 37:16,17 39:4
 40:3,12 44:24 46:14
 47:2,12,18 48:19 49:3
 49:9,17 50:1,6 51:12
 53:19 54:4,23 55:16
 57:24 64:8 66:9
ripped 44:19
road 48:2
Robert 1:4 3:24
roof 51:7 59:10
roof/wall 54:12
room 45:10
rooms 17:25 18:2 46:9
 46:10 52:3,5
Ross 13:5 14:13,19 16:6
 48:7 49:2
rotten 40:19 59:25 60:2
 65:16
Roughly 7:23
rowlock 58:2
rules 2:14 5:5,22
running 26:10 32:13,16
 43:21,22

_____
S

S 2:1,1 3:1
sales 16:9,24 20:21 21:6
same 2:13 9:5 20:13
 26:24
satisfaction 24:25
saw 13:3 20:9 32:13,22
 32:25 46:16 54:17 59:3
saying 26:22 31:7 37:24
 49:3
says 24:11 27:25 55:13
 58:24
school 7:10,12,13,17,18
 8:17 11:1

Scott 39:20 40:2 51:5,21
 52:10 60:9,20 61:25
 63:14 66:1,3
seal 56:18
sealed 57:8,11 58:24
second 24:4,9,12,13
 28:2 36:1 42:6 63:19
section 51:8
see 10:1 19:16,25 20:14
 20:22 25:12 32:16
 50:24 54:15,21 55:2
seeing 29:23 32:6,9,13
seemed 45:15
seen 11:18 17:50:22 66:4
 66:6
segments 61:12
sell 62:10
selling 11:18 47:19
send 23:17
September 21:7
seven 55:12
seven-hundred-some-...
 51:25
several 14:13,14,17
 55:13 56:18 58:3
sewage 9:13
sewers 10:9
Shades 12:6
Sheetrock 25:7 45:10
 65:16,20
Sherman 27:4,5
shingles 51:9
shock 43:23
shorten 25:12
show 16:12 64:2
showing 58:22
shows 59:2 60:22
siding 59:9
signature 2:11 16:14,21
signed 14:9
signing 15:15
simultaneous 13:19
since 11:8 43:4 66:3
sink 26:6,11,12
sit 26:15 27:20,22 38:21
site 18:23 19:9 20:10
six 55:8
size 44:18
skip 45:13
slope 58:4
small 13:14
smoke 56:8
Snider 63:11
sold 10:22
solid 37:22,22,25
some 12:24 15:14 23:10
 23:10 24:20 25:4,21,22
 29:22 31:11 38:4 39:4
 40:12 41:17 42:12 52:1
 62:2 63:5
somebody 26:19 41:18
someone 27:9 37:1 50:9
 50:15
something 6:18 10:12
 23:8 24:2 43:3,4 48:9
 50:10
Sometimes 19:4
somewhere 39:13
soon 56:22

sorry 19:5 32:24
sound 40:3
sounds 61:13
space 17:23 43:24
spaces 18:1
spacing 57:17
spec 47:17
specifically 13:12 22:12
 31:25 52:4
specifications 17:12
 18:3
specs 18:7
spend 61:18
spent 11:11 61:12
spoke 34:4
spots 36:11
Springs 14:16
Stacy 1:8 3:23 5:19
 12:17 13:2,10,23 14:1
 14:4,9 16:8 17:7 19:5
 20:13,18 21:12,16
 22:10,15 24:19,25
 25:14 28:16 29:8,16,22
 30:2,12,25 31:8 32:5
 32:18 33:6,10,11,16,19
 34:1,5,9,22 35:9,13
 36:5 40:24 41:16 44:11
 46:15,22 47:2 48:4
 52:20,22,25 55:2 56:5
 57:13 61:1,3
Stacy's 56:10 58:17
staining 52:3,6 55:1
 56:12
stakes 47:22 48:18
stand 25:6
standard 58:4
started 13:9 33:20 47:15
state 2:7 5:3 10:25 24:23
 51:23 67:3,22
stated 52:4
states 58:15 59:9,19
stemming 31:7 49:15
stenotype 67:8
sticks 36:4,9
still 23:12 27:1 30:14,16
 33:7 38:8 61:22
STIPULATED 2:2,10,16
stipulation 5:6
stop 28:3 33:13
stopped 11:6
storage 22:3,6,6
straight 45:17
stream 32:20,21,22,25
 33:1 46:17
stress 53:11,11,11,12
strictly 9:22 11:18 52:1
structural 61:6
stuff 10:9 22:3 45:5,17
submit 9:19 15:23
submitted 28:10 29:3,16
sudden 45:2
sufficient 22:17 57:5
Suite 3:5,13
supervision 67:10
support 45:9
supposed 36:16 46:24
 65:3
supposedly 36:20,25
 48:3

sure 15:20 20:24 21:17
 24:15 27:18 33:10
 38:12 39:22 42:3 43:16
 43:18 48:21 49:5,6,23
 50:20 52:4 57:2 59:3
 63:6
survey 47:22 48:19,23
 49:1
surveyed 47:19 49:4
Swagelok 8:4,9
sworn 5:13
system 9:14 56:1
S-R-T-U 25:4,5,6
S-W-A-G-E-L-O-K 8:10
S-W-A-G-L-O-K 8:9
s/Karen 67:18

_____
T

T 2:1,1 67:1,1
take 6:6,9,10 9:22 11:1
taken 2:6 38:22 44:7 67:7
taking 2:15 21:13 42:10
talk 14:8 33:16 61:3
talked 13:2 14:20,25 15:5
 29:6 42:13 45:12 54:25
 55:14,24 56:12 61:9
talking 13:9 36:23 38:16
 38:23 53:22 57:21 64:2
talks 56:13 57:16 58:18
tear 39:2
tell 15:4,21 24:18 37:1,3
 42:18,19 45:11 47:6
 49:12 61:19
telling 13:16
ten 16:11 56:13
terminology 43:16
terrified 53:13
test 10:23 11:1
testified 5:13 35:1 59:20
testimonial 27:13,15,19
 28:11 29:3
testimony 25:13 42:11
their 2:3 9:13,13 10:1
 13:6 37:11
thereto 2:23 67:8
thing 15:12 40:17 44:19
 63:23
things 9:19 10:13 18:24
 23:10 29:1 40:12 43:1
 43:18 45:24 50:4 53:1
 55:5 59:14 62:2 63:5
think 8:9 11:5 16:7 20:5
 20:9 22:16 26:15 30:19
 39:15,24 46:6 48:21
 54:16 57:18
thinking 11:6
Third 1:20
Thompson 63:14
though 13:16 29:2 31:7
 39:23 48:12
thought 53:16
three 52:7 54:11
three-and-a-half 7:23
through 2:23 23:22
 24:5,7,16 25:2,10
 42:17 44:21 54:4,5
 58:8
tighten 50:2
tightened 49:21

time 2:21,21 6:9,12 10:24
 11:11 13:5,13 19:22,25
 19:25 20:3,19 21:10,13
 25:3 27:11,24 28:17
 29:2 30:15 37:17 41:6
 43:25 50:17 53:17
times 19:10 20:5 21:15
 35:17 41:14 45:22
timing 21:20
today 5:19 23:19 27:20
 27:22 38:21
together 15:23
told 38:10 31:1 35:6 37:2
 45:1 46:18,22 47:2
 50:13 60:7,17 63:8,10
 64:14,16,19,21 65:9
top 55:12,25 56:17
topics 38:4
total 61:17
touching 35:13
touch-up 13:14 25:8
towards 21:18
town 7:7 43:15 44:2
transcribed 23:8
transcript 67:11
trial 2:21
tried 34:3
triple 65:14
trouble 48:9
true 67:11
try 54:5
trying 23:4
turned 17:24
turning 18:1
twice 19:4 22:5
two 8:24 17:24 18:1
 28:22,23,24 54:6 55:25
two-fold 29:25
type 13:14 15:12
types 45:4,4

_____
U

U 2:1
Uh-huh 15:9 27:21
Uh-huhs 6:6
uh-uhs 6:6
ultimately 15:25
unaware 51:1
under 12:14,16 15:5 51:5
 58:3 67:9
underneath 26:7
understand 5:24
understanding 14:12
 30:14,16 34:16,20
 50:11 64:13
understood 6:3
unplugged 56:9
unsealed 54:21,22
until 17:24 21:5 59:25
upgrades 17:16,17,19,22
 18:6
upper 60:23
upset 43:23
upsetting 53:21
use 13:7 16:3

_____
V

A50B525
**MINDY BARTON      JANUARY 4, 2012**

6

**v** 1:7
**value** 62:6,14
**veneer** 60:22
**verbatim** 44:15 45:7
**very** 14:16 22:7 43:23
  53:21
**visible** 51:1

**W**

**wait** 28:2 33:13
**waived** 2:12
**waiving** 42:25
**walk** 24:9
**walk-through** 22:25 24:5
  24:12,13
**wall** 31:6 32:14,17,22
  33:2 45:20,24 47:13,21
  48:2 49:15 58:8 59:10
  59:15
**want** 25:2 36:1,9 40:15
  50:24 63:22
**wanted** 13:4,22 14:24
  17:7,7 19:14,15 43:24
  44:24 45:14 47:13
**wanting** 40:14
**warped** 26:7 40:19
**warranty** 16:21 35:12
**wasn't** 10:11 15:14 18:2
  19:22 30:1 47:4 49:24
  51:18 57:11
**water** 26:10 27:1 29:6,24
  30:5,8 31:4 32:6,13,16
  32:19,21,21,22,25 33:1
  33:2,8,16 34:6,13,18
  36:2,14 46:16,17 52:3
  52:6,11,14,16 53:15,25
  54:18 55:1 56:11 58:15
  58:18 59:24 66:4,6
**way** 34:15 42:24 43:9,19
  45:3 47:24 65:19
**wear** 39:2
**website** 27:14
**week** 20:9
**weeks** 21:23 46:24
**weep** 50:19,23 57:4,5
  58:11
**weep/relief** 59:16
**well** 8:22 10:24 11:3,15
  16:10 33:15 35:20 36:8
  37:11 38:11 39:17 41:2
  48:16 54:20 62:7
**went** 7:18 8:17,25 9:2
  13:10 17:20 44:2,4
**were** 5:10,20 6:19,25 7:5
  9:5 10:8 12:13 13:6,6
  13:11 14:15,20 15:4,13
  15:15,16,19 16:3 17:10
  17:12,13,19,21,23 18:6
  21:3 23:4,7 24:18,24
  25:14,22 26:25 31:7
  32:11 33:25 35:4 36:4
  37:1 42:10,11 43:19,23
  45:18,22,24,25 46:4,8
  46:24 47:22 50:21,22
  51:5,13 54:22 55:13
  58:11 67:9
**weren't** 16:2 25:22 40:4
  57:5
**West** 8:10

**Weygand** 49:1,4,7
**we've** 54:24 55:24
**while** 15:19 53:14
**whole** 33:19,21,23 37:9
  44:16,19 65:17,18
**window** 29:7,23,24 30:1
  30:3,5,20 31:5,12,22
  31:23 32:3,8 36:3,19
  37:3,7,9 38:3 47:9 60:5
  65:14,17,18,22 66:7
**windows** 30:9 31:8,16
  32:7 46:18,19 54:24
  56:18 58:3 64:1,22,24
  64:25 65:3,4,8,12,12
**wipe** 60:18
**witness** 2:12 36:24 63:22
  67:12
**wood** 37:22,25 44:18
  60:2 65:16
**words** 30:17
**work** 8:3,23 9:16 10:7,15
  11:2 13:15 15:18,22,23
  20:18 22:11 27:6 29:22
  31:11,14,15,21,24 32:2
  32:5,23,24 33:1,3,7,12
  33:17 34:10,24 35:10
  39:11,20 40:25 41:1,9
  41:10,11 43:20 46:5
  49:2 50:2 51:6,14,18
  56:6 60:12 63:14
**worked** 8:24 9:2,12,12
  9:25 10:21 13:5 38:9
  45:23
**working** 11:6 20:17
**world** 48:9
**wouldn't** 22:22 42:15
  59:13,14
**write** 43:1
**writing** 29:16
**written** 23:10 39:13
**wrong** 38:2 57:21
**wrote** 23:8 42:12,17,18
  42:19,23,24 43:11,12

**Y**

**yard** 13:4 47:23 48:16
**yeah** 6:17 10:5 11:5 31:3
  43:10
**year** 6:19 7:14 8:5,21
  10:17 11:4,5 50:5
  51:17 57:1
**years** 7:23 8:24 10:2
  23:21 24:3 28:22,24,25
  38:11
**year-and-a-half** 41:18
**young** 53:17
**y'all** 6:13,19,22 12:15,24
  16:8 20:17 21:22 22:24
  24:4 28:10 29:19,19
  37:4 40:11 41:18 44:7
  44:21 61:9

**$**

**$20,000** 40:2
**$2500** 22:1

**#**

**#317** 67:19,20

**1**

**1** 16:13
**1:18** 66:11
**10** 25:8
**100** 26:1
**100-percent** 49:6
**11** 23:3 25:19 26:5,13,16
  56:17
**11:50** 1:17 2:9
**12** 27:12
**13** 21:2 25:20 26:6,13,17
  50:20 56:4
**14** 56:4
**15** 20:2 61:22
**18** 13:3,25
**19** 12:3 60:22
**1989** 7:15
**1993** 8:6,16
**1996** 6:21

**2**

**2** 16:17
**20** 57:8
**20,000** 61:22
**200** 3:5
**2006** 16:9
**2012** 1:16 2:8 5:4
**2021** 1:14 2:7 3:5 5:7
**205)324-1834** 3:7
**205)980-5888** 3:15
**22** 57:20
**23** 57:24
**235** 17:3
**24** 24:5,7 58:2
**25** 58:7 64:4
**250** 17:2
**26** 16:9 58:11
**27** 58:15
**28** 58:18
**29** 58:22

**3**

**3** 16:20
**30** 59:2
**31** 59:9
**317** 1:24
**32** 59:15
**33** 59:19
**3500** 3:13
**35203** 3:6
**35243** 3:14

**4**

**4** 1:16 2:8 5:4 18:9
**425** 3:13

**5**

**5** 4:3 18:5
**500** 1:20
**551-7300** 1:22

**6**

**6** 18:12

**8**

**8/27/12** 67:23
**818** 1:22

**850,000** 62:11,17
**89** 7:15

**9**

**9/30/12** 67:20
**91203** 1:21
**93** 8:22
**96** 11:4

EXHIBIT 5



## Crown   Construction   Consulting,   LLC

277 Pat Mell Road, Suite A   Marietta, Georgia 30060

770 -333-8060   fax 770-333-6004   DavidBennett@Crownconst.com

**INSPECTION REPORT**

**Report No.** R10-0909-1

Client/Homeowner:   **Robert and Mindy Barton**

Property Address:   **3949 Butler Springs Way,   Hoover, Alabama 35226**

(205)290-2255; MINDYBARTON@BELLSOUTH.NET

Date of Inspection:   **August 20, 2010**,

Inspector:   **David W. Bennett**, (Alabama State Inspector's License #: HI 2079)

This inspection was of readily accessible areas of the residence and is limited to visual observations of the apparent conditions existing at the time of the inspection only. Reference is made to the Inspection Agreement for other limitations.



3949 Butler Springs Way, Hoover, Alabama 35226

1

**AREAS OF CONCERN:**

The following items of concern were observed:

**Attic:**



1.  The rafters are cut longer than the ridge beam.



2

2.  The ridge beam is unsupported at its ends.



3.  There is water damages substrate and roof decking on all front elevation dormers with evidence of fungal growth.

2



4.  Improper roof/wall flashing.



5.  Unsealed toe board nail holes.

    **\*\*** Note: The water damage extends down past the roof line to the upstairs bedroom front interior wall, (Girls' room).

3





4

6.  Moisture Barrier was not noted having been installed into rough window openings at dormers, and leaking. (per mfg spec.s) (IRC-R703.1)

Applicable Code Sections of the 2003 International Residential Code (IRC):
-Improper roof structure framing (IRC 802.3);

**HVAC:**





5

7.   There are no drip legs installed in the gas supply lines to the HVAC. (IRC- 2419.4).



8.   The gas supply line is not insulated at entry into unit. (mfgr specs.)



9.  Attic HVAC condensate line is inverted and does not allow proper drainage. (IRC.- 1411.3.2)          6

**INTERIOR:**



10. Several doors were observed to be misaligned.



11. Several faucet handles and bath fixtures were not installed properly and have come loose.

7



12. The Gross HVAC return systems require at least 1 inch clearance under rooms being supplied.



8

13. Closet light fixture has come loose and broke.

14. Closet pass through door skin is broken.



15. Upstairs hallway smoke detector was found unplugged.



9

16. Water staining was noted on front foyer wall, Palladium window appears to be leaking.



17. Front entry door ball bearing hinge is incomplete.

10

**EXTERIOR:**



18. Several exterior windows do not seal properly at sill.

11



19. Front left hand patio brick veneer has no weep holes.  (IRC- sec. 703.7.6)



20. Half column is not sealed at the brick.



21. Excessive spacing was noted between the full columns over elevated area. (IRC-R312.2)



22. Garage door was swapped around leaving hinge butt cut through.

13



23. Rear exterior doors to open patio are defective, skin is warping and underside was improperly cut.



24. Brick rowlock coursing under several windows does not meet minimum standard for slope.

14



25. Through-wall flashing is not installed and/or not consistent. (IRC>-sec. 703.1 & 703.8)



26. Weep holes are missing in several locations and are inconsistent . (IRC- sec. 703.7.6)

15



27. Basement water purifier leaks.



28. Hot water heaters do not have drip legs on gas lines as required.  (IRC-2419.4)

16

29. Dissimilar exterior materials are not sealed to protect from weather.  (IRC-P2606.1)



30. Driveway corner is cracked.

17



31. Improper siding application noted on all roof rake and wall areas. (mfr. specs.)



32. Front retaining wall does not have weep/relief outlets installed.

18



33. Excessive fungus growth noted on exterior of several windows. This could be caused by window leakage  of conditioned air and condensation run-off.



19

34. Rear patio arched windows have the brick veneer pulling away along the upper arch.

I would like to thank you for the opportunity to be of service to you.  If you have any questions , or need further assistance, please feel free to contact me.

Report Dated:  September  9, 2010

Sincerely,

_____

David W. Bennett,
 for Crown Construction & Consulting, LLC.
Alabama State Licensed Inspector #: HI 2079

20

EXHIBIT 6

DOCUMENT 153

ELECTRONICALLY FILED
7/18/2014 5:37 PM
01-CV-2011-900187.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| ROBERT BARTON and | ) | |
| MINDY BARTON, | ) | |
| | ) | CIVIL ACTION NUMBER: |
|     Plaintiffs, | ) | |
| | ) | CV-2011-900187 |
| v. | ) | |
| | ) | |
| STACY ALLISTON DESIGN AND | ) | |
| BUILDING, INC., *et al.* | ) | |
| | ) | |
|     Defendants. | ) | |

---

## MOTION FOR SUMMARY JUDGMENT AND
## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Plaintiffs, Robert Barton and Mindy Barton move the Court, pursuant to Rule 56 of the Alabama Rules of Civil Procedure, to enter an order granting summary judgment in their favor and against Defendant Stacy Alliston Design and Building, Inc (hereinafter "Alliston Design"), on the grounds that there are no genuine issues of material fact and Plaintiffs are entitled to a judgment as a matter of law. In support of this motion, Plaintiffs submit the following:

### INTRODUCTION

1.    Plaintiffs filed this action seeking compensation for damages to their home arising from the negligent and wanton construction practices of defendant Alliston Design, with whom Plaintiffs had entered into a contract for the design and construction of their home. It will be shown below that Alliston Design negligently and wantonly oversaw, implemented, and constructed Plaintiffs' home, and that Plaintiffs have suffered damages as a result. It will further be shown that defendant Alliston Design has not been represented by counsel for nearly a year, and has failed to defend itself in this action during that time.

2.    In support of this motion, Plaintiffs rely upon and incorporate all previous pleadings, the narrative summary of undisputed facts set forth below, and all evidentiary submissions attached hereto.

## NARRATIVE SUMMARY OF UNDISPUTED FACTS

3.      On January 26, 2006, Plaintiffs Robert Barton and Mindy Barton entered into a contract with Defendant Alliston Design for the construction of a custom home to be located at 3949 Butler Springs Way, Hoover, Alabama 35226. (Exhibit A, Real Estate Sales Contract For New Construction.) Specifically, the Contract provided that defendant Alliston Design would design, plan and construct a home for the Plaintiffs in return for the sum of $715,000.00. (Ex. A.)

4.      As general contractor, defendant Alliston Design had exclusive control over the direction and supervision of the subcontractors that performed work on Plaintiffs' home. (Ex. A; Exhibit B, deposition of Stacy Alliston, corporate representative of Alliston Design, pp. 24-25.)

5.      Defendant Alliston Design knew when it pulled the building permit for Plaintiffs' home that it was responsible for making sure that the home met all applicable code requirements. (Ex. B, pp. 46-47.) During construction, however, Alliston Design did not possess a copy of the building code applicable to Plaintiffs' home, and in fact did not keep building codes applicable to any of the homes it constructed during the 2006-2007 timeframe. (Ex. B, pp. 28-29.)

6.      Following completion, Plaintiffs closed on the home October 27, 2006. (Exhibit C, warranty deed.) Upon receiving possession, Plaintiffs identified numerous deficiencies with the home and listed them on a punch list which was provided to Alliston Design. (Exhibit D, punch list.) In addition, Plaintiffs notified Alliston Design, via telephone, of the home's deficiencies numerous times throughout the one year limited warranty period. (Exhibit E, deposition of Mindy Barton, pp. 34, 37-38; Exhibit F, deposition of Robert Barton, pp. 46-49, 56.) Despite being notified of the deficiencies, Alliston Design failed or refused to repair all of the deficient items identified. (Ex. F, pp. 43-70.)

7.      After defendant Alliston Design failed or refused to correct the deficient items identified with the home, Plaintiffs filed the present suit on January 19, 2011, alleging, among

2

others, the following claims: Count One - Negligence/Wantonness Construction (Complaint, ¶¶ 21-30); Count Two - Negligence/Wantonness: Repair (Complaint, ¶¶ 31-36); and, Count Three - Negligence/Wantonness: Hiring/Supervision/Training (Complaint, ¶¶ 37-42).

8.      Defendant Alliston Design filed an answer on March 24, 2011, at which time it was represented by the law firm of Gaines, Wolter & Kinney, P.C. (*See* Answer.) However, counsel for Alliston Design filed a Notice of Withdrawal which was granted by this Court on August 21, 2013. (Exhibit G - Notice of Withdrawal; Exhibit H - Order Granting Withdrawal.) To date, Alliston Design has failed to retain counsel as required by the Alabama Rules of Civil Procedure. Defendant has failed to defend itself or participate in any capacity in this case since August of 2013.

9.      Plaintiffs had the home inspected by E-Services, Inc. so as to provide a detailed list of the deficiencies that form the basis for Plaintiffs' suit. (*See* Exhibit I, Affidavit of Richard LaFramboise, licensed home inspector for E-Service, Inc.) The inspection report, attached to Mr. LaFramboise's affidavit as Attachment 2, identifies numerous deficiencies with Plaintiffs' home including, but not limited to, the following: lack of proper flashing at brick veneer; severe cracks in rear brick arch above window; lack of proper flashings at windows with siding; improper siding installation; water damage in the wall cavity; siding damage as well as resulting substrate damage at front dormers; evidence of moisture damage at windows and framing resulting from deficiencies with the brick, siding and window installations; damage to window components and assembly resulting in inability to function as intended, and; deficient door installations leading to additional damages at framing and substrate. (Ex. I, Attachment 2.)

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### STANDARD OF REVIEW

Rule 56 of the Alabama Rules of Civil Procedure sets forth a two-tiered standard for determining whether summary judgment is proper. In order to enter summary judgment, the trial court must determine: (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to judgment as a matter of law. *Cash v. Caldwell*, 693 So. 2d 1001, 1003 (Ala. 1992). When the movant makes a prima facie showing that there is not genuine issue of material fact, the burden shifts to the non-movants to present substantial evidence creating such an issue. *Bath v. Southtrust Bank of Baldwin County*, 531 So. 2d 794, 797-98 (Ala. 1989).

### ARGUMENT

**I.    Summary Judgment is due to be granted in Plaintiffs' favor on their negligence and wantonness claims against defendant Alliston Design.**

To prove a claim of negligence, the plaintiff must show (1) a duty; (2) breach of that duty; (3) proximate causation; and (4) resulting damage or injury. *Farr Metal, Inc. v. Hines*, 738 So. 2d 863, 863 (Ala. 1999). Wantonness is defined as the conscious doing of some act or the omission of some duty while knowing that such act or omission of such duty will result in injury. *Thermal Components v. Golden*, 716 So. 2d 1166, 1169 (Ala. 1998). In this case it is undisputed that Alliston Design had a duty to use reasonable care and construct the Plaintiffs' home in a good and workmanlike manner, that Alliston Design breached its duty knowingly by failing to properly follow proper building codes or ensure that the work being performed by its subcontractors was proper, and that Alliston Design's breach was the proximate cause of damage to Plaintiffs' home. Accordingly, as no dispute of fact exists, Plaintiffs are due summary judgment as a matter of law on their negligence and wantonness claims against defendant Alliston Design.

4

**A. Defendant Alliston Design had a duty to ensure that all aspects of construction of Plaintiffs' Home were done properly.**

Defendant Alliston Design had a common law duty to use "reasonable care" in constructing Plaintiffs' home. Thompson v. Mindis Metals, Inc., 692 So. 2d 805, 807-08 (Ala. 1997). As explained by Alabama's pattern jury instructions, "[a] person's conduct is negligent when [he/she] either does something that a reasonably prudent person would not do in a similar situation, or [he/she] fails to do something that a reasonably prudent person would have done in a similar situation." 1 Ala. Pattern Jury Instr. Civ. 28.01 (2nd ed.); see also, Great Atlantic & Pacific Tea Co. v. Keltner, 191 So. 633, 635 (Ala. 1939). The Alabama Supreme Court has adopted § 324(a) of the Second Restatement of Torts, which provides:

> [O]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if his failure to exercise reasonable care increases the risk of such harm.

Beasley v. MacDonald Engineering Co., 249 So. 2d 844 (Ala. 1981) (citing Restatement (Second) of Torts § 324(a).)[1] In this case, Alliston Design undertook, for consideration, to render construction services to Plaintiffs, and was therefore required to use reasonable care in performing those services, with knowledge that its failure to do so might cause harm to Plaintiffs.

Furthermore, every construction contract in Alabama imposes a duty on the builder to construct the home in a good and workmanlike manner, regardless of whether this standard is specifically expressed in the contract. C.P. Robinson & Associates v. Stevens, 301 So. 2d 196, 199 (Ala. Civ. App. 1974) ("It is a general rule in contracts for work or services that there is implied a duty to perform with that degree of skill or workmanship which is possessed by those of ordinary

---

1 See also Haddock v. Multivac, Inc., 703 So. 2d 969, 972 (Ala. Civ. App. 1996) (one who acts on his own volition, although under no duty to act, is charged with the duty of acting with reasonable care and is liable for harm caused by the failure to use reasonable care).

5

skill in the particular trade for which one is employed." (quoting Sherrill v. Ala. Appliance Co., 197 So. 1 (Ala. 1940))). Accordingly, Alliston Design had a duty to use reasonable care in constructing Plaintiffs' home, but also a duty to perform with the "degree of skill or workmanship" that would be expected of others in its trade, i.e., other similar home-building contractors. See id.

The undisputed facts prove, however, that Alliston Design did not use reasonable care or perform its duties with the skill and workmanship expected of other home builders, because it ignored applicable building codes and failed to ensure that the work being performed by its subcontractors was proper. As a result, defendant Alliston Design breached its duty to construct the Plaintiffs' home in a good and workmanlike manner, causing the damages set forth above in the statement of undisputed facts.

### B. Defendant Alliston Design breached its duties to use reasonable care and properly construct all aspects of the Plaintiffs' Home in a good and workmanlike manner.

Defendant Alliston Design's failure to adhere to the applicable building codes, or properly supervise its subcontractors, while constructing Plaintiffs' home constituted a breach of its duties to use reasonable care and to construct the home and a good and workmanlike manner. It is undisputed that Alliston Design was the licensed home builder who constructed Plaintiffs' home, (Ex. A, p. 1), and Alliston Design obtained the various permits and licenses, selected all subcontractors, specified all the construction materials, directed the subcontractors and supervised the subcontractors' work. (Ex. B, pp. 24-25). It is further undisputed that Defendant Alliston Design knew it was required by the applicable building departments and code bodies, as well as industry standards for workmanship, to provide a home that meets the minimum requirements contained within the building code:

6

> Q.      [Counsel for Plaintiffs:] I take it that you understand when you pulled the building permit that you were responsible for making sure that [the Plaintiffs' home] meets the code requirements, not the building inspector?

> A.      [Stacy Alliston:] Correct.

(Ex. B, depo. of Stacy Alliston, p. 47.) However, Alliston Design admitted it did not keep the applicable building codes on site for reference during construction of Plaintiffs' home, and further admitted that it did not keep applicable building codes on site for any of the homes it was constructing during that time period. (Ex. B, pp. 28-29.) Thus, Alliston Design knew or should have known that its failure to adhere to the applicable building code would likely result in injury to Plaintiffs, as it was fully aware that it was not following the applicable building codes. (Id.)

Additionally, the evidence shows that Alliston Design was not diligent in directing or supervising its subcontractors' work. As the licensed home builder, Alliston Design admitted it was ultimately responsible for the direction and supervision of all employees and subcontractors who performed work on Plaintiffs' home. (Ex. B, pp. 28-29.) Alliston Design was incapable of properly directing or supervising its subcontractors, however, because it did not possess a copy of the building codes its subcontractors were required to follow. (Ex. B, pp. 28-29.) Additionally, the fact that Alliston Design negligently supervised its subcontractors is further evidenced by the deficiency of their work, and the resulting damages therefrom. (*See* Ex. I, Attachment 2.)

Despite not directly performing the actual deficient work itself, Alliston Design is ultimately responsible for any liability created by its subcontractors' deficient work because the duty to construct the Plaintiffs' home in a good and workmanlike manner is non-delegable and remains with the builder, as explained by the Alabama Supreme Court in *Cincinnati v. Barber, Inc.*:

> The foregoing is applicable to most cases of contracts between a principal building contractor and subcontractors. Such contracts are made to enable the principal contractor to perform and, their performance by a subcontractor does not in itself discharge the principal contractor's duty to the owner with whom he has contracted. The installation of plumbing fixtures and construction of cement floors by a subcontractor is not a discharge of the principal contractor's duty to the owner

7

to deliver a finished building containing those items.

946 So. 2d 441, 446-47 (Ala. 2006) (quoting 9 Arthur L. Corbin, *Corbin on Contracts* 779D (1951)). Thus, Defendant Alliston's failure to properly direct and supervise the work of its subcontractors constitutes a breach of its duty to perform the construction contract with reasonable care and to complete Plaintiffs' home in a good and workmanlike manner.

Based on the above stated facts, it is undisputed that Defendant Alliston Design breached its duties to Plaintiffs, because it would not be reasonable for a home builder to completely ignore the building codes applicable to its construction project, or fail to direct and supervise its subcontractors. Furthermore, Defendant Alliston Design's knowing failure to construct Plaintiffs' home to applicable code standards constitutes wantonness under Alabama law. Wantonness is defined as the "conscious doing of some act or the omission of some duty while knowing that such act or omission of such duty will result in injury." *Thermal Components v. Golden*, 716 So. 2d 1166, 1169 (Ala. 1998). Alliston Design knew it was not following applicable building codes, and therefore knew that damages were likely to result. Based on the uncontroverted evidence that Defendant breached its duties of care owed to Plaintiffs, Plaintiffs' Motion for Summary Judgment as to the negligent and wanton construction and supervision claims are due to be granted.

   **C. Plaintiff has submitted extensive evidence of damages to Plaintiffs' home that were proximately caused by Defendant Alliston Design's failure to adhere to building codes and oversee its subcontractors.**

Plaintiffs have submitted evidence of damages that resulted from Defendant Alliston Design's failure to adhere to applicable building codes during the construction of Plaintiffs' home. (*See* Ex. I, attachment 2.) Proximate cause has been defined as "the primary moving cause without which [the injury] would not have been inflicted, but which, in the natural and probable sequence of events, and without the intervention of any new or independent cause, produces the

8

injury." Hilburn v. Shirley, 437 So. 2d 1252, 1254 (Ala. 1983) (quoting Mobile City Lines, Inc. v. Proctor, 272 Ala. 217, 224, 130 So. 2d 388 (1961)). In this case it is undisputed that the damages to Plaintiffs' home were primarily caused by Defendant Alliston Design's failure to adhere to building codes and supervise its subcontractors, resulting in deficient work. The inspector of Plaintiffs' home explained in his affidavit that his inspection "revealed numerous construction defects and failures to adhere to code requirements by the home's builder, as well as resulting damages, which were typical of the types of damages that commonly result from a builder's failure to adhere to building code mandates." (Ex. I, ¶ 3.) Specifically, evidence of the following damages has been introduced and uncontroverted in this case:

1. Damage at siding and substrate at front dormers. Stains at windows and framing. No evidence of proper house wrap or flashing at windows.
2. Improper flashing at sidewall.
3. Daylight at flashing area at gable, scab added.
4. Improper condensate drain line.
5. Stains at windows below dormers.
6. Improper door installations, bad hinge cutout.
7. Doors askew.
8. Rear entrance door is delaminated. Doors do not fit properly and rub at jamb when closed.
9. Rear arch has severe crack at brick course above window and no evidence of proper flashing at brick veneer.
10. Exterior veneers not sealed at terminations.
11. Poor workmanship at wood trim and post.
12. No evidence of proper flashing at windows at siding, improper siding installation and water damage at wall cavity.
13. No evidence of proper flashing at brick veneer.
14. Windows do not close and seal properly.
15. Cracks at drive.
16. Large gap at roof termination at corner.
17. Downspouts should direct water down shingles not across.
18. No relief drain at brick retaining wall.
19. Downspouts not directing water away from structure.
20. Improper roof assembly.

(Ex. I, attachment 2, p. 2.)   Additionally, it is undisputed that Alliston Design was responsible for all aspects of the construction of Plaintiffs' home, including ensuring that the work performed was

up to code. (Ex. B, pp. 24-25 46-47.) Accordingly, Plaintiff is due summary judgment as to its negligence and wantonness claims because the undisputed damages set forth above were a natural and probable result of Defendant Alliston Design's failure to construct Plaintiffs' home in a good and workmanlike manner.

## II.     Defendant Alliston Design cannot represent itself under Alabama law.

Defendant Alliston Design, a corporation organized under the laws of Alabama, has failed to retain counsel as required by Under Alabama Law, a corporation may not proceed *pro se* in a court of law, and must have its defense conducted by a licensed Alabama attorney. *Ex parte Ghafary*, 738 So. 2d 778 (Ala. 1998). The Alabama Supreme Court recently summarized Alabama law regarding the representation of corporations engaged in litigation as follows:

> The general rule in Alabama is that "a person must be a licensed attorney to represent a separate legal entity, such as a corporation." *Ex parte Ghafary*, 738 So. 2d 778, 779 (Ala. 1998). Further, a corporate officer who "appear[s] as an advocate on behalf of a corporation, even one he wholly owns, [engages] in the unauthorized practice of law." *Stage Door Dev., Inc. v. Broadcast Music, Inc.*, 698 So. 2d 787, 787 (Ala.Civ.App. 1997) . This Court has thus held that a pleading filed by a non-attorney engaging in the unauthorized practice of law in purporting to represent a separate legal entity is a nullity. *Ghafary*, 738 So. 2d at 78-81. The purpose of this prohibition on the practice of law by non-attorneys, and accordingly the rule that a licensed attorney must represent a corporation, serves, among other things, "to protect the public . . . by protecting citizens from injury caused by ignorance and lack of skill on the part of those who are untrained and inexperienced in the law ...." *Ghafary*, 738 So. 2d at 779.

*Progress Industries, Inc. v. Wilson*, 52 So. 3d 500, 507-08 (Ala. 2010). Defendant Alliston Design's counsel withdrew from this case with this Court's approval on August 21, 2013, and no further defense has been undertaken. (Ex. G; Ex. H.) Plaintiffs' motion for summary judgment is, therefore, due to be granted as Plaintiffs have submitted evidence of their claims in support of this motion, and Defendant Stacy Alliston Design has failed to retain counsel or otherwise defend the claims against it.

## CONCLUSION

As the licensed home builder and permit holder, defendant Alliston Design was duty bound by Alabama common law and the construction contract with Plaintiffs to ensure that all work performed at Plaintiffs home be completed in accordance with minimum requirements of the applicable codes, and be completed in a good and workmanlike manner free from defect. Defendant breached the duty of care owed to Plaintiffs and damages have been sustained by Plaintiffs as a direct result of failing to comply with its duty of care. Finally, Defendant Alliston Design has failed to defend this case and, to date, continues to refuse to hire counsel to represent it. For the reasons set forth above, this Honorable Court should grant this Motion for Summary Judgment and enter judgment on behalf of Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Court grant Summary Judgment as to Plaintiffs' negligence and wantonness claims against Defendant Stacy Alliston Design, because no question of material fact exists and Plaintiffs are due judgment as a matter of law.

s/ H. Arthur Edge III
H. Arthur Edge, III (EDG004)
Attorney for Plaintiffs

**OF COUNSEL:**
ARTHUR EDGE, III, P.C.
2021 Morris Avenue, Suite 300
Birmingham, Alabama 35203
telephone: (205) 453-0322
facsimile: (205) 453-0326
art@edgelawyers.com

                                                s/ David L. Horsley_____
                                                David L. Horsley (HOR052)
                                                Attorney for Plaintiffs

**OF COUNSEL:**
COLLINS & HORSLEY, P.C.
2021 Morris Avenue, Suite 200
Birmingham, Alabama 35203
telephone: (205) 324-1834
facsimile: (205) 324-1846
david@collinshorsley.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, I electronically filed the foregoing with the Clerk of the Court using the Alabama E-filing system which will send notification of such filing; and I hereby certify that any non-E-filing participants to whom the foregoing is due will have a copy of same placed in the United States mail, first class postage prepaid and properly addressed this same day.

Stacy Alliston Design and Building, Inc.
c/o Mr. Stacy Alliston
1175 Berwitk Road
Birmingham, Alabama 35242

                                                s/ H. Arthur Edge, III_____
                                                OF COUNSEL

12

EXHIBIT 7

DOCUMENT 153


ELECTRONICALLY FILED
11/12/2014 10:09 AM
01-CV-2011-900187.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

| | | |
|---|---|---|
| ROBERT BARTON; and<br>MINDY BARTON; | ) | |
| | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **Plaintiffs,** | ) | |
| | ) | **CV-2011-900187** |
| v. | ) | |
| | ) | |
| STACY ALLISTON DESIGN AND<br>BUILDING, INC.; et al. | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter came before the Court on Plaintiffs' Motion for Summary Judgment. Having reviewed the pleadings and evidence submitted in support of Plaintiffs' motion, the Court hereby finds that Plaintiffs' Motion for Summary Judgment is granted. The judgment amount, based on evidence submitted by Plaintiffs regarding damages sustained to their home and emotional distress, is $900,000.00. Judgment is hereby entered in favor of Plaintiffs Robert and Mindy Barton and against Defendant Stacy Alliston Design and Building, Inc. in the amount of $900,000.00.

Done this _10_ day of _November_, 2014.

_____
Circuit Court Judge

EXHIBIT 8



**Nationwide®**
is on your side

# Certification

I, Palenthia Boswell as a duly authorized Nationwide Insurance associate entrusted with oversight of the system of record from which this copy was produced, based upon information and belief, certify under the penalty of perjury that this attached copy of **77-01-PR-735-296-3001** was made at or near the time of certification, as part of regularly conducted business activities, and is a true and accurate copy of the official record kept as part of regular business activities.

Signature

Palenthia Boswell
Print Name

Supervisor

Title

05/25/2017
Date

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

POLICY NUMBER: 77PR 735-296-3001

| POLICY CHANGE EFFECTIVE | COMPANY |
|---|---|
| DECEMBER 18, 2008 | NATIONWIDE MUTUAL FIRE INSURANCE COMPANY |

| NAMED INSURED | | AUTHORIZED REPRESENTATIVE |
|---|---|---|
| STACY ALLISTON DESIGN<br>AND BUILDING INC<br>PO BOX 380903<br>BIRMINGHAM  AL 35238-0903 | | DL HAYES<br>0024933 01 |

COVERAGE PARTS AFFECTED

GENERAL LIABILITY

### CHANGES

Subject to all terms and conditions of the policy, it is understood and agreed that:

**Policy Term:** <u>12/18/08</u>  **to**  <u>12/18/09</u>

CURRENT TERM TOTAL COST FOR CLASS CODE 91583 (CONTRACTORS - SUBCONTRACT WORK) HAS BEEN DECREASED FROM THE EXPOSURE LIMIT OF $300,000 TO $80,000.

**This agreement to amend your policy does not in any way supersede or modify your policy status as set forth in a non-renewal or cancellation sent you.**

The above amendments result in a change in the premium as follows:

| ☐ | NO CHANGES | ☐ | TO BE ADJUSTED AT AUDIT | DECREASED PREMIUM | REVISED PREMIUM |
|---|---|---|---|---|---|
| | | | | $ | $ 6,811.00 |

01/07/09 JMF

Authorized Representative Signature

IL 12 01 11 85

Copyright, Insurance Services Office, Inc., 1983
Copyright, ISO Commercial Risk Services, Inc., 1983



BLANKET PROTECTOR
COMMON DECLARATIONS

ISSUED BY   NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

POLICY NUMBER  77PR735296-3001

NAMED INSURED  STACY ALLISTON DESIGN
AND BUILDING, INC.
MAILING ADDRESS  PO BOX 380903
BIRMINGHAM          AL  35238

POLICY PERIOD  FROM  12/18/08  TO  12/18/09  AT
12.01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS.

FORM OF BUSINESS  CORPORATION

DESCRIPTION OF BUSINESS  NEW HOME CONSTRUCTION
IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THE
POLICY, WE AGREE TO PROVIDE YOU WITH THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE COVERAGES INDICATED AS INCLUDED. THE PREMIUM
MAY BE SUBJECT TO ADJUSTMENT.

|  |  | NOT |
|---|---|---|
|  | INCLUDED | INCLUDED |
| COMMERCIAL PROPERTY COVERAGE |  | X |
| COMMERCIAL GENERAL LIABILITY COVERAGE | X |  |
| COMMERCIAL CRIME COVERAGE |  | X |
| MECHANICAL, ELECTRICAL AND PRESSURE EQUIPMENT COVERAGE |  | X |
| COMMERCIAL INLAND MARINE COVERAGE |  | X |
| COMMERCIAL AUTO COVERAGE |  | X |
| GARAGE COVERAGE |  | X |

TOTAL ADVANCE PREMIUM $    6,811.00
PREMIUM PAYABLE AT INCEPTION $     6,811.00

IN THE EVENT OF CANCELLATION BY YOU, WE SHALL RECEIVE AND RETAIN NOT
LESS THAN $100 AS THE MINIMUM PREMIUM.

FORMS IN COMMON TO ALL COVERAGES
IL 00 17-1198      CAS 3228          IL 00 03-0498
CAS 3687 A-0194

ISSUED AT   P.O. BOX 147080
GAINESVILLE, FL  32614
COUNTERSIGNED AT GAINESVILLE, FL      BY HAYES RASBURY INS AGY INC 0024933 01

01/02/09                                      PAGE 001
 209/505
          CAS. 3200-A (01-87)                    R
  00017



BLANKET PROTECTOR
COMMERCIAL GENERAL LIABILITY
COVERAGE PART DECLARATIONS

ISSUED BY   NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

POLICY NUMBER  77PR735296-3001

POLICY PERIOD   FROM 12/18/08  TO  12/18/09  AT
12.01 A.M. STANDARD TIME AT YOUR MAILING ADDRESS

LIMITS OF INSURANCE

| | |
|---|---|
| GENERAL AGGREGATE LIMIT | $ 2,000,000 |
| PRODUCTS - COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 |
| EACH OCCURRENCE LIMIT | $ 1,000,000 |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 |
| ANY ONE PERSON OR ORGANIZATION | |
| MEDICAL EXPENSE LIMIT | $     5,000 |
| ANY ONE PERSON | |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $   100,000 |
| ANY ONE PREMISES | |

--------------------------------------------------------------

LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY

| LOC | BLDG | ADDRESS | |
|---|---|---|---|
| 001 | 01 | 222 ESSEX DR | |
| | | STERRETT, | AL 35147 059 |

--------------------------------------------------------------

| CLASSIFICATION | CODE NO. | PREMIUM BASIS | PRODS/COMP OPS ADV PREM | ALL OTHER ADV PREM |
|---|---|---|---|---|
| CONTRACTORS - SUBCONTRACT WORK IN CONN/W BLDG CONST, RECONST, EREC OR REPAIR- 1 OR 2 FAM DWG | 91583 | 80,000 TOTAL COST | INCLUDED | INCLUDED |
| CARPENTRY - NOC | 91342 | 50,000 PAYROLL | INCLUDED | INCLUDED |
| GRADING OF LAND | 95410 | 18,000 PAYROLL | INCLUDED | INCLUDED |
| LANDSCAPE GARDENING | 97047 | 40,000 PAYROLL | | INCLUDED |

PROD-COMP OPS SUBJ GEN AGG LMT

--------------------------------------------------------------

COMMERCIAL GENERAL LIABILITY ADVANCE PREMIUM $    6,811

--------------------------------------------------------------

FORMS APPLICABLE TO COMMERCIAL GENERAL LIABILITY COVERAGE PART

| | | |
|---|---|---|
| IL 00 21-0498 | CG 21 67-1204 | CG 21 70-0108 |
| CAS 4487-0693 | CG 21 86-1204 | CAS 6349-0504 |
| CAS 6351-0504 | CAS 2527 B-0794 | CG 00 01-1207 |
| CAS 3392-0887 | CAS 3880-0897 | CAS 6184-0702 |
| CG 21 47-1207 | CG 21 50-0989 | CG 21 60-0498 |
| CG 21 96-0305 | CG 24 26-0704 | IL 09 85-0108 |

01/02/09                                      PAGE   002
209/505
      CAS. 3203-A (03-05)
 00017

00002201 7
14..35



**BLANKET PROTECTOR**
**COMMERCIAL GENERAL LIABILITY**
**COVERAGE PART DECLARATIONS**

ISSUED BY   NATIONWIDE MUTUAL FIRE INSURANCE COMPANY

POLICY NUMBER   77PR735296-3001

CG 21 44-0798        CG 21 65-1204        CG 22 94-1001

01/02/09                                                    **PAGE    003**
  209/505
       CAS. 3203-A (03-05)
  00017

POLICY NUMBER:  77-PR-735-296-3001          COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

  **2. Exclusions**

  This insurance does not apply to:

  **Silica Or Silica-Related Dust**

  a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

  b. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

  c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

B. The following exclusion is added to Paragraph 2., Exclusions of **Section I – Coverage B – Personal And Advertising Injury Liability:**

  **2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

  a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

  b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

C. The following definitions are added to the **Definitions** Section:

  1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

  2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

CG 21 96 03 05          Copyright, ISO Properties, Inc., 2004          Page 1 of 1    □

POLICY NUMBER:  77-PR-735-296-3001                              COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO DESIGNATED PREMISES OR PROJECT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

## SCHEDULE

| | |
|---|---|
| **Premises:**    See Declarations | |
| **Project:** | |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance applies only to "bodily injury", "property damage", "personal  and advertising injury" and medical expenses arising out of:

1. The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises; or

2. The project shown in the Schedule.

CG 21 44 07 98                    Copyright, Insurance Services Office, Inc., 1997

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions:

**A   Cancellation**

1.   The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2.   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a.   10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b.   30 days before the effective date of cancellation if we cancel for any other reason.

3.   We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4.   Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5.   If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6.   If notice is mailed, proof of mailing will be sufficient proof of notice.

**B.   Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C.   Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D.   Inspections And Surveys**

1.   We have the right to:

   a.   Make inspections and surveys at any time;

   b.   Give you reports on the conditions we find; and

   c.   Recommend changes.

2.   We are not obligated to make any inspections, surveys, reports or recommendations and any

such action we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a.   Are safe or healthful; or

   b.   Comply with laws, regulations, codes or standards.

3.   Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4.   Paragraph 2. of this condition does not apply to any inspections, surveys, reports of recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, or boilers, pressure vessels or elevators.

**E.   Premiums**

The first Named Insured shown in the Declarations:

1.   Is responsible for the payment of all premiums; and

2.   Will be the payee for any return premiums we pay.

**F.   Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98          Copyright, Insurance Services Office, Inc., 1998



# MANDATORY ENDORSEMENT

### POLICYHOLDER MEMBERSHIP IN THE COMPANY

(Applicable Only in the Nationwide Mutual Insurance Company or the Nationwide Mutual Fire Insurance Company in All States Except Those Specifically Provided For)

Because this policy is issued by a mutual insurance company, you are a member of the company while this or any other policy is in force.  While a member you are entitled to a vote only - either in person or by proxy - at meetings of the company.  You are entitled to any dividends which are declared by the Board of Directors and are applicable to coverages in your policy.

The annual meeting of the members of the company issuing your policy (the company is indicated on the Declarations Page) will be held at the Nationwide Plaza in Columbus, Ohio, on the first Thursday of April.   The time of the meeting for the Nationwide Mutual Fire Insurance Company is 9:30 A.M. and the time of the meeting for the Nationwide Mutual Insurance Company is 10:00 A.M.  We will mail notice of any change in meeting dates, times or place to you at your address last known to us at least ten days prior to the rescheduled meeting date.

This policy is non-assessable, meaning that you are not subject to any assessment beyond the premiums we require for each policy term.

### POLICYHOLDER MEMBERSHIP IN THE COMPANY

(Applicable Only in the Nationwide Mutual Insurance Company or the Nationwide Mutual Fire Insurance Company When This Policy is Issued in The State of Texas)

**1. MUTUALITY – MEMBERSHIP AND VOTING NOTICE.**  You are notified that by virtue of this policy you are a member of the Nationwide Mutual Insurance Company of Columbus, Ohio or the Nationwide Mutual Fire Insurance Company of Columbus, Ohio as shown on the Declarations Page of this Policy, and you are entitled, as is lawfully provided in the charter, constitution, or by-laws to only one vote regardless of the number of policies owned either in person or by proxy, in any or all meetings of the company.   The annual meetings are held at the Home Office at Columbus, Ohio, on the first Thursday of April, in each year, at 9:30 A.M. for the Nationwide Mutual Fire Insurance Company and 10:00 A.M. of the same day for the Nationwide Mutual Insurance Company.

**2. MUTUALS - PARTICIPATION CLAUSE WITHOUT CONTINGENT LIABILITY.** No Contingent Liability: This policy is non-assessable. You are a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in the distribution of dividends so fixed and determined provided such determinations are in accordance with the provisions of the Texas Insurance Code and other applicable law, which includes the rules and regulations of the State Board of Insurance.

IN WITNESS WHEREOF: Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company or Nationwide Property and Casualty Insurance Company, whichever is the issuing company, as designated on the Declarations, has caused this policy to be signed by its President and Secretary at Columbus, Ohio, and countersigned by a duly authorized representative of the company.

ATTEST:

*Patricia R. Hatler*
Secretary

*Stephen S. Rasmussen*
President

Nationwide Mutual Insurance Company
Nationwide Mutual Fire Insurance Company

*DC Robinette*
President

Nationwide Property and Casualty Insurance Company

Cas. 3228

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESSOWNERS POLICY
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL CRIME COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY – NEW YORK

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

IL 00 03 04 98                    Copyright, Insurance Services Office, Inc., 1997

# AMENDATORY ENDORSEMENT - PREMIUM PAYMENT

The named insured has elected to pay the premium for this policy or bond in payments in accordance with the premium payment plans approved for use by us and set forth in our approved portfolios or manuals. For each separate payment, including the initial payment, there is a payment plan service charge of five dollars ($5.00).

Cas. 3687-A (1-94)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT (BROAD FORM)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF
  TRANSPORTATION
UNDERGROUND STORAGE TANK POLICY

1.  The insurance does not apply:

    A.  Under any Liability Coverage, to "bodily injury" or "property damage":

        (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Under-writers, Nuclear Insurance Associ-ation of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

        (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    B.  Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of

"nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

    C.  Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," if:

        (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

        (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured"; or

        (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.  As used in this endorsement:

Copyright, Insurance Services Office, Inc., 1997

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material," "Special nuclear material" or "by-product material";

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel," or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at anytime the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2. Exclusions of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

   2. **Exclusions**

      This insurance does not apply to:

      **Fungi Or Bacteria**

      a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

      b. Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

   This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

B. The following exclusion is added to Paragraph 2. Exclusions of **Section I – Coverage B – Personal And Advertising Injury Liability:**

   2. **Exclusions**

      This insurance does not apply to:

      **Fungi Or Bacteria**

      a. "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

      b. Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

C. The following definition is added to the **Definitions** Section:

   "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

Copyright, ISO Properties, Inc., 2003

**COMMERCIAL GENERAL LIABILITY**
**CG 21 70 01 08**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

> COMMERCIAL GENERAL LIABILITY COVERAGE PART
> LIQUOR LIABILITY COVERAGE PART
> OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
> POLLUTION LIABILITY COVERAGE PART
> PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
> RAILROAD PROTECTIVE LIABILITY COVERAGE PART
> UNDERGROUND STORAGE TANK POLICY

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

© ISO Properties, Inc., 2007

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LEAD EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL AUTO COVERAGE PART
BUSINESSOWNERS POLICY
CONTRACTORS POLICY
FARM COVERAGE PART
SCHOOL DISTRICT LIABILITY POLICY
COMMERCIAL UMBRELLA LIABILITY POLICY
BUSINESS PROVIDER POLICY
PROFESSIONAL LIABILITY POLICY
NATIONWIDE RURAL ELECTRIC COMMERCIAL ACCOUNT POLICY

This insurance does not apply to:

1. "Bodily Injury," "property damage," "personal injury," "advertising injury" or medical payments arising out of or relating to the exposure to lead or any claims from lead; including but not limited to the ingestion, inhalation or absorption of lead in any form.

2. Any loss, cost or expense rising out of any request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead; or

3. Any loss, cost or expenses arising out of any claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of lead.

For purposes of this endorsement, lead means lead and lead compounds in any form.

Cas. 4487 (6-93)

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

1. The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

2. "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system", or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

B. The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

1. A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

2. The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

3. A reinforced or unreinforced base coat;

4. A finish coat providing surface texture to which color may be added; and

5. Any flashing, caulking or sealant used with the system for any purpose.

CG 21 86 12 04 | Copyright, ISO Properties, Inc., 2003 | Page 1 of 1

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CHANGES – INSURING AGREEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Paragraph 1.b. under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** in **SECTION I – COVERAGES** is replaced by the following:

  b. This insurance applies to "bodily injury" and "property damage" only if:

    (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    (2) The "bodily injury" or "property damage" first "manifests" during the policy period.

    (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who is an Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

B. Paragraph 1.b. under **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** in **SECTION I – COVERAGES** is replaced by the following:

  b. This insurance applies to "Personal and Advertising Injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage

territory" and first "manifests" during the policy period.

C. The following definition is added to **SECTION V – DEFINITIONS**:

  "Manifests" means that the damage or injury is either:

    a. Discovered by the insured or some other person; or

    b. Reasonably should be discovered by the insured or some other person.

D. The following exclusion is added to paragraph 2., **Exclusions** of COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I – Coverages):

  This insurance does not apply to:

  "Bodily injury" and "property damage" which "manifests" prior to the inception of this policy or after termination of this policy.

E. The following exclusion is added to paragraph 2., **Exclusions** of COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY (Section I – Coverages):

  This insurance does not apply to:

  Prior Manifestation

    "Personal and Advertising injury" which "manifests" prior to the inception of this policy or after termination of this policy.

Cas. 6349 (5-04)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# SUBSIDENCE OF LAND - EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
CONTRACTORS POLICY

This policy does not apply to any claims arising out of:

"property damage" included within the "products completed operations hazard" when caused by, resulting from, contributed to or aggravated by the subsidence of land.

Subsidence shall mean earth movement, including but not limited to landslide, mud flow, earth sinking and earth rising or shifting.

Cas. 6351  (5-04)

# AMENDATORY ENDORSEMENT— ADDITIONAL POLICY CONDITION

It is agreed that the following condition is made a part of this policy:

If this policy and any other policy issued to you by us or any affiliated Company apply to the same occurrence, the total maximum amount payable under all policies, including limits of liability, general aggregate limit and products-completed operations aggregate limit, shall not exceed the highest applicable limits of liability, general aggregate limit or products-completed operations aggregate limit under any one policy. This condition does not apply to any policy issued by us or an affiliated Company specifically to apply as excess insurance over this policy.

Includes copyrighted material of Insurance Services Office, with its permission.  Copyright, Insurance Services Office, Inc., 1977, 1979

Cas. 2527-B  (7-94)

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1.  Insuring Agreement**

   **a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   **b.**  This insurance applies to "bodily injury" and "property damage" only if:

      **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

      **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   **c.**  "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   **d.**  "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

© ISO Properties, Inc., 2006

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

### f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with

respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

   (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

   (i) Any insured; or

   (ii) Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

   (i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

   (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

   (iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

© ISO Properties, Inc., 2006

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) the operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. **War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

j. **Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## 2. Exclusions

This insurance does not apply to:

### a. Knowing Violation Of Rights Of Another

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

### b. Material Published With Knowledge Of Falsity

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

### c. Material Published Prior To Policy Period

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

### d. Criminal Acts

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

### e. Contractual Liability

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

### f. Breach Of Contract

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

### g. Quality Or Performance Of Goods – Failure To Conform To Statements

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

### h. Wrong Description Of Prices

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

### i. Infringement Of Copyright, Patent, Trade-mark Or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

### j. Insureds In Media And Internet Type Businesses

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web-sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

### k. Electronic Chatrooms Or Bulletin Boards

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

### l. Unauthorized Use Of Another's Name Or Product

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

### m. Pollution

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

### n. Pollution-Related

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage **A**.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

   These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence"

are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

         (b) Conduct and control the defense of the indemnitee in such "suit".

   So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

   Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

**c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

**a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

**(1)** "Bodily injury" or "personal and advertising injury":

**(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

**(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

**(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

**(d)** Arising out of his or her providing or failing to provide professional health care services.

**(2)** "Property damage" to property:

**(a)** Owned, occupied or used by,

**(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

**(1)** With respect to liability arising out of the maintenance or use of that property; and

**(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage **C**;

   b. Damages under Coverage **A**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage **B**.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage **A**; and

   b. Medical expenses under Coverage **C**

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph **5.** above, the Medical Expense Limit is the most we will pay under Coverage **C** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

© ISO Properties, Inc., 2006

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

**a.** To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

**b.** To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when Paragraph **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph **c.** below.

**b. Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

**(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only.

At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific

market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**4.** "Coverage territory" means:

**a.** The United States of America (including its territories and possessions), Puerto Rico and Canada;

**b.** International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph **a.** above; or

**c.** All other parts of the world if the injury or damage arises out of:

**(1)** Goods or products made or sold by you in the territory described in Paragraph **a.** above;

**(2)** The activities of a person whose home is in the territory described in Paragraph **a.** above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph **a.** above or in a settlement we agree to.

**5.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

 © ISO Properties, Inc., 2006

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

   (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

   (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

    a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

    b. While it is in or on an aircraft, watercraft or "auto"; or

    c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

    but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    b. Vehicles maintained for use solely on or next to premises you own or rent;

    c. Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    **(1)** Power cranes, shovels, loaders, diggers or drills; or

    **(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    **(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    **(2)** Cherry pickers and similar devices used to raise or lower workers;

**f.** Vehicles not described in Paragraph **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    **(1)** Equipment designed primarily for:

        **(a)** Snow removal;

        **(b)** Road maintenance, but not construction or resurfacing; or

        **(c)** Street cleaning;

    **(2)** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    **(3)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**15.** "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    **(1)** Products that are still in your physical possession; or

    **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        **(a)** When all of the work called for in your contract has been completed.

        **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

    **(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by

the "loading or unloading" of that vehicle by any insured;

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials; or

**(3)** Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

**19.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**20.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the

scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

**(2)** The providing of or failure to provide warnings or instructions.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITS OF INSURANCE ENDORSEMENT

This endorsement modifies insurance provided by the Commercial General Liability Coverage Form.   Section III Limits of Insurance is amended by the addition of a subpart 1.d. as follows:

    1.d. Premises, operations or projects insured.

Cas. 3392 (8-87)

# ASBESTOS LIABILITY EXCLUSION

The following exclusion is added:

"This insurance does not apply to bodily injury, property damage, personal injury or advertising injury arising out of asbestos or goods containing asbestos or real property containing asbestos. This exclusion applies whether the bodily injury, property damage, personal injury or advertising injury is caused solely by asbestos or goods containing asbestos or real property containing asbestos, or is caused by other means in conjunction or separately with asbestos or goods containing asbestos or real property containing asbestos."

Cas. 3880 (8-97)

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF PERSONAL AND ADVERTISING INJURY LIABILITY EXCLUSIONS

This endorsement modifies insurance provided under the following:

  COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion i. under Paragraph 2., **Exclusions** of **Section I - Coverage B - Personal And Advertising Injury Liability** is replaced by the following:

2.  **Exclusions**

   This insurance does not apply to:

   i.  **Infringement Of Intellectual Property Rights**

      "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret, trade dress, trade name, service mark or other intellectual property rights.

      However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

COMMERCIAL GENERAL LIABILITY

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

**(1)** A person arising out of any:

    **(a)** Refusal to employ that person;

    **(b)** Termination of that person's employment; or

    **(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

© ISO Properties, Inc., 2006

CG000220170114:35

**COMMERCIAL GENERAL LIABILITY**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMENDMENT OF LIQUOR LIABILITY EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion c. of COVERAGE A (Section I) is replaced by the following:

**c.** "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you:

**(1)** Manufacture, sell or distribute alcoholic beverages;

**(2)** Serve or furnish alcoholic beverages for a charge whether or not such activity:

**(a)** Requires a license;

**(b)** Is for the purpose of financial gain or livelihood; or

**(3)** Serve or furnish alcoholic beverages without a charge, if a license is required for such activity.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION — YEAR 2000 COMPUTER-RELATED AND OTHER ELECTRONIC PROBLEMS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., **Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph 2., **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability**:

2.   **Exclusions**

This insurance does not apply to "bodily injury", "property damage", "personal injury" or "advertising injury" arising directly or indirectly out of:

a.   Any actual or alleged failure, malfunction or inadequacy of:

(1)  Any of the following, whether belonging to any insured or to others:

(a)  Computer hardware, including micro-processors;

(b)  Computer application software;

(c)  Computer operating systems and related software;

(d)  Computer networks;

(e)  Microprocessors (computer chips) not part of any computer system; or

(f)  Any other computerized or electronic equipment or components; or

(2)  Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph 2.a.(1) of this endorsement

due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

b.   Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph 2.a. of this endorsement.

Copyright, Insurance Services Office, Inc., 1997

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# AMENDMENT OF INSURED CONTRACT DEFINITION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph 9. of the **Definitions** Section is replaced by the following:

9.   "Insured contract" means:

   a.   A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b.   A sidetrack agreement;

   c.   Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d.   An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e.   An elevator maintenance agreement;

   f.   That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" is caused, in whole or in part, by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

   (1)   That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, under-pass or crossing;

   (2)   That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

      (a)   Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

      (b)   Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

   (3)   Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

CG 24 26 07 04          Copyright, ISO Properties, Inc., 2004          Page 1 of 1

POLICY NUMBER:

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

### SCHEDULE

| |
|---|
| **Terrorism Premium (Certified Acts) $   0** |
| **This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):   Not applicable** |
| |
| **Additional information, if any, concerning the terrorism premium:  Not applicable** |

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**C. Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

IL 09 85 01 08                    Copyright Insurance Services Office, Inc.

COMMERCIAL GENERAL LIABILITY

CG 00 22 2017 14 : 35

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion f. under Paragraph 2. **Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

f.  **Pollution**

(1) "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

(a) "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guest; or

(b) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

(i) At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

(ii) At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

CG 21 65 12 04    Copyright, ISO Properties, Inc., 2003    Page 1 of 1    □

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion l, of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

2. **Exclusions**

This insurance does not apply to:

l. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

CG 22 94 10 01                    Copyright, ISO Properties, Inc., 2000

# EXHIBIT 9

DOCUMENT 79

ELECTRONICALLY FILED
9/12/2011 10:53 AM
CV-2011-900187.00
CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
ANNE-MARIE ADAMS, CLERK

## IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA

ROBERT BARTON; and )
MINDY BARTON; )
)
    Plaintiffs, )    CIVIL ACTION NUMBER:
)
v. )    CV-2011-900187
)
STACEY ALLISTON DESIGN AND )
BUILDING, INC.; et al. )
)
    Defendants. )

## PLAINTIFFS ROBERT AND MINDY BARTON'S  ANSWERS TO DEFENDANT STACEY ALLISTON DESIGN AND BUILDING, INC.'S FIRST INTERROGATORIES

COME NOW Plaintiffs Robert Barton and Mindy Barton in the above-styled action and, with reservation of right to supplement and amend, respond to Defendant Stacey Alliston Design and Building, Inc.'s First Interrogatories as follows:

### GENERAL OBJECTIONS

Plaintiffs and their attorneys object to each and every Interrogatory on each and all of the following grounds:

1.    Plaintiffs' objections to Defendant's Interrogatories are made without waiver of, or prejudice to, any additional objections Plaintiffs may make.

2.    All such objections are hereby expressly preserved as is the right to move for a protective order.

3.    Plaintiffs reserve all objections as to the admissibility at trial of any information provided.

4.    The supplying of any information does not constitute an admission by Plaintiffs that

such information is relevant in this lawsuit. All information provided by Plaintiffs is for use in this litigation only and for no other purpose.

5.      Plaintiffs and their attorneys object to each and every Interrogatory to the extent that the information called for, if any, was obtained and prepared in anticipation of litigation or for trial and, Defendant has made no showing that it has substantial need for the materials in the preparation of its case and that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. Plaintiffs and their attorneys further object to each and every Interrogatory to the extent that the information called for, if any, is privileged and is not discoverable under Rule 26(b)(3), Alabama Rules of Civil Procedure, and *Hickman v. Taylor*, 329 U.S. 495 (1947).

6.      Plaintiffs and their attorneys object to each and every Interrogatory to the extent that the information called for, if any, is protected from discovery by the attorney/client privilege.

7.      Plaintiffs and their attorneys object to each and every Interrogatory to the extent that it seeks to vary the obligations imposed upon Plaintiffs under the Alabama Rules of Civil Procedure.

8.      Plaintiffs and their attorneys object to each and every Interrogatory to the extent that it seeks information that is equally available to Defendant and, the burden on Defendant to obtain the requested information is no greater than the burden on Plaintiffs.

9.      Plaintiffs and their attorneys object to each and every Interrogatory to the extent that it is overly broad, oppressive, unduly burdensome and expansive and beyond the permissible scope of discovery under the Alabama Rules of Civil Procedure.

10.     Plaintiffs and their attorneys object to each and every Interrogatory to the extent that it seeks an answer involving an opinion or contention that relates to fact or the application of law to fact before discovery has been completed or a pre-trial conference has been conducted.

11.     Plaintiffs and their attorneys object to Defendant's Interrogatories to the extent that

Defendant's Interrogatories exceed the requirements of Rule 33(a) of the Alabama Rules of Civil Procedure.

12.     Formal discovery has only just commenced in this civil action and, therefore, Plaintiffs reserves the right to supplement their responses to Defendant's Interrogatories upon completion of discovery.

## SPECIFIC OBJECTIONS AND RESPONSES

Without waiving the General Objections and specifically asserting each Specific Objection as to each and every Interrogatory propounded by Defendant, Plaintiffs and their attorneys further object as set forth below:

## INTERROGATORIES

1.     State the correct name, address, date of birth, and social security number for each Plaintiff.

**ANSWER:**     **On the advice of legal counsel, we object to this request on the grounds that it seeks information not relevant to the issues in this lawsuit, and is not reasonably calculated to lead to the discovery of admissible evidence. Without waiving said objection:**

**Robert Besalski Barton**          **Mindy Lee Barton**
**3949 Butler Springs Way**       **3949 Butler Springs Way**
**Hoover, Alabama 35226**         **Hoover, Alabama 35226**
**May 7, 1969**                        **August 14, 1971**

2.     State the specificity when you alleged the incident or incidents made the basis of this lawsuit occurred, including but not limited to the date(s) and approximate time(s) of each alleged incident(s).

**ANSWER:**     **We began to notice problems with the home within the first year. We contacted Stacey Alliston to correct the issues and on several occasions he assured us that the problems we observed with the home would be corrected. We worked with Mr. Alliston to correct the issues, however he later informed us that because of his financial situation he would unable to correct the problems we reported**

under the warranty.

3.      State the names, addresses, and telephone numbers of any and all contractors, subcontractors, engineers, architects, designers, inspectors, employees, independent contractors, and any other entity or individual who has performed work on the residence located at 3949 Butler Springs Way, Hoover, Alabama 35226, Jefferson County, Alabama at any time prior or subsequent to this lawsuit.

**ANSWER:**    **No work has been performed on the home since we moved in.**

4.      State the name and give the address and telephone number of each and every contractor, subcontractor, engineer, architect, designer, inspector, employee, independent contractor, and any other individual or entity who you allege was or were present when the damage(s) alleged in Plaintiffs' Complaint occurred, if any.

**ANSWER:**    **On the advice of legal counsel, we object to this request on the grounds that it seeks an expert opinion and/or legal conclusion for which we are not qualified to give. Further, the use of the word occurred is vague and ambiguous to the degree I cannot answer with any additional specificity without further explanation or to what the interrogatory is actually requesting.   Without waiving said objection: David Bennett of Crown Construction performed an inspection of the home and documented damage, however the damage has been ongoing and we are not aware at this time of other individuals who were present to observe the occurrence.**

5.      State the name, address, and telephone number of any individual or entity who or which has provided damage appraisals, repair estimates, or any other documentation showing or purporting to show damages plaintiffs allege to have sustained as a result of the incident(s) made the basis of plaintiffs' Complaint.

**ANSWER:**    **David Bennett**
**Crown Construction & Consulting, LLC**
**277 Pat Mell Road, Suite A**
**Marietta, Georgia 30060**
**(770) 333-8060**

Scott Holcombe
H & H Home Repair Service
(205) 296-9028

6.      Describe in detail how or why plaintiffs contend that this defendant acted negligently, which allegedly caused Plaintiffs to sustain damages.

**ANSWER:**   **On the advice of legal counsel, we object to this request on the grounds that it seeks a legal conclusion and/or expert opinion for which we are not qualified to give.  Without waiving said objection: In our lay opinion, we have suffered damages due to Defendant's inability to meet minimum building code requirements and/or Defendant's lack of adequate supervision of workers or subcontractors which allowed the home to be constructed in a substandard manner causing extensive damage throughout.**

7.      Have you had any conversations with any representatives of this defendant?  If so, for each conversation, please state:

        a.      the date, time and location of the conversation

        b.      the substance, in detail, of the conversation

        c.      the identity of the representative.

**ANSWER:**   **We both spoke with Defendant Stacey Alliston on numerous occasions.  We spoke with Mr. Alliston prior to the construction of the home to discuss the building of our home.  We spoke with Mr. Alliston on several occasions during the construction of the home to discuss certain aspects of the home and the progress.  We also spoke with Mr. Alliston after completion of the home to discuss the problems we were experiencing with the home.  Mr. Alliston stated that he would like to help us but was financially incapable.**

8.      Describe with specificity each and every element of damages plaintiffs claim to have sustained as a result of the incident(s) alleged in plaintiffs' Complaint.

**ANSWER:**   **On the advice of legal counsel, we object to this request on the grounds that it is overly broad and ambiguous, seeks an expert opinion and/or legal conclusion for which we are not qualified to give, cannot be reasonably calculated at this time as damages are ongoing.  Without waiving said objection: We are seeking damages to effectuate the ultimate repair, loss of value, opportunity costs, emotional distress, physical injury and any and all damages recoverable under the law.  Plaintiff will supplement this response prior to the trial of this matter.**

9.      Describe with specificity any measures taken by you or on your behalf, if any, to abate or mitigate any other damage(s) claimed by plaintiffs as a result of the incident(s) made the basis of this lawsuit.

**ANSWER:**      **We met with Defendant Alliston regarding the problems with the home in an attempt to get him to repair the problems.  When he informed us that he was financially unable to make the repairs the complaint was filed.  We have spoken to a contractor about doing work, however we have been unable to perform remedial work or mitigate the damages due to the filing of the complaint and third party complaint and the notice required to Defendants/Third-Party Defendants.  We are waiting for Third Party Defendants to inspect the home.**

10.      List with specificity those portions of the Alabama Code, municipal code, and any other statute, ordinance, rule, regulation or code, with which you contend this defendant failed to comply in regards to the claims you have brought against it, if any.

**ANSWER:**      **On the advice of legal counsel, we object to this request on the grounds that it seeks an expert opinion and/or legal conclusion for which we are not qualified to give.**

11.      State the name, address, and telephone number of each and every person or representative of any company whom you expect to call as a witness at the trial of this case.

**ANSWER:**      **We have not compiled a list of witnesses at this time, but will supplement this response in accordance with the Court's Scheduling Order.**

12.      State whether you expect to call any expert witnesses at the trial of this case,  and if so, state:

a.      the name and address of each such expert;

b.      the education, experience and qualifications of each such expert;

c.      the subject matter upon which each such expert is expected to testify;

d.      the substance of the facts and opinions to which the expert is expected to

testify; and

     e.     a summary of the grounds of each such opinion.

**ANSWER:**    **We have not designated testifying experts at this time, but will supplement this response in accordance with ARCP 26 and the Court's Scheduling Order. Without waiving said objection: See produced reports.**

13.    State whether Plaintiff has received payment from any other party, individual, company, insurer, or any other entity, whether or not named as a party to this litigation, due to the injuries or damages plaintiff claims to have sustained in the incident(s) made the basis of this lawsuit. If so, state:

     a.     the amount received;

     b.     from whom payment was received; and

     c.     whether you executed a release, settlement agreement, or any other document in return for payment.

**ANSWER:**   **a.**    **We received $780.32**
            **b.**    **The payment was received from our homeowners insurance, Allstate**
            **c.**    **We did not have to execute any release or agreement, as the payment was for painting. The majority of the claim was denied on the grounds that damages were the result of deficient construction.**

14.    State whether you have attended any meetings where a representative of this defendant was present. If so, for each meeting, please state:

     a.     the date, time and location of the meeting

     b.     the reason for the meeting

     c.     the substance, in detail, of any statements made by the representative of this defendant

     d.     the identity of the representative(s) present at the meeting(s).

**ANSWER:**    **We met with Stacey Alliston prior to the construction of the home to discuss the**

building of our home.  We met with Mr. Alliston on several occasions during the construction of the home to discuss certain aspects of the home and the progress.  We also met with Mr. Alliston after completion of the home to discuss the problems we were experiencing with the home.

15.     Have you ever filed an insurance claim for any injury or damages arising out of any occurrence prior to or subsequent to the accident made the basis of this suit (other than medical insurance claims)?  If so, describe any claims filed by you or on your behalf, gibing the date of the claim, nature of the claim, name and address of the insurance carrier, insurance policy number, claim number, name of your attorney (if applicable), and current disposition of claim.

**ANSWER:**     **We filed a claim with our Homeowner's Insurance, Allstate, however the majority of the claim was denied under the construction defect exclusion.  We received $780.32 from Allstate for the sole purpose of painting over water stains in our daughter's bedroom.  To the best of my memory, this is the only claim I have filed.**

16.     Have you ever filed suit for any injury or damages arising out of any occurrence prior to or subsequent to the accident made the basis of this suit; if so, describe any suits filed by you or on your behalf, giving the style, court, case number, name of your attorney (if applicable), and current disposition of each case.

**ANSWER:**     **No.**

17.     Identify the name and address of each doctor and other healthcare treatment provider by whom either plaintiff has been examined and/or treated for any of the injuries allegedly suffered in this case.

**ANSWER:**     **We have suffered damages however we have not sought medical treatment at this time.**

18.     Identify the name and address of any therapists, psychiatrists, psychologists, ministers or other counselors with whom either plaintiff has had an appointment, with whom plaintiffs have consulted, and with whom plaintiffs have received any treatment following the incident(s) alleged

in plaintiffs' Complaint.

**ANSWER:**    **No treatment has been sought at this time.**

     19.    State the name and address of each doctor, hospital or other healthcare provider by whom either Plaintiff has been treated during the five (5) years preceding the date of the incident(s) made the basis of this suit.  For each doctor, hospital or other healthcare provider, describe the condition or disease for which either plaintiff was treated or examined, and give the dates of each such treatment or examination.

**ANSWER:**    **On the advice of legal counsel, we object to this request on the grounds that it is overly broad seeks information not relevant to the issues in this lawsuit, and is not reasonably calculated to lead to the discovery of admissible evidence.**

Mindy Barton

Sworn to and Subscribed before me, a
Notary Public, by Plaintiff as being true
and correct, this 6th day of _Sept_, 2011.

My Commission Expires _9 /21 /12_

GEORGIA ELLARD RABY
Notary Public, State of Alabama
My Commission Expires 09/21/12

Robert Barton

Sworn to and Subscribed before me, a
Notary Public, by Plaintiff as being true
and correct, this 6th day of _Sept_, 2011.

My Commission Expires _9 /21 0/12_

GEORGIA ELLARD RABY
Notary Public, State of Alabama
My Commission Expires 09/21/12

s/David L. Horsley
David L. Horsley (HOR052)
Attorneys for Plaintiffs

**OF COUNSEL:**
COLLINS & HORSLEY, P.C.
2021 Morris Avenue, Suite 200
Birmingham, Alabama 35203
telephone: (205) 324-1834
facsimile: (205) 324-1846
E-mail:david@collinshorsley.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2011, I electronically filed the foregoing with the Clerk of the Court using the Alabama E-filing system which will send notification of such filing; and I hereby certify that any non-E-filing participants to whom the foregoing is due will have a copy of same placed in the United States mail, first class postage prepaid and properly addressed this same day.

Ralph D. Gaines, III, Esquire
James Alan Potts, II, Esquire
GAINES, WOLTER & KINNEY, P.C.
3500 Blue Lake Drive, Suite 425
Birmingham, Alabama 35243

C&P Construction, LLC
927 Highway 67
Calera, Alabama 35040

Oscar's Masonrys
41 Minnow Lane
Birmingham, Alabama 35143

s/David L. Horsley
OF COUNSEL

EXHIBIT 10

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - DAMAGE TO WORK PERFORMED BY SUBCONTRACTORS ON YOUR BEHALF

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion l, of **Section I - Coverage A - Bodily Injury And Property Damage Liability** is replaced by the following:

2. **Exclusions**

This insurance does not apply to:

l.  **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

CG 22 94 10 01                Copyright, ISO Properties, Inc., 2000

EXHIBIT 11

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.  The following exclusion is added to Paragraph 2.
Exclusions of **Section I – Coverage A – Bodily
Injury And Property Damage Liability:**

  **2.  Exclusions**

  This insurance does not apply to:

  **Fungi Or Bacteria**

  a.  "Bodily injury" or "property damage"
  which would not have occurred, in whole
  or in part, but for the actual, alleged or
  threatened inhalation of, ingestion of,
  contact with, exposure to, existence of, or
  presence of, any "fungi" or bacteria on or
  within a building or structure, including its
  contents, regardless of whether any other
  cause, event, material or product contrib-
  uted concurrently or in any sequence to
  such injury or damage.

  b.  Any loss, cost or expenses arising out of
  the abating, testing for, monitoring, clean-
  ing up, removing, containing, treating, de-
  toxifying, neutralizing, remediating or dis-
  posing of, or in any way responding to, or
  assessing the effects of, "fungi" or bacte-
  ria, by any insured or by any other person
  or entity.

  This exclusion does not apply to any "fungi" or
  bacteria that are, are on, or are contained in, a
  good or product intended for bodily consumption.

B.  The following exclusion is added to Paragraph 2.
Exclusions of **Section I – Coverage B – Per-
sonal And Advertising Injury Liability:**

  **2.  Exclusions**

  This insurance does not apply to:

  **Fungi Or Bacteria**

  a.  "Personal and advertising injury" which would
  not have taken place, in whole or in part, but
  for the actual, alleged or threatened inhala-
  tion of, ingestion of, contact with, exposure
  to, existence of, or presence of any "fungi" or
  bacteria on or within a building or structure,
  including its contents, regardless of whether
  any other cause, event, material or product
  contributed concurrently or in any sequence
  to such injury.

  b.  Any loss, cost or expense arising out of the
  abating, testing for, monitoring, cleaning up,
  removing, containing, treating, detoxifying,
  neutralizing, remediating or disposing of, or in
  any way responding to, or assessing the ef-
  fects of, "fungi" or bacteria, by any insured or
  by any other person or entity.

C.  The following definition is added to the **Defini-
tions** Section:

  "Fungi" means any type or form of fungus, including
  mold or mildew and any mycotoxins, spores, scents
  or byproducts produced or released by fungi.

              Copyright, ISO Properties, Inc., 2003                      ☐